UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA
-------------------------------------------------------------------------------x Docket No.:
STEVEN FLORIO, PATRICK COSTELLO, WILLIAM
MILLIOS, TIMOTHY MALLACH, SCOTT PLUMMER
ROGER KRAFT, JOEL BARISH, BRANDON R. HILL,
JAMES BELDON, JR., and ERNEST WILLMAN,

|                               |                          |
|-------------------------------|--------------------------|
| Plaintiffs,                   | COMPLAINT                |
|                               |                          |
| against                       | Plaintiffs Demand        |
|                               |  Trial By Jury           |

GALLAUDET UNIVERSITY, THE BOARD OF TRUSTEES
OF GALLAUDET UNIVERSITY, ROBERTA CORDANO,
and WP COMPANY LLC d/b/a THE WASHINGTON POST,

Defendant.
-------------------------------------------------------------------------------x

COME NOW the Plaintiffs Steven Florio, Patrick Costello, William Millios, Timothy

Mallach, Scott Plummer, Roger Kraft, Joel Barish, Brandon R. Hill, James Beldon, Jr., and

Ernest Willman, who by and through their counsel state their Complaint against the Defendants

Gallaudet University ("Gallaudet"), The Board of Trustees of Gallaudet University ("The

Gallaudet Board"), Roberta Cordano ("President Cordano") and WP Company LLC d/b/a The

Washington Post, ("The Post") as follows:

## INTRODUCTION

1.  In the aftermath of the tragic death of George Floyd on May 25, 2020 and in the midst

of the resulting Black Lives matter protests, the problem of systemic racism in America was

brought to the forefront of the American psyche. Many governments and their agencies, private

and public businesses, and organizations of all kinds including educational institutions and their

leaders were quick to engage in self assessment, recognize the problem of systemic racism

within, and then undertake to acknowledge and accept responsibility as the first step towards

confronting and addressing this serious problem.

2.  This was not the case, however, with Gallaudet University, the face of the Deaf community worldwide, and its President, Roberta Cordano.

3.  Prior to the death of George Floyd, numerous concerns associated with systemic racism at Gallaudet had been repeatedly brought to the attention of the Gallaudet Board of Trustees, as well as the President's office, by the Organization for Equity for Deaf Staff of Color (OEDSOC) and others, but these efforts did not result in any substantive resolutions.

4.  Indeed, even before President Cordano took Office as President of Gallaudet University on January 1, 2016, systemic racism was and had long been a persistent, pervasive and entrenched problem at all levels of Gallaudet University, such that in December 2, 2015, before she even took office then "President-Select" Cordano published a vlog on Gallaudet's web page expressing her awareness of the problem of systemic racism and assuring the Gallaudet community that battling such problem would be a priority when she took office.

5.  As the facts herein will demonstrate, President Cordano failed miserably in living up to that assurance.

6.  As Black Lives Matter protests over George Floyd's death and systemic racism were taking place in early June, 2020, President Cordano participated in a Town Hall meeting with Gallaudet's Student Body Government and the Black Student Union on or about June 5, 2020.

7.  At this meeting, President Cordano was confronted with the ongoing problem of inequity within the hiring process at Gallaudet University, a lack of training for officers of the Department of Public Safety, and a culture of racist and oppressive behavior at all levels of the University that had and has severely damaged the lives of Black Deaf students, faculty, and staff

2

and the fact that this behavior and the results had a ripple effect on Black Deaf adults and children world-wide.

8.   President Cordano would shortly thereafter and on or about June 9, 2020 claim that at such Town Hall meeting she " became aware of new information that led to renewed demands for change with Kappa Gamma, a fraternity with a long history at Gallaudet."

9.   Upon information and belief, if President Cordano did become aware on June 5, 2020 of "new information resulting in renewed demands for change with Kappa Gamma," such information and the subject of Kappa Gamma was only one of many issues of systemic racism brought up at that Town Hall Meeting of June 5. 2020 as identified in paragraph 7 of this Complaint.

10.   Having once again been confronted with the reality of this long standing and unresolved problem of systemic racism at all levels of Gallaudet University at the June 5, 2020 Town Hall meeting, just as she had been so confronted many times since becoming President of Gallaudet University, President Cordano found herself compelled to create an appearance of taking immediate action.

11.   In what can only be described as a failure of leadership of the highest magnitude, President Cordano chose not to acknowledge and accept responsibility for the systemic racism that had long existed and still existed at Gallaudet and which had gone unresolved under her tenure as President which began more than four and one-half years earlier on January 1, 2016.

12.   Instead, consistent with her failure of leadership, President Cordano sought to divert attention from her failings and the failings of the University she had been leading for the past four and a half years.

3

13.  On June 9, 2020, under pressure to create an appearance that she was taking prompt and meaningful action in the battle against systemic racism at all levels of Gallaudet University, President Cordano published a vlog on Gallaudet's You Tube page wherein she inexplicably announced that she was suspending Gallaudet's oldest on-campus fraternity, Kappa Gamma, saying of  Kappa Gamma and therefore its current and alumni members as well that "They have become the face of systemic racism at Gallaudet University."

14.  President Cordano lobbed this false, outrageous and defamatory allegation at Kappa Gamma and therefore its current and former members despite the fact that neither Kappa Gamma nor its past or then current activities were the cause or face of the systemic racism at all levels of Gallaudet University as detailed in paragraph 7 of this complaint, which systemic racism was the major issue complained of at the June 5, 2020 Town Hall meeting.

15.  The evidence of the foregoing facts regarding the Town Hall meeting of June 5, 2020 is reflected in an open letter to the Board of Trustees of Gallaudet University, dated June 16, 2020, by the National Black Deaf Advocates (NBDA).  Said letter accurately and eloquently characterized the offensive diversionary tactic of President Cordano saying:

> In response to this meeting, President Cordano inexplicably announced that she was suspending an on-campus fraternity, saying, "They have become the face of systemic racism in our community."  This was a deflection of the highest order.  It was a slap in the face to our Black Deaf students who bravely stepped up to address the injustices, oppression, and abuse that they have suffered. This failure to view systemic racism as an overarching priority for the University and to accept accountability demonstrates a lack of leadership, and moral conviction required from her role. It was not only a leadership failure - it was a failure of character. It was myopic, short-sighted, and displayed an incredible lack of social awareness and empathy to Black Deaf Community members, who are only demanding a safe and

4

inclusive space for everyone.

As the face of the Deaf community world-wide, the Gallaudet
University President has the power to shape public opinion. Her
words carry the weight of her office, and the weight of the history
of Gallaudet University. The President has fostered a hostile and
unsafe environment on campus and in our communities.

16. The effect of the false, outrageous and defamatory attack on Kappa Gamma and its
alumni members by this President of Gallaudet University, the face of the Deaf community
world-wide whose words carried the weight of her Office, the weight of the history of Gallaudet
University, and the power to shape public opinion, was fast, furious and widespread throughout
the Deaf community and the country, if not the world.

17. On June 12, 2020 the Washington Post published the story of Dr. Cordano's words
and actions online and in its printed newspaper, including the false and defamatory attack by
President Cordano against her University's oldest fraternity, adding some additional defamatory
statements of its own.

18. Within hours, if not minutes of the publication of President Cordano's attack on
Kappa Gamma, and the likewise defamatory Washington Post article, attacks on Kappa Gamma,
its members and its alumni members, including each plaintiff herein, flooded the internet, social
media, newspapers and television reports. Newspapers all over the country published and re-
published the Washington Past article or reported the contents of that Washington Post article.
Television news stations likewise published and reported the false and defamatory allegations
against Kappa Gamma.

19. On Facebook, a Deaf News video site known as "The Daily Moth" and hosted by a
Kappa Gamma alumnus, Alex Abenchuchan, reported on the June 9, 2020 speech of President

Cordano as well as her subsequent video announcements and actions, and the wide ranging reactions and effects thereof.

20.  From June 9, 2020 onward, and even more so on and after June 12, 2020, posts and vlogs were posted on Facebook by a multitude of members of the Deaf community naming individuals who were Kappa Gamma alumni, posting "wanted" style pictures of them, accusing them and their organizational affiliations of being racists and having engaged in Nazi, anti-Semitic and racist practices, listing their current employment and other affiliations, and demanding that they be discharged and terminated from their employment and that their businesses not be patronized.

21.  These posts brought about comments and tweets ridiculing and attacking these individuals, and spreading false rumors of wrongful or inappropriate behavior on their part, some as outrageous as claiming that alumni members of Kappa Gamma had maintained a "rape room" at the fraternity's on-campus home.

22.  The aforesaid false and libelous publications by President Cordano, Gallaudet University, and The Washington Post were followed by many Kappa Gamma alumni and, in particular, the plaintiffs herein, being subjected to suspensions of their employment, "investigations" and placement on administrative leave by their employers and/or affiliated organizations.

23.  Many individuals associated with Kappa Gamma, including the plaintiffs herein, then lost their jobs and suffered financial losses to their businesses.  Each of the plaintiffs herein and others suffered permanent damage to their hard earned, long standing good names and respected reputations within the Deaf Community and the wider world.

6

24.   For years prior to and since their graduations and departures from Gallaudet, these Gallaudet/Kappa Gamma members and alumni, and in particular the plaintiffs herein, were among the most prominent and accomplished members of the Gallaudet alumni and within the Deaf community.

25.   One of those most prominent Gallaudet/Kappa Gamma alumni was Dr. Robert Davila, the ninth President of Gallaudet University who, upon observing the results of the derogatory and defamatory treatment to which Kappa Gamma and its alumni members were subjected, stated as follows:   "I am angry that our frat, which has done so much good on the campus, is now the pariah on campus."

26.   While all male Presidents of Gallaudet University have been invited to become members of Kappa Gamma upon assuming the Presidency, Dr. Davila, notably of Hispanic heritage, was the only Gallaudet University President who was a member of Kappa Gamma as a student and as an alumnus.

27.   Dr. Davila has achieved many "firsts" in his life. He was the first Latino Gallaudet undergraduate alumnus to obtain an earned doctoral degree, the first deaf person elected president of the Convention of American Instructors of the Deaf (CAID), first deaf elected president of the Conference of Educational Administrators of Schools and Programs for the Deaf (CEASD), first deaf person elected president of the Council on Education of the Deaf, the first deaf CEO of the National Technical Institute for the Deaf (NTID), and he was the first deaf person in history to address an official session of the United Nations General Assembly when he was assigned to close out the United Nations Decade of Disabled Persons in 1992.

28.   Other accomplishments of this prominent member of Kappa Gamma are these

"firsts": First minority student to enroll at Gallaudet University in 1948, the university's 84th year; First deaf person appointed by the President of the United States to a policy position in government where he managed a budget of almost six billion and supervised over 750 employees; First Gallaudet graduate promoted to Vice President and second to serve as President; First deaf person appointed Director of the Kendall School; First deaf person to serve as Headmaster of the New York School for the Deaf and first appointed to the school's board of trustees; First deaf person and first foreigner to be elected a member of La Asociacion de Educadores de Sordos de Espana; Commencement speaker at Hunter College, Syracuse University School of Education, Lamar University and California State University at Fresno; First deaf person elected to the Hunter College Hall of Fame.

29.  Years before President Cordano, a deaf woman, assumed the presidency of Gallaudet University, the road was paved for her and other deaf educators and administrators to attain such respected offices.  That road was paved in 1988 by student protestors led by then Kappa Gamma members, now Kappa Gamma alumni,  who brought about the "Deaf President Now" movement at Gallaudet University, bringing an end to the despicable long time practice of audism by Gallaudet officials and then Gallaudet Board members who would not appoint qualified deaf educators and administrators to the Presidency of Gallaudet University.

30.  With the success of the "Deaf President Now" protests which resulted in the appointment of Dr. I King Jordan as the first Deaf President of Gallaudet University, every subsequent President of Gallaudet University has been a Deaf individual.

31.  At the time that President Cordano and The Washington Post published their defamatory statements against Kappa Gamma, its members and alumni, two Kappa Gamma

8

alumni were members of Gallaudet's Board of Trustees; one of the two was actually then the President of the Board of Trustees.

32.  So too, at the time President Cordano unleashed her attack on Kappa Gamma and its current and former members, including her own father who had been a member of Kappa Gamma during his lifetime, numerous Kappa Gamma alumni were superintendents and other high ranking administrators at numerous Schools for the Deaf throughout the United States. Others had attained high level appointment in government agencies and others had established and/or headed businesses serving both Deaf and hearing communities.  Still others had established and/or headed non-profits serving the Deaf and other communities.

33.  For many of these individuals, and for the plaintiffs herein in particular, the defamatory publications made by President Cordano and The Washington Post on and after June 9, 2020, brought about their downfall.

34.  In blatant disregard of the harm that they had done, President Cordano, Gallaudet University, and The Washington Post denied repeated requests for retraction of their respective defamatory statements.

35.  So too,  in what can only be regarded as the height of arrogance, The Board of Trustees of Gallaudet University then awarded President Cordano a five year renewal of her contract of employment as President of  Gallaudet University.

36.  This action is brought by the within plaintiffs who seek justice and an award of monetary damages as compensation for the wrongs done to them and the harms they have suffered at the hands of the defendants.

PARTIES

37.  Plaintiff Steven Florio is a resident of Franklin, Norfolk County, Massachusetts.

38.  Plaintiff Patrick Costello is a resident of Upton, Worcester County, Massachusetts.

39.  Plaintiff William Millios is a resident of Montpelier, Washington County, Vermont..

40.  Plaintiff Timothy Mallach is a resident of Coquitlam, British Columbia, Canada.

41.  Plaintiff Scott Plummer is a resident of Paola, Miami County, Kansas.

42.  Plaintiff Roger Kraft is a resident of Fishers, Hamilton County, Indiana.

43.  Plaintiff Joel Barish is a resident of Buda, Hays County, Texas.

44.  Plaintiff Brandon R. Hill is a resident of Eagle Mountain, Utah County, Utah.

45.  Plaintiff James Beldon, Jr., is a resident of  Frederick, Frederick County, Maryland.

46.  Plaintiff Ernest Willman is a resident of Hyattsville, Prince George's County, Maryland.

47.  Each of the individual Plaintiffs herein have been members of Kappa Gamma Fraternity during part or all of their time as students of Gallaudet University.

48.  Each of the Plaintiffs herein are or have been affiliated with and/or members of Kappa Gamma International, the organization of Kappa Gamma alumni, subsequent to their graduation from Gallaudet University.

49.  Within the Gallaudet Community and within the wider Deaf community, Gallaudet alumni who were previously members of Kappa Gamma fraternity in their student days are recognized by their affiliation and association with Kappa Gamma and are referred to as being "Kappa Gamma," such as "John Doe is Kappa Gamma."

50.  Defendant Gallaudet University is a federally charted private university for the

education of the deaf and hard of hearing founded in 1864 at the District of Columbia with a principal place of business at Washington, D.C.

51. The Board of Trustees of Gallaudet University is the governing body of Gallaudet University with a principal place of business at Washington, D.C.

52. Roberta Cordano is now and was at all relevant times herein employed as the President of Gallaudet University and resides on the University campus at Washington, D.C.

53. WP Company LLC d/b/a The Washington Post is a foreign corporation organized under the laws of the State of Delaware with a principal place of business at Washington, D.C.

54. WP Company LLC d/b/a The Washington Post is a foreign limited liability company organized under the laws of the State of Delaware with a principal place of business at Washington, D.C.

55. The Post publishes nationwide and worldwide a daily and weekly newspaper known as "The Washington Post," both as a printed publication and an online publication of the internet.

JURISDICTION AND VENUE

56. Pursuant to 28 U.S.C. 1332( c) "a corporation shall be deemed a citizen of any State by which it has been incorporated and of the State where it has its principal place of business."

57. There is complete diversity of citizenship between all of the Plaintiffs and the Defendants Gallaudet University, The Board of Trustees of Gallaudet University, and Roberta Cordano.

58. There is complete diversity of citizenship between all of the Plaintiffs and the Defendant WP Company LLC d/b/a The Washington Post.

59. The amount in controversy for each Plaintiff individually exceeds Seventy Five

Thousand  Dollars ($75,000.00) exclusive of interest, costs and attorneys fees, as required to

sustain subject matter jurisdiction in this Court.

60.  This Court has subject matter jurisdiction of this action pursuant to 28 USC 1332(a).

61.  Venue is proper in this district pursuant to 28 U.S.C. 1391(b) because each of the

defendants are present and/or reside in this District and are subject to personal jurisdiction in this

District and a substantial part of the events giving rise to the claims asserted herein occurred in

this District.

FACTS COMMON TO ALL CLAIMS

(1) RELEVANT HISTORY OF GALLAUDET AND ITS RACISM PROBLEMS

62.  Gallaudet University, previously Gallaudet College, was founded in 1864, its

enabling legislation having been signed by President Lincoln on April 8, 1864.

63.  Prior to receiving its charter on April 8, 1864, what later became Gallaudet College

and thereafter Gallaudet University was a then a grammar school established in 1857 and named

Columbia Institution for the Instruction of the Deaf and Dumb and the Blind, subsequently

changed to Columbia Institution for the Instruction of the Deaf and Dumb.  That would continue

to be the corporate name until 1911 when the corporate name was changed to the Columbia

Institution for the Deaf.

64.  With receipt of its 1864 charter authorizing it to grant and confirm college degrees

the Columbia Institution for the Instruction of the Deaf and Dumb established a Collegiate

Department named the National College for the Deaf and Dumb which name was used from

1864 to 1865.

65.  From 1865 to 1894 the Collegiate Department was re-named the National Deaf Mute

12

College.

66.  In 1894 the Collegiate Department was re-named Gallaudet College,

67.  In 1911 the corporate name of the entire institution was changed from Columbia Institution for the Instruction of the Deaf and Dumb to Columbia Institution for the Deaf.

68.  In 1954 the corporate name of the entire institution was changed from Columbia Institution for the Deaf to Gallaudet College.

69.  In 1986 Gallaudet College became Gallaudet University.

70.  While the use of names and terminology in reference to deaf individuals and the deaf community such as "Columbia Institution for the Instruction of the Deaf and Dumb and the Blind," "Columbia Institution for the Instruction of the Deaf and Dumb," "National College for the Deaf and Dumb," and "National Deaf Mute College" may have been acceptable during the late 1800s and early 1900s, terminology such as "Deaf and Dumb" and "Deaf Mute" have since been recognized as being offensive to and derogatory of Deaf individuals and the Deaf community and with such recognition, such terminology, at least among enlightened individuals, has been abandoned.

71.  Despite its history of names referring to the Deaf as "Deaf and Dumb" and "Deaf Mute" in its charter and in its corporate name and in identifying its schools and organization, Gallaudet University has never found it necessary or appropriate to recognize and acknowledge the wrongfulness of its past use of such terminology.

72.  To this day and during the tenure of President Cordano, Gallaudet's "History and Traditions Page" expressly publicizes its past use of such offensive terminology with a "What's In A Name" section. (See

13

https://www.gallaudet.edu/about/history-and-traditions/whats-in-a-name).

73.  Such "What's In A Name" page does not even acknowledge that its past use of such terminology is no longer acceptable and it is in fact offensive to and derogatory of the Deaf community it exists to serve.

74.  Indeed, Gallaudet University continues to celebrate April 8th as "Charter Day" and on April 8, 2014 held a 150th anniversary celebration named "Charter Day Festival of Learning" to commemorate its charter which created the National College for the Deaf and Dumb as part of the  Columbia Institution for the Instruction of the Deaf and Dumb.

75.  Presumably Dr. Cordano and Gallaudet University and the Gallaudet Board feel it is proper to celebrate the heritage of Gallaudet's past when the individuals it was established to serve were referred to as "Deaf and Dumb" and "Deaf Mutes" and they see no need to apologize for that past or make amends for that past because they perceive that such terminology was acceptable in those times notwithstanding that such terminology is no longer acceptable today.

76.  Gallaudet University graduated its first Black Deaf student in 1954, the same year that the US Supreme Court issued its landmark decision in *Brown v Board of Education of Topeka,* 347 U.S. 483.

77.  Notwithstanding that it finally opened its doors to Black Deaf students in 1950, Gallaudet has continued to be  plagued with systemic racism issues since that time and continuing to the present day.

78.  In 1989, thirty nine years after it finally opened its doors to its first Black Deaf Student, Gallaudet University had only 150 Black students on campus.

79.  Gallaudet's  more recent history, during the past 10 years, is demonstrative of the

unresolved and growing problem of systemic racism at all levels of Gallaudet University.

80. On February 28, 2011, Gallaudet University appointed Dr. Angela McCaskill, the first Deaf Black woman to earn a Ph.D from Gallaudet University to be Gallaudet's first Chief Diversity Officer.

81. By August 1, 2013 Gallaudet University demoted Dr. McCaskill, moving her to a faculty position and leaving the Chief Diversity Officer position vacant between Fall 2013 and July, 2017, one and a half years into President Cordano's first term as President, notwithstanding her assurance at the start of her tenure that she would make the filling of that position a priority.

82. On December 2, 2015 then "President-Select" Roberta Cordano published a video message to the Gallaudet community wherein she spoke of a then recent Black Student Union Town Hall meeting wherein Black students told of experiences with racism, sexism, classism, audism, ableism, homophobia and belief based discrimination. In that vlog she stated as follows: "As we come together to work and listen to each other's stories, we will end racism and systemic discrimination."

83. On June 9, 2020, President Cordano, chose not to "come together to work and listen" as the means of ending systemic racism at Gallaudet University. Instead she chose to divert attention from the true issues and causes of systemic racism; she chose to divide the Gallaudet Community, its students and alumni and the Deaf Community throughout the country by defaming the University's oldest fraternity and its alumni members, making them the scapegoat for her own failings..

84. On December 4, 2015, Heather Harker, then President of the University's Board of Trustees and now Chief of Staff to President Cordano published a vlog wherein she stated that

15

racism was one of Gallaudet University's biggest problems.  In doing so, she did not state or suggest that Kappa Gamma and/or its alumni members were the cause or face of systemic racism at Gallaudet University.

85.  On December 17, 2015, Gallaudet's students of color presented a vlog called "Are We Done?" which was an open request to the University President and the Board of Trustees to develop a plan of action to end racism at Gallaudet University.

86.  On January 29, 2016 President Cordano and the students presented a second vlog wherein they detailed Gallaudet's commitment to addressing racism on campus.  In doing so, they did not state or suggest that Kappa Gamma and/or its alumni members were the cause or face of systemic racism at Gallaudet University.

87.  On May 11, 2016 President Cordano presented yet another vlog in which she stressed that the issues of racism and all other "isms" which had been prevalent since before her arrival at Gallaudet were very important to her and she stated "I am fully committed to working with you to build a more supportive climate for all members of the Gallaudet community."

88.  On June 9, 2020 President Cordano ignored her stated commitment of May 11, 2016 and by falsely and wrongfully defaming Kappa Gamma and thereby its current and alumni members as the face of racism at Gallaudet University, she created a dangerous and harmful climate at Gallaudet University and throughout the country for Kappa Gamma student members and alumni, including the plaintiffs herein.

89.  On November 17, 2016 President Cordano presented yet another vlog in which she shared Gallaudet's priorities with members of the campus community, identifying said priorities as bilingualism; campus climate, diversity, equity and inclusion; student success; institutional

leadership and strategic planning; academic vitality and strategic positioning; and strengthening and diversifying revenue streams.  In discussing the priorities of campus climate, diversity, equity and inclusion she did not state or suggest that Kappa Gamma or its current and/or alumni members were causes of the problems for which those priorities were being established.

90.   During the period from September 26, 2017 through December 28, 2018, President Cordano found herself facing numerous objections in her attempts to appoint a Vice President of Student Affairs and Community Engagement when her first choice, a white male, was met with opposition from students and others with concerns about Diversity and Inclusion; none of those concerns were brought about by any conduct on the part of  Kappa Gamma or its alumni members.  Said opposition included a student led march joined in by faculty, staff, alumni and community members. This pressure caused President Cordano to put the position on hold.

91.   In announcing that she was putting the position on hold, President Cordano expressed her perception that the march was about creating a Gallaudet University where everyone belongs and feels safe.  No suggestion was made that this need to create a safe place was brought about by any acts of Kappa Gamma, Kappa Gamma International or its alumni members.

92.   Pressure on Dr. Cordano increased when a Black Deaf female candidate for the aforesaid Vice President position who had been one of the finalists for the position of President of Gallaudet University when President Cordano was chosen, was interviewed and screened out. This resulted in a letter of concern being sent to President Cordano by a group of students.  This letter was not the result of any conduct on the part of Kappa Gamma or its alumni members.

93.   On May 10, 2019 President Cordano was faced once again with concerns about race, diversity and inclusion when her choice for the University's 2019 Commencement Speaker met

with opposition by minority students and others.  These concerns were not caused by any actions

of Kappa Gamma or its alumni members.  Notwithstanding the expressed concerns, President

Cordano continued with the invitation to her chosen speaker.

94.  On June 14, 2020, a vlog was presented by Sheryl Emery addressing Gallaudet

University's handling of Black Lives Matter, and asking the question "Do Black Deaf Lives

Matter at Gallaudet and other Deaf Services Programs?"

95.  According to a Washington Post article dated October 20, 2020 a Black female

Gallaudet Board member who resigned in May, 2020 just prior to the protests of violence against

Black people erupted in the streets, stated  that university leadership "continually skirted around

undertaking the uncomfortable conversations, as well as bold and decisive actions necessary to

dismantle the pervasive structural and systemic racism that is so deeply entrenched in this

156-year-old institution."

96.  In that same article it was also reported that current and former Board members of

Gallaudet said that the issues of racism at Gallaudet are reflected in the school's leadership,

where people of color are under-represented.

97.  In that same article, it was further reported that a Black student, a junior at Gallaudet,

stated "There's not enough support for Black students, I'm from Mississippi. I came all the way

to D.C. to take up classes. When I do take up classes, I feel discrimination."

98.  According to that same Washington Post article, President Cordano, who just four

months earlier had destroyed the reputations of so many Kappa Gamma alumni, and in particular

the plaintiffs herein, and caused them to sustain substantial financial losses with her false and

defamatory claim against Kappa Gamma and therefore its alumni members to the effect that

18

"They have become the face of systemic racism at Gallaudet University." now admitted that "Our anti-racism commitment comes with full acknowledgment of where we have fallen short.  Our focus on equity, belonging and anti-racism is now a collective commitment."

99.   The foregoing facts establish that as of June 9, 2020 the problem of racism at Gallaudet University was the result of an already entrenched practice of systemic racism at all levels and that President Cordano had failed miserably in dealing with and bringing about even a partial resolution of the problem in the four and one-half years since she took office.

100.   The foregoing facts establish that as of June 9, 2020, systemic racism had been so deeply entrenched at all levels of Gallaudet University, that there was no possibility that Kappa Gamma, its members and alumni could possibly be or have been the face of systemic racism at Gallaudet University.

FACTS COMMON TO ALL CLAIMS

(2) RELEVANT HISTORY OF KAPPA GAMMA AND ITS TRADITIONS

101.   In its history and during the time plaintiffs herein were student members Kappa Gamma had traditions which included the use of a salute and the use of robes, traditions not unusual among fraternities nationwide.

102.   For a salute Kappa Gamma adopted the Bellamy Salute in 1901 and continued its use until, by its own volition, it ceased using such salute in 1992/93.

103.   With respect to its use of robes, Kappa Gamma was introduced to the use of robes in 1904 and continued such use until 2015 when Gallaudet banned the use of robes in public spaces by all Greek organizations.  There was no prohibition against using robes in private spaces.

19

104.  The Bellamy salute was designated by Francis Bellamy, the author of the American Pledge of Allegiance and was utilized throughout the country in conjunction with the recitation of the Pledge of Allegiance commencing in 1892.

105.  The Bellamy salute was adopted and practiced by Kappa Gamma Fraternity as its' traditional salute commencing in 1901.

106.  During the 1920s and 1930s Italian Fascist and German Nazis adopted a salute popularly believed to have been used in ancient Rome.  That salute, while having some similarities in appearance to the Bellamy salute, was not the same salute as the Bellamy salute.

107.  The United States continued utilizing the Bellamy salute in conjunction with the Pledge of Allegiance throughout the 1920s and 1930s and early 1940s.

108.  It was not until December 22, 1942 that the United States Congress amended the Flag Code and replaced the Bellamy salute with the hand over heart salute.

109.  The daughters of the American Revolution and United States Flag Association opposed the change in the American use of the Bellamy salute on the grounds that it was inappropriate for Americans to have to change their traditional salute because foreigners had subsequently adopted a salute with similarities to the Bellamy salute.

110.  In amending the US Flag Code to replace the Bellamy salute with the hand over heart salute, Congress did not discuss or take into account the controversy over the use of the salute, nor did Congress declare the Bellamy salute should never again be used by any American.

111.  Further, Congress did not declare continued use of the Bellamy salute to be inappropriate or unpatriotic or a symbol of Nazism and did not ban the use of the salute in America.

112.  Under those circumstances, Kappa Gamma continued to use the Bellamy salute as its traditional salute throughout most of the twentieth century and it did so during that time without objection or criticism from the Gallaudet administration.

113.  At times the use of the Bellamy salute  was done in the presence of Gallaudet University Presidents who acknowledged and acquiesced in its use.  All but one now former President of Gallaudet University were members of Kappa Gamma either as Gallaudet students or as invited members, and used the salute themselves.

114.  Kappa Gamma, of its own volition, decided to discontinue the use of the Bellamy salute in 1992/93.  If it was thereafter used at all, it was used in private only.  That decision is wholly inconsistent with the organization being a racist organization, much less the face of racism.

115.  With respect to robes utilized by Kappa Gamma, the idea of robes was first introduced to the Fraternity in 1904, upon the suggestion of Dr. Percival Hall, who later became President of Gallaudet. Over the years, there have been various modifications made to the robes with the addition of trims and patches.

116.  These robes were worn by Kappa Gamma members during "state occasions", including the annual fall visit to House One, to honor the University President as they welcomed the student body back to campus for another academic year.

117.  Regalia such as robes, hoods, and unique to Gallaudet, the Mace, represented prestige and achievement - at both Gallaudet and other academic institutions.

118.  Emulating the University leaders, robes and similar regalia were also worn by members of other Greek organizations on the Gallaudet campus for their own events. The various

21

regalia used throughout the institution by other individuals and organizations on campus were celebrated and proudly memorialized annually in the University yearbooks and student papers.

119.  The students, faculty, staff and administration at Gallaudet were all very much aware of the use of these robes and other regalia; their use was no secret.

120.  These robes were worn by all brothers of Kappa Gamma and other Greek organizations at Gallaudet every year and without objection until 2014 when the Gallaudet Student Body Government reported concerns expressed by students about the robes and it was recognized that the formerly positive perspective on campus had evolved as more individuals voiced concerns that specific elements of the regalia could be viewed as similar to those used by white supremacist organizations, despite having different intents and purposes.

121.  In 2014 when the Student Body Government informed the Gallaudet administration of  a number of concerns of which it had been made aware as aforesaid, no mention  of concerns about the Bellamy salute were made in the SBG report, its use having been discontinued by Kappa Gamma well prior to that time.

122.  The Student Body Government report of 2014 resulted in an announcement of July 15, 2015 by the then Dean of Student Affairs, A. Dwight Benedict. That written announcement was issued to the Greek Presidents' Council and was entitled "Greek Life at Gallaudet University."

123.  Among the policies and restrictions set forth in that written announcement was a provision that stated as follows:

> **The use of robes and other similar regalia during marches and other public events on and off campus is permanently banned.**  This ban extends to all Greek

> Organization publications, promotions, and advertisement,
> including, but not limited to, member pictures, composites,
> websites, event banners, flyers, e-mail messages and
> alumni functions. (Emphasis supplied.)

124.  At the end of the third paragraph and beginning of the fourth paragraph of the July

15, 2015 announcement, Dean Benedict stated:

> As institutions of higher education have evolved over
> time, such as Gallaudet University, the expectations and
> standards of conduct for Greek life have changed as well.
> **Conduct that was tolerated decades ago, is no longer
> acceptable**. (Emphasis supplied.)

125.  Nowhere in said July 15, 2015 announcement was any reference made of the use by

Kappa Gamma of the Bellamy salute, which had already long been voluntarily discontinued

without any ban.

126.  In July 2015, when Gallaudet University, as part of its aforesaid new Greek Life

policy, banned the use of all student organization regalia, including robes, in public spaces.

Kappa Gamma accepted and respected that ban and had continued to do so to June 9, 2020 and

beyond..

127.  President Cordano became president of Gallaudet University on January 1, 2016,

less than 6 months after the July 15, 2015 policy was announced and at which time said policy

still remained in effect, and remained in effect to June 9, 2020 and beyond.

128.  On October 27, 2016 there appeared in a Gallaudet newspaper, "The Buff and Blue"

an article entitled "The re-emergence of the Bellamy Salute" authored by Gabrielle Humlicek.  In

said article Ms. Humlicek reported that **a photograph taken "25 years ago" was tweeted and

re-tweeted**. She further reported that **the photo consisted of Kappa Gamma brothers**, with

23

shaded circles blotting out their faces, **doing a Bellamy Salute**. . ." (Emphasis supplied).

129.  In said article Ms. Humlicek further reported as follows: **"From time to time, the photo of those Kappa Gamma brothers doing the Bellamy Salute re-emerges and circulates across the internet, like this recent incident."** (Emphasis supplied)

130.  Ms. Humlicek further reported that in response to said article, Kappa Gamma made a Facebook post to address the circulated photo on September 26, 2016. She reported as follows: **"The gestures shown are denounced, not practiced, nor accepted in any form by any recent or current administration. These pictures go against our present-day standards of conduct for our members, pledges, and alumni," the Kappa Gamma fraternity replied, dispelling any doubts.** (Emphasis supplied.).

FACTS COMMON TO ALL CLAIMS

(3) THE FALSE AND DEFAMATORY STATEMENTS OF CORDANO AND GALLAUDET

131.  Upon information and belief, the aforesaid 30/31 year old photo of Kappa Gamma members using the Bellamy salute, in the public domain and not within the control of Kappa Gamma members or alumni nor Kappa Gamma International, re-emerged on social media once again in May or June, 2020 and prior to June 9, 2020..

132.  On June 9, 2020, President Cordano published a vlog on the Gallaudet University You Tube and elsewhere wherein she spoke in American Sign Language (ASL) with a transcript of that announcement in English.  In that video announcement President Cordano made this statement: **"Kappa Gamma, pictures distributed to media of their use of robes with hoods and of their salute, they have become the face of systemic racism."**  This behavior is unacceptable."  (Emphasis supplied.) President Cordano then went on to announce the

24

suspension of Kappa Gamma.

133.  In the transcript of the video message of June 9, 2020 which reads slightly different from the ASL version, President Cordano stated with respect to Kappa Gamma: **"They have become the face of systemic racism in our community, with photographs of the salute and use of robes being shared on social media.**  This behavior is unacceptable."  (Emphasis supplied.) President Cordano then went on to announce the suspension of Kappa Gamma.

134.  The photo of then Kappa Gamma members using the salute which President Cordano referred to on June 9 was, according to that statement, clearly the now 30/31 year old photograph described by Ms. Humlicek in October, 2016, except that the faces of the individuals in the picture were no longer blotted out.

135.  The individuals in the picture were not wearing robes or anything that appeared to be like robes; they were wearing shirts and jeans and sitting on a lawn.

136.  As Ms. Humlicek reported in 2016, that photograph had a tendency to re-emerge over the years and circulate across the internet thereby establishing that such re-emergence was beyond the control of the members of Kappa Gamma.

137.  Despite what she said on June 9, 2020 Dr. Cordano would soon thereafter claim that **'They were not suspended because of old photos'** thereby constituting a representation by her that the photo or photos to which she referred in her June 9, 2020 vlog were new photos.

138.  Moreover, President Cordano would also subsequently state that  **"Recent photos posted on social media showed the group in the outfits again"** making no mention of any recent photo of Kappa Gamma members using the salute, thereby establishing the falsity of her claim in her June 9, 2020 vlog that Kappa Gamma had become the face of systemic racism at

Gallaudet **"with photographs of the salute and use of robes being shared on social media."**

139.  Between June 9, 2020 and July 16, 2020 inclusive, Gallaudet University's President Cordano made the following false statements which individually and in context with each other were defamatory in that they asserted that Kappa Gamma and its then current and alumni members were racist, that they were the face of racism in the Gallaudet Community, that the Bellamy salute which they had once used and whose history establishes it was not racist was racist, that the robes they used, as did other fraternities on campus and at colleges and universities throughout the country, were racist, that Kappa Gamma had violated a 2015 University policy against the use of robes in public, that they did in fact resume use of the robes in public, that they had an intention to resume the use of robes, and that they had a plan to resume the use of robes and made such intentions and plans public causing distress on the Gallaudet campus.  Said statements were as follows;

a) On June 9, 2020 (vlog and transcript)  **"Over the past few days, with the SBG/BSU Town Hall last Friday, we became aware of new information that led to renewed demands for change with Kappa Gamma"**

b) On June 9 , 2020 (vlog):  **"Kappa Gamma, pictures distributed to media of their use of robes with hoods and of their salute, they have become the face of systemic racism.**

c) On June 9, 2020 (transcript):  **"They have become the face of systemic racism in our community, with photographs of the salute and use of robes being shared on social media.**

d) June 12, 2020 WAPO article quote:  ***"Recent photos* posted on social media**

showed *the group in the outfits again*"

e)  June 12, 2020 WAPO article quote: "***the return of the fraternity's* robes reignited demands for change within an organization that has previously been accused of anti-Semitism and racism.**"

f) July 16, 2020 (vlog and transcript):  **"In early June 2020, new evidence emerged about the Kappa Gamma student chapter's *intention to bring back the use of robes in their meetings and ceremonies and this information became public*"** and "**This prompted an immediate investigation that concluded the Kappa Gamma chapter violated the 2015 policy.**"

g)  July 16, 2020 (vlog and transcript): **"They were not suspended because of old photos**."

h) July 16, 2020 (vlog and transcript): **"Kappa Gamma alone is not responsible for systemic racism."**

I)  July 16, 2020 (vlog and transcript): **Kappa Gamma used robes and a salute that is racist**.

j) July 16, 2020 (vlog and transcript):  **"The *publicly disclosed plans to reintroduce the use of robes* shone a spotlight on Kappa Gamma and they had become a face of the systemic racism that exists throughout the fabric of our racist society.**"

k)  July 16, 2020 (vlog and transcript):  **I will make it clear, *Kappa Gamma is not the sole culprit nor the face of systemic racism alone at Gallaudet but became a face due to the re-emergence of the use of their robes* at the same time as our national Black Lives Matter response to the brutal death of George Floyd and pictures of the racist rituals being**

27

circulated in social media.

l) July 16, 2020 (vlog and transcript): **It is up to Kappa Gamma to become anti-racist and join our broader community and Gallaudet in dismantling systemic racism.**

140. The aforesaid defamatory and false statements contained in paragraph 139 and identified as (a) through (g) and (I) through (j) and (l) were intended to be and were understood to be statements of fact and not opinion, particularly when viewed in light of the context and totality of the statements and the effects they had on the plaintiffs, their employers, their businesses, their families, their customers, their associates and friends and co-workers.

141. The aforesaid statements (a) through (g) and (I) through (j) and (l) were not privileged, nor could they be because they were false and made with reckless disregard for the truth.

142. Evidence of the falsity of President Cordano's defamatory statements regarding Kappa Gamma and misconduct on its part are reflected in her numerous evolving and conflicting statements from June 9, 2020 through July 16, 2020 as set hereinbefore set forth .

143. As the aforesaid quoted statements demonstrate, an accusation that began with **"Members were identified wearing prohibited ceremonial robes that resemble Ku Klux Klan garb"** eventually shifted to an accusation that **"Recent photos posted on social media showed the group in the outfits again,"** which accusation then morphed into a lesser accusation of intent as opposed to an act that **"In early June 2020, new evidence emerged about the Kappa Gamma student chapter's <u>intention to bring back</u> the use of robes in their meetings and ceremonies and this information became public"** which accusation then morphed into an even lesser accusation that there were **"publicly disclosed plans to reintroduce the use of robes."**

28

144.  While president Cordano may have tried to give the impression that she was speaking solely of the Kappa Gamma organization itself and not its members or alumni, that attempt is belied by the fact that in referring to Kappa Gamma she referred to "it" as "They."

145.  Even those of the above quoted statements of President Cordano which might at first appear to be exculpatory and non-defamatory of plaintiffs, are in fact defamatory.

146.  For example, when defendant Cordano claimed to be attempting to explain and clarify her statements about Kappa Gamma and its alumni members being the face of racism at Gallaudet University saying ***Kappa Gamma is not the sole culprit nor the face of systemic racism alone at Gallaudet but became a face*** [of racism], her use of the terminology 'is not the sole culprit or face of racism alone' simply amounted to yet another statement that Kappa Gamma and its alumni members are culprits and a face of systemic racism along with certain unidentified others.  President Cordano was therefore actually doubling down on her prior attacks on Kappa Gamma and its then current and alumni members.

147.  Similarly, President Cordano effectively branded Kappa Gamma and its alumni members racist or pro-racist when she said ***It is up to Kappa Gamma to become anti-racist.***

148.  The use of the word "They" when speaking of "the face of systemic racism"and when speaking of  "racist" behavior in Kappa Gamma's past clearly targeted the former student, now alumni, members of Kappa Gamma including the Plaintiffs herein in particular.

149.  The statements of defendant Cordano for which her employer, Gallaudet University and its board of trustees are liable, statements imputing to Plaintiffs support for Nazism, for the Ku Klux Klan, and for racism subjected each plaintiff herein to the hatred, contempt and ridicule of a considerable and respected class of their communities, the deaf community, the communities

29

in which they reside and the communities in which they worked and did business.

150.   The defendants Cordano, Gallaudet University and its Board of Trustees have subjected Plaintiffs to a double standard.  They are willing to overlook and/or forgive their institution's history of characterizing Deaf individuals as 'Deaf and Dumb' and 'Deaf Mutes' apparently because such terminology was acceptable at the time it was used, but refuse to accord the same perspective to Plaintiff's past use of the Bellamy salute and robes which were acceptable at the time they were used.

151.   President Cordano, Gallaudet University and its Board of Directors knew that the defamatory statements made by President Cordano while referring to Kappa Gamma as 'They' would cause those statements to be perceived as being directed against Kappa Gamma members and alumni, and they were indeed so perceived as is evidenced by the prompt adversity and harm to which such members, and plaintiffs herein in particular were subjected.

152.   Defendants Cordano, Gallaudet University and its Board of Trustees made and condoned the making of the defamatory statements knowing that they were false, with malice, and with a reckless disregard for the truth.

FACTS COMMON TO ALL CLAIMS

(4) THE FALSE AND DEFAMATORY STATEMENTS OF THE WASHINGTON POST

153.   On or about June 12, 2020 The Washington Post published in its print newspaper and its online publication articles pertaining to Gallaudet's suspension of Kappa Gamma.  In those articles the Washington Post made false, misleading and defamatory statements, express and implied about Kappa Gamma and its members and alumni members, and in particular the plaintiffs herein.

30

154.  The Post's articles also intended to and did portray Kappa Gamma members and alumni in a false light.

155.  The defamatory nature of The Post's June 12, 2020 article began with its sensationalized headline reading: "Gallaudet University suspends fraternity after anti-Semitic photo resurfaces." Without including the actual picture with the story, the Post then schemed to support its sensationalized headlined allegation of the fraternity having been suspended for "Anti-Semitic"activity, describing a 30 year old picture wherein then student members were depicted performing the Bellamy salute.

156.  In doing so, The Post knew full well that the suspension was not based on the 30 year old picture allegedly depicting anti-Semitic activity because in the article itself The Post reported that the suspension was reportedly due to "recent photos posted on social media" showing the group wearing robes again.

157.  As The Post well knew, the wearing of the robes, even if true, had no relation to "anti-semitic activity." Nevertheless, The Post, by its headline and its reference to an old picture having nothing to do with the suspension or alleged activity giving rise to the suspension, created the immediate impression that the fraternity and its members had engaged in anti-Semitic activity leading to the suspension.

158.  Having created the aforesaid false and defamatory impression, the post subsequently added to its online publication of the story a "clarification" that the photo the suspension was reportedly based upon was a "new photo" as opposed to the 30 year old photo mentioned and described in the story and which had nothing to do with the suspension.  This clarification was "too little, too late" and meaningless since the story headlined with a false allegation of "anti-

semitic activity" had already created the uproar that The Post had intended to create.

159.  Within hours, if not minutes, of the publication of the story headlined with a false but sensational reference to anti-Semitic activity, The Post's story was spread all over the internet, was republished time and again by other news media including newspapers, internet news services, and television news reports.

160.  The Post's article was further false, misleading and defamatory in describing the robes that fraternity members were allegedly identified wearing as "ceremonial robes that resemble Ku Klux Klan garb."

161.  The Post's June 12th story however was based on a June 9th announcement by Gallaudet President Cordano which announcement made no statement or suggestion that the robes being referred to resembled "Ku Klux Klan" garb.

162.  The Post and its' reporter had never seen the Kappa Gamma robes nor a picture of them and therefore had no basis in fact to describe them as resembling Ku Klux Klan garb,

163.  No less sensational, false and defamatory was the statement in The Post's story that the Bellamy salute it referred to was an "apparent Nazi salute," when The Post knew or should have known in the exercise of proper journalistic practices that the salute was a Bellamy salute, which is not a "Nazi salute" nor an "apparent Nazi salute."

164.  The defamatory statements made in The Posts' article were not privileged, not could they be because they were false.

165.  The defamatory statements contained in The Post's article were intended to be and were understood by readers to be statements of fact and not statements of opinion.

### AS AND FOR A FIRST CAUSE OF ACTION
### ON BEHALF OF PLAINTIFF STEVEN FLORIO

166.   Plaintiff repeats and reiterates each and every allegation contained in the preceding paragraphs of this Complaint with the same force and effect as if more full set forth herein.

167.   Plaintiff Steven Florio is a graduate of Gallaudet University having graduated in 1992.

168.   Plaintiff Florio was a student member of Kappa Gamma from April 1991 through May, 1992.

169.   Plaintiff Florio was a co-founder and the first director of the Kappa Gamma International chapter in New England in 2010.

170.   Plaintiff Florio's association with Kappa Gamma is such that he is well known and recognized as a student and alumnus member of Kappa Gamma and it is said of him "Steve Florio is Kappa Gamma."

171.   Plaintiff Florio was not in the 30 year old picture of Kappa Gamma members using the Bellamy Salute as he was not yet a student at Gallaudet University nor was he a member of Kappa Gamma during that time.

172.   Steven Florio is a prominent Gallaudet and Kappa Gamma alumnus and until the defamatory publications made by the defendants herein against Kappa Gamma were published in June, 2020, he enjoyed an excellent reputation in the deaf community, the Kappa Gamma Community, his home community, and among his friends and co-workers.

173.   Following his graduation from Gallaudet, Florio was employed as a Small Business Accountant from 1992 to 1993; he was thereafter employed by JP Morgan/Chase as an

Accounting/Financial Specialist from 1993 to 2002.  Thereafter in 2002 he was appointed to be

Executive Director of the Rhode Island Commission on the Deaf and Hard of Hearing from which

employment continued until 2019.  In 2019 Florio was appointed by the Governor of

Massachusetts to the position of Commissioner the Massachusetts Commission for the Deaf and

Hard of Hearing.

174.  In addition to his impressive employment credentials Florio has obtained a MS

Degree in leadership from North Eastern University and has attained specialized certificates from

Villanova University and FEMA.

175.  Florio has an extensive history in working with and serving numerous organizations

including Non-Profits and State Entities and Agencies.

176.  Florio's stellar reputation has earned him no less than 20 awards from 1998 to 2020.

177.  Shortly after he defamatory publications by defendants Cordano, Gallaudet and the

Washington Post regarding Kappa Gamma on and after June 9, 2020 a Massachusetts state

employee who saw such publications and knew of Florio's affiliation with Kappa Gamma made a

report to the Governor's Office regarding that affiliation and incorrectly reporting that Florio was

one of the individuals using the Bellamy Salute in the 30 year old picture.

178.  As a result of the defamatory publications by the defendants, Florio was subjected to

numerous hours of interviews and investigations by two State agencies and was thereafter

terminated from his position as Commissioner of the Massachusetts Commission for the Deaf and

Hard of Hearing.

179.  Florio has since been unsuccessful in obtaining new employment as the news of his

affiliation with Kappa Gamma and the resulting rumors and allegations that he has participated in

Nazi and anti-Semitic activities as a Kappa Gamma member have seriously damaged his reputation.  He was denied one position for which he was highly qualified do to this damage to his reputation and his undeserved notoriety.

180.  Florio has developed emotional distress, depression and sleeplessness as a result of the defendants' defamatory publications and his family has suffered as well.

181.  The damage to Florio's reputation is such that it is unlikely he will find employment in his field for he foreseeable future, and possibly not before he attains retirement age,

182.  The resulting loss of employment, loss of earnings, medical and emotional suffering has caused and will continue to cause irreparable damage to Florio.

183.  Based in his age, experience, earnings history and abilities, and given the losses other than earnings which he sustained Plaintiff Steven Florio has been damaged by the defendants in the sum of Five Million Dollars.

## AS AND FOR A SECOND CAUSE OF ACTION
## ON BEHALF OF PLAINTIFF PATRICK COSTELLO

184.  Plaintiff repeats and reiterates each and every allegation contained in the preceding paragraphs of this Complaint with the same force and effect as if more full set forth herein.

185.  Plaintiff Patrick Costello is a graduate of Gallaudet University having graduated in 1989 with a BA Degree in Business.

186.  Plaintiff Costello was a student member of Kappa Gamma from April 1987 through 1989..

187.  Plaintiff Costello has been a member of the Kappa Gamma alumni organization Kappa Gamma International from 1989 to date.

188.   Plaintiff Costello's association with Kappa Gamma is such that he is well known and recognized as a student and alumnus member of Kappa Gamma and it is said of him "Pat Costello is Kappa Gamma."

189.   Plaintiff Costello continued with his post graduate education following receipt of his undergraduate degree by attending graduate school at Boston University where he obtained a Masters Degree in Deaf Education in 1997.  He then earned a ED.S Degree from Gallaudet University in 2002.

190.   Patrick Costello is a prominent Gallaudet and Kappa Gamma alumnus and until the defamatory publications made by the defendants herein against Kappa Gamma were published in June, 2020, he enjoyed an excellent reputation in the deaf community, the Kappa Gamma Community, his home community, and among his friends and co-workers.

191.   Patrick Costello was employed by a deaf school, The Learning Center in Massachusetts for 23 years from 1996 to 2020 having held such positions as High School Teacher, Middle School Principal, Director of ASL Instruction and Director of the Deaf Cultural Center.

192.   As a result of the defamatory publications by the defendants, Costello was pressured to resign as word of the defamatory allegations published by the defendants Cordano, Gallaudet and The Post became common knowledge in the Deaf community and at the school where plaintiff was employed for 23 years.  The stellar reputation he had earned as an Educator and Administrator during his 23 years at The Learning Center was destroyed.

193.   Before his reputation was destroyed Plaintiff Costello was requested to work with other deaf schools as a consultant; was periodically requested by organizations to talk and give

lectures at their events, did committee with the MA Department of Education and had two articles in publication.

194.  Costello has since been unsuccessful in obtaining new employment as the news of his affiliation with Kappa Gamma and the resulting rumors and allegations that he has participated in Nazi and anti-Semitic activities as a Kappa Gamma member have seriously damaged his reputation.

195.  Costello  has developed emotional distress, shock, confusion, and sleeplessness as a result of the defendants' defamatory publications and his family has suffered as well.

196.  The damage to Costello's reputation is such that it is unlikely he will find employment in his field for he foreseeable future, and possibly not before he attains retirement age,

197.  The resulting loss of employment, loss of earnings, medical and emotional suffering has caused and will continue to cause irreparable damage to Costello.

198.  Based in his age, experience, earnings history and abilities, and given the losses other than earnings which he sustained Plaintiff Patrick Costello has been damaged by the defendants in the sum of Five Million Dollars.

AS AND FOR A THIRD CAUSE OF ACTION
ON BEHALF OF PLAINTIFF WILLIAM MILLIOS

199.  Plaintiff repeats and reiterates each and every allegation contained in the preceding paragraphs of this Complaint with the same force and effect as if more full set forth herein.

200.  Plaintiff William Millios is a graduate of Gallaudet University having graduated in 1991 with a B.S. in Computer Science.

201.  Plaintiff Millios was a student member of Kappa Gamma from 1989 through 1991 and has remained an active alumnus member of Kappa Gamma International.  He also served as Fraternity Advisor to Kappa Gamma while employed at Gallaudet from 2003-2005.

202.  Plaintiff Millios' association with Kappa Gamma is such that he is well known and recognized as a student and alumnus member of Kappa Gamma and it is said of him "William Millios is Kappa Gamma."

203.  Plaintiff Millios continued with his post graduate education following receipt of his undergraduate degree by earning a M.A. Degree in Computer Science from George Washington University in 1994.  He has completed Ph.D course work in Computer Science at George Washington University from 1999 to 2005.

204.  William Millios is a prominent Gallaudet and Kappa Gamma alumnus and until the defamatory publications made by the defendants herein against Kappa Gamma were published in June, 2020, he enjoyed an excellent reputation in the deaf community, the Kappa Gamma Community, his home community, and among his friends and co-workers.

205.  William Millios was employed as a Systems Engineer and Software Developer at Bell Laboratories from 11991 to 1999.  From 1999 to 2006 he was an Assistant Professor of Mathematics and Computer Science at Gallaudet University. He subsequently served as Digital Media Director for USA Deaf Sports Federation from 2009-2013.  He is currently the owner of Bill Millios Photography from 2004 to the present.  He has worked for the Registry of Interpreters for the Deaf as a Communications Director from 2013-2017 and as Director of Communications and Outreach from 2017-2020.

206.  Due to his excellent communications skills and stellar reputation in the Deaf

community Millios has served on the Boards of two schools for the Deaf and a Visual Arts and Education Center.

207.  As a result of the defamatory publications by the defendants, Millios lost his employment of 7 years with the Registry of Interpreters for the Deaf. Because the negative publicity generated by the defamatory publications of the defendants continues to persist, Millios has little hope of finding new gainful employment anytime in the foreseeable future, if ever.

208.  Plaintiff Millios has  has developed emotional distress and sleeplessness as a result of the defendants' defamatory publications and his family has suffered as well.  His two children are deaf and were traumatized when the Cordano announcement and Washington Post article were published and spread through the deaf community and the internet.

209.  The damage to Millio's reputation is such that he reasonably feels he will never obtain new employment.

210.  The resulting loss of employment, loss of earnings, medical and emotional suffering has caused and will continue to cause irreparable damage to Millios.

211.  Based in his age, experience, earnings history and abilities, and given the losses other than earnings which he sustained Plaintiff William Millios has been damaged by the defendants in the sum of Three Million Dollars.

## AS AND FOR A FOURTH CAUSE OF ACTION
## ON BEHALF OF PLAINTIFF TIMOTHY MALLACH

212.  Plaintiff repeats and reiterates each and every allegation contained in the preceding paragraphs of this Complaint with the same force and effect as if more full set forth herein.

213.  Plaintiff Timothy Mallach attended Gallaudet University for the Spring semester of

1990 and did not complete his education at Gallaudet.

214.  Plaintiff Mallach was a student member of Kappa Gamma from February 1990 through May 1990.

215.  Notwithstanding his short time as a student member of Kappa Gamma, Plaintiff Mallach' association with Kappa Gamma is such that he is well known and recognized as a student and alumnus member of Kappa Gamma and it is said of him "Tim Mallach is Kappa Gamma."

216.  Plaintiff Mallach had been employed as a Resident Counselor at a school for the Deaf in Ontario, Canada for twenty years and worked as a Deaf Interpreter for 15 years.  His short time as a Gallaudet Student and Kappa Gamma member have now adversely affected his life and future.

217.  When the defamatory publications by the defendants became public and reached Canada, a individual who had been a substantial donor to his employer observed Tim Mallach's involvement and sent a threatening letter to his employer. In order to placate the donor the employer requested him to resign from his employment immediately.

218.   Plaintiff Mallach has been unable to find new employment due to the damage to his reputation.

219.  The damage to Mallach's reputation is such that he reasonably feels he will never obtain new employment.

220.  The resulting loss of employment, loss of earnings, and damage to his good name and reputation are such that Mallach will continue to suffer irreparable damage as a result of the defamation he was subjected to at the hands of the defendants.

221.  Based in his age, experience, earnings history and abilities, and given the losses than earnings which he sustained Plaintiff Timothy Mallach has been damaged by the defendants in the sum of Three Million Dollars.

AS AND FOR A FIFTH CAUSE IF ACTION

ON BEHALF OF PLAINTIFF SCOTT PLUMMER

222.  Plaintiff repeats and reiterates each and every allegation contained in the preceding paragraphs of this Complaint with the same force and effect as if more full set forth herein.

223.  Plaintiff Scott Plummer attended Gallaudet University for three semester from 2000-2001.

224.  Plaintiff Plummer was a student member of Kappa Gamma for three semesters from 2000 to 2001.

225.  Plaintiff Plummer was and is employed as a teacher at Kansas School for the Deaf and has been so employed since 2004.

226.  As a result of the adverse publicity from defendant's defamatory publications, plaintiff was denied a promotion, losing a $30,000 per year salary increase.  He also found it necessary to resign as Academic Bowl Coach to avoid returning to Gallaudet, resulting in a $3,000 per year loss in income.

227.  Based in his age, experience, earnings history and abilities, and given the losses than earnings which he sustained Plaintiff Scott Plummer has been damaged by the defendants in the sum of Three Million Dollars.

AS AND FOR A SIXTH CAUSE IF ACTION

ON BEHALF OF PLAINTIFF ROGER KRAFT

41

228.  Plaintiff repeats and reiterates each and every allegation contained in the preceding paragraphs of this Complaint with the same force and effect as if more full set forth herein.

229.  Plaintiff Roger Kraft attended Gallaudet University graduating in 1990.

230.  Plaintiff Kraft was a student member of Kappa Gamma from 1998 to 1990.

231.  Plaintiff Kraft was and is employed with an Interpreter Service Organization.

232  As a result of the adverse publicity from defendant's defamatory publications, plaintiff was denied a promotion, losing a $5,000 per year salary increase.

233.  Based in his age, experience, earnings history and abilities, and given the losses than earnings which he sustained Plaintiff Roger Kraft has been damaged by the defendants in the sum of Seventy Five Thousand Dollars.

AS AND FOR A SEVENTH CAUSE IF ACTION

ON BEHALF OF PLAINTIFF JOEL BARISH

234.  Plaintiff repeats and reiterates each and every allegation contained in the preceding paragraphs of this Complaint with the same force and effect as if more full set forth herein.

235.  Plaintiff Joel Barish attended Gallaudet University graduating in 1992.

236.  Plaintiff Barish was a student member of Kappa Gamma from 1990 to 1993.

237.  Plaintiff Barish was and is self employed.

238.  As a result of the adverse publicity from defendant's defamatory publications, plaintiff business suffered loss of customers and a resulting loss of income.

239.  Based in his age, experience, earnings history and abilities, and given the losses than earnings which he sustained Plaintiff Joel Barish has been damaged by the defendants in the sum of Three Million Dollars.

AS AND FOR A EIGHTH CAUSE IF ACTION

ON BEHALF OF PLAINTIFF BRANDON R. HILL

240.  Plaintiff repeats and reiterates each and every allegation contained in the preceding paragraphs of this Complaint with the same force and effect as if more full set forth herein.

241.  Plaintiff  attended Gallaudet University graduating in 2003.

242.  Plaintiff Hill was a student member of Kappa Gamma from 2000 to 2003.

243.  Plaintiff Hill was and is self employed and also seeking employment.

244.  As a result of the adverse publicity from defendant's defamatory publications, plaintiff has experienced social media disconnection and anxiety and had to close his Facebook account. He has had several friends and co-workers question and challenge him about his fraternity connection. He had a leadership role in Kappa Gamma and also created much of the artwork (murals, banners, t shirts, program books, advertisements, etc.) so he am known as having a strong connection to Kappa Gamma. He believes that he has lost teaching opportunities (especially at Gallaudet University where he has taught in the past in their sign language masters program).  He believes his business has suffered loss of customers and a resulting loss of income.

245.  Based on his age, experience, earnings history and abilities, and given the losses than earnings which he sustained Plaintiff Brandon R. Hill has been damaged by the defendants in the sum of One Hundred Fifty Thousand Dollars.

AS AND FOR A NINTH CAUSE IF ACTION

ON BEHALF OF PLAINTIFF JAMES BELDON, JR

246.  Plaintiff repeats and reiterates each and every allegation contained in the preceding paragraphs of this Complaint with the same force and effect as if more full set forth herein.

43

247.  Plaintiff James Beldon Jr attended Gallaudet University graduating in 1991.

248.  Plaintiff Beldon was a student member of Kappa Gamma until graduation in 1991 and then remained an alumnus member of KGI until 2020.

249.  Plaintiff Beldon was and is self employed and also seeking employment.

250.  As a result of the adverse publicity from defendant's defamatory publications, plaintiff has experienced loss of clientele for his interpreting business including the state of Minnesota.

251.  Based on his age, experience, earnings history and abilities, and given the losses than earnings which he sustained Plaintiff Brandon R. Hill has been damaged by the defendants in the sum of Four Hundred Thousand Dollars.

AS AND FOR A TENTH CAUSE IF ACTION

ON BEHALF OF PLAINTIFF ERNEST WILLMAN

252.  Plaintiff repeats and reiterates each and every allegation contained in the preceding paragraphs of this Complaint with the same force and effect as if more full set forth herein.

253.  Plaintiff Ernest Willman attended Gallaudet University graduating in 2016.

254.  Plaintiff Willman was a student member of Kappa Gamma from 2015 to 2016 and then was active as a alumnus member of KGI from 2018 to the present.

255.  Plaintiff Willman was and is self employed

256.  As a result of the adverse publicity from defendant's defamatory publications, plaintiff has experienced an impact on a professional and personal level. It has an impact on his sister, Heather as well. The harm on his personal endeavors is to connect (building relationships) with people through his role as a Vice President of DCAD, interpreter/consumer, and private

citizen. The harm to his profession was that he could not last in his workplace at MSSD after struggling to defend himself as a teacher from colleagues and students. He is  also a Deaf interpreter and had through some challenges in working with the agency after they viewed him as a racist that reflects badly on the agency. They prevented him from taking gigs with agencies. He also own a business that focuses on translation and interpreting - He suspect he lost some clients and potential clients. He recruited a renter for his basement and prevented from getting the renter because of the renter's friend advising him not to take the premises due to my racism and antisemitism behavior with KG after the announcement from President Cordano. His sister, Heather had to defend herself and experienced mixed feelings (embarrassment, shame, anger) after a number of her friends talked to her about his affiliation with Kappa Gamma.

257.  Based on his age, experience, earnings history and abilities, and given the losses than earnings which he sustained Plaintiff Ernest Willman has been damaged by the defendants in the sum of Seventy Five Thousand Dollars.

JURY DEMAND

Plaintiffs demand trial by jury.

WHEREFORE Plaintiffs demand Judgment against the defendants jointly and severally in the following sums: Five Million Dollars on the First Cause of Action in favor of Plaintiff Steven Florio, Five Million Dollars on the Second Cause of Action in favor of Plaintiff Patrick Costello, Three Million Dollars on the Third Cause of Action in favor of Plaintiff William Millios, Three Million Dollars on the Fourth Cause of Action in favor of Plaintiff Timothy Mallach, Three Million Dollars on the Fifth Cause of Action in favor of Plaintiff Scott Plummer, Seventy Five Thousand Dollars on the Sixth Cause of Action in favor of Plaintiff Roger Kraft, Three Million

Dollars on the Seventh Cause of Action in favor of Plaintiff Joel Barish, One Hundred Fifty

Thousand Dollars on the Eighth Cause of Action in favor of Plaintiff Brandon R. Hill, Four

Hundred Thousand Dollars on the Ninth Cause of Action in favor of Plaintiff James Beldon, Jr.,

and Seventy Five Thousand Dollars on the Tenth Cause of Action in favor of Plaintiff Ernest

Willman, all together with interest from June 9, 2020 and the costs, disbursements and attorneys

fees incurred in the prosecution of this action.

Dated: Syosset, New York
      June 8, 2020                       /s/ *Ralph G. Reiser*
                                                     Ralph G. Reiser, Esq.
                                                         Attorney for Plaintiffs
                                                         3 Walnut Drive
                                                         PO Box 171
                                                         Syosset, NY 11791
                                                         516-496-9745
                                                         516-496-9754 (Fax)
                                                         Reiserlaw@aol.com