UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| STEVEN FLORIO, PATRICK COSTELLO, WILLIAM MILLIOS, and TIMOTHY MALLACH, | |
| Plaintiffs, | |
| v. | No. 1:21-cv-01565-CRC |
| GALLAUDET UNIVERSITY 800 Florida Avenue, NE Washington, DC  20002 | |
| THE BOARD OF TRUSTEES OF GALLAUDET UNIVERSITY, 800 Florida Avenue, NE Washington, DC  20002 | |
| ROBERTA CORDANO, 800 Florida Avenue, NE Washington, DC  20002 | |
| and | |
| WP COMPANY LLC, d/b/a THE WASHINGTON POST, | |
| Defendants. | |

**DEFENDANTS GALLAUDET UNIVERSITY, THE BOARD OF TRUSTEES OF GALLAUDET UNIVERSITY, AND ROBERTA CORDANO'S MOTION TO DISMISS**

Defendants Gallaudet University, the Board of Trustees of Gallaudet University, and Roberta Cordano, pursuant to Federal Rule of Civil Procedure 12(b)(6), respectfully move to dismiss all claims asserted by Plaintiffs.  As set forth in the accompanying Memorandum of Law, which is incorporated by reference, Plaintiffs' claims should be dismissed in their entirety. Alternatively, if the Court denies the motion as to Defendants Gallaudet University and Roberta Cordano, it should grant the motion, on separate grounds, as to Defendant Board of Trustees.

## HEARING REQUEST

Defendants Gallaudet University, the Board of Trustees of Gallaudet University, and

Roberta Cordano respectfully request a hearing on their Motion to Dismiss.

October 25, 2021                                Respectfully submitted,

                                                /s/ Laura Offenbacher Aradi
                                                Clifford J. Zatz (D.C. Bar No. 298596)
                                                czatz@crowell.com
                                                Laura Offenbacher Aradi (D.C. Bar No. 1000199)
                                                laradi@crowell.com
                                                CROWELL & MORING LLP
                                                1001 Pennsylvania Ave., NW
                                                Washington, DC 20004
                                                Tel: (202) 624-2500
                                                Facsimile: (202) 628-5116

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of October, 2021, a true copy of the above document

was served via CM/ECF on all counsel of record.

                                                /s/ Laura Offenbacher Aradi
                                                Laura Offenbacher Aradi

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| STEVEN FLORIO, PATRICK COSTELLO, WILLIAM MILLIOS, and TIMOTHY MALLACH, | | |
| Plaintiffs, | | |
| v. | | No. 1:21-cv-01565-CRC |
| GALLAUDET UNIVERSITY, THE BOARD OF TRUSTEES OF GALLAUDET UNIVERSITY, ROBERTA CORDANO, AND WP COMPANY LLC, d/b/a THE WASHINGTON POST, | | |
| Defendants. | | |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS GALLAUDET UNIVERSITY, THE BOARD OF TRUSTEES OF
GALLAUDET UNIVERSITY, AND ROBERTA CORDANO'S
<u>MOTION TO DISMISS</u>**

Clifford J. Zatz (D.C. Bar No. 298596)
czatz@crowell.com
Laura Offenbacher Aradi (D.C. Bar No. 1000199)
laradi@crowell.com
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC  20004
Telephone:    (202) 624-2500
Facsimile:    (202) 628-5116

*Attorneys for Gallaudet University,
The Board of Trustees of Gallaudet University,
and Roberta Cordano*

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

BACKGROUND ....................................................................................................................2

LEGAL STANDARD.............................................................................................................5

ARGUMENT ..........................................................................................................................6

I.    The Allegedly Defamatory Statements About "Kappa Gamma" Were Not
      "Concerning" Plaintiffs...............................................................................................6

II.   Calling Kappa Gamma The "Face Of Systemic Racism" At Gallaudet And
      Commenting On Racist Conduct Are Protected Expressions Of Opinion
      and Hyperbole, Not Assertions Of Fact.....................................................................12

III.  In The Event The Challenged Statements Are Found To Be Actionable—
      Which They Are Not—Plaintiffs' Claims Should Still Be Dismissed
      Because President Cordano's Statements Were Substantially True. .............................16

IV.   The Board Of Trustees Should Be Dismissed Because Plaintiffs Have Not
      Pleaded A Plausible Claim Against It..........................................................................19

CONCLUSION......................................................................................................................20

# TABLE OF AUTHORITIES

**Cases**                                                                                                **Page(s)**

*Alexis v. District of Columbia*,
   77 F. Supp. 2d 35 (D.D.C. 1999) ......................................................................6, 9, 11

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ...................................................................................................5, 19

*Bauman v. Butowsky*,
   377 F. Supp. 3d 1 (D.D.C. 2019) ...................................................................................15

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ...................................................................................................5, 19

*Brimelow v. N.Y. Times Co.*,
   No. 20 Civ. 222, 2020 WL 7405261 (S.D.N.Y. Dec. 16, 2020) ....................................13

*BYD Co. v. All. for Am. Mfg.*,
   No. 20-cv-03458, 2021 WL 3472386 (D.D.C. Aug. 6, 2021) .....................................5

*Close It! Title Servs., Inc. v. Nadel*,
   248 A.3d 132 (D.C. 2021) ................................................................................................6

*Copeland-Jackson v. Oslin*,
   555 F. Supp. 2d 213 (D.D.C. 2008) ...............................................................................17

*Davis v. Wernick*,
   No. 19-cv-3327, 2021 WL 310999 (D.D.C. Jan. 29, 2021) ........................................5, 6

*E.E.O.C. v. St. Francis Xavier Parochial Sch.*,
   117 F.3d 621 (D.C. Cir. 1997) .........................................................................................2

*Fowler v. Curtis Pub. Co.*,
   182 F.2d 377 (D.C. Cir. 1950) .........................................................................................6

*Gertz* v. *Robert Welch, Inc.*,
   418 U. S. 323 (1974) .......................................................................................................13

*Hopkins v. Women's Div., Gen. Bd. of Glob. Ministries*,
   238 F. Supp. 2d 174 (D.D.C. 2002) ..........................................................................13, 19

*Jankovic v. Int'l Crisis Grp.*,
   494 F.3d 1080 (D.C. Cir. 2007) .......................................................................................7

*Kahl v. Bureau of Nat'l Affairs, Inc.*,
   856 F.3d 106 (D.C. Cir. 2017) ........................................................................... 5

*Libre by Nexus v. Buzzfeed, Inc.*,
   311 F. Supp. 3d 149 (D.D.C. 2018) ................................................................. 17

*Lohrenz v. Donnelly*,
   223 F. Supp. 2d 25 (D.D.C. 2002), *aff'd*, 350 F.3d 1272 (D.C. Cir. 2003) .......................... 16

*Marsh v. Hollander*,
   339 F. Supp. 2d 1 (D.D.C. 2004) ...................................................................... 2

*Masson v. New Yorker Mag., Inc.*,
   501 U.S. 496 (1991) ...................................................................................... 17

*Milkovich v. Lorain J. Co.*,
   497 U.S. 1 (1990), *aff'd*, 875 F.3d 709 (D.C. Cir. 2017) ...................................... 13, 15

*Montgomery v. Risen*,
   197 F. Supp. 3d 219 (D.D.C. 2016) ................................................................. 13

*New York Times Co. v. Sullivan*,
   376 U.S. 254 (1964) ................................................................................... 7, 8

*Ollman v. Evans*,
   750 F.2d 970 (D.C. Cir. 1984) ........................................................................ 16

*Ratajack v. Brewster Fire Dep't Inc.*,
   178 F. Supp. 3d 118 (S.D.N.Y. 2016) .............................................................. 13

*Reilly v. WNEP*,
   No. 557 MDA 2020, 2021 WL 1017154 (Pa. Super. Ct. Mar. 17, 2021) ................... 14

*Riss & Co. v. Ass'n of Am. R.R.*,
   187 F. Supp. 323 (D.D.C 1960) ...................................................................... 9, 10

*Robertson v. Cartinhour*,
   867 F. Supp. 2d 37 (D.D.C. 2012), *aff'd per curiam,* 553 F. App'x 1 (D.C.
   Cir. 2014) ................................................................................................. 17

*Ruifang Hu v. K4 Sols., Inc.*,
   No. 18-cv-1240, 2020 WL 1189297 (D.D.C. Mar. 12, 2020) ................................ 13

*Rybas v. Wapner*,
   457 A.2d 108 (Pa. Super. Ct. 1983) ................................................................. 14

*Sall v. Barber*,
   782 P.2d 1216 (Colo. App. 1989) .................................................................... 14

*Serv. Pkg. Corp. v. Wash. Times Co.*,
    92 F.2d 502 (D.C. Cir. 1937) ........................................................................................10, 12

*Sigal Const. Corp. v. Stanbury*,
    586 A.2d 1204 (D.C. 1991) .............................................................................................13

*Smith v. Sch. Dist. of Phila.*,
    112 F. Supp. 2d 417 (E.D. Pa. 2000) ..........................................................................14, 15

*Steadman v. Sinclair*,
    223 A.D.2d 392 (N.Y. App. Div. 1996) ...........................................................................14

*Tagliaferri v. Szulik*,
    No. 15 Civ. 2685, 2016 WL 3023327 (S.D.N.Y. May 25, 2016)......................................16

*Tannerite Sports, LLC v. NBCUniversal News Grp.*,
    864 F.3d 236 (2d Cir. 2017)............................................................................................17

*Ward v. Zelikovsky*,
    643 A.2d 972 (N.J. 1994)................................................................................................14

**Rules**

Fed. R. Civ. P. 12(b)(6)..............................................................................................................5

**Other Authorities**

Martin L. Newell, The Law of Slander and Libel in Civil and Criminal Cases
    (4th ed. 1924).................................................................................................................12

## INTRODUCTION

Addressing the Gallaudet University community about "our commitment to the work of dismantling racism," President Roberta Cordano opined that the Kappa Gamma fraternity had "become the face of systemic racism in our community, with photographs of the salute and use of robes being shared on social media.  This behavior is unacceptable."  Ex. 1, GallaudetU, *Acting on our History of Systemic Racism* (June 9, 2020), Tr. at 1, https://www.youtube.com/watch?v=hqdA3Zmtay0; Compl. ¶ 133.  She made no reference to these Plaintiffs, all of them decades removed from their student days at Gallaudet.  Yet Plaintiffs' cause of action for defamation stems primarily from this statement.

In a bid to demonstrate that this and related statements by President Cordano were false and defamatory, the Complaint alleges, in excruciating detail, why Plaintiffs believe the University is itself so racist "that there was no possibility that Kappa Gamma, its members and alumni could possibly be or have been the face of systemic racism at Gallaudet University."  *See* Compl. ¶¶ 1-4, 99-100.  Plaintiffs advance a theory that President Cordano targeted the Kappa Gamma fraternity in an effort to divert attention from her own challenges in addressing racism on campus.  *See id.* ¶¶ 10-14, 83.  They note many events of historical significance, and they explain that, "while having some similarities in appearance[,]" the Nazi-like Bellamy salute once used by Kappa Gamma is not the same as the Nazi salute.  *Id.* ¶¶ 104-114.  The sheer volume of text and historical trivia, however, does not substitute for the elements of actionable defamation Plaintiffs must allege for their Complaint to survive this 12(b)(6) motion to dismiss.

Indeed, Plaintiffs' defamation case rests on two fundamentally flawed premises, each fatal to their claim.  First, under the doctrine of "group defamation," Plaintiffs fail to allege specific facts to demonstrate how President Cordano's statements about Kappa Gamma could be construed as "of and concerning" them individually. None of the Plaintiffs alleges that President

Cordano named or otherwise identified him; none alleges that he was involved in any of the recent actions she described.  As such, none of them was defamed.

Second, the statements Plaintiffs challenge are First Amendment- protected expressions of opinion. To state a plausible cause of action for defamation, Plaintiffs must allege, at a minimum, a verifiably false statement of fact.  They have not done so.  Courts have consistently held that commentary about racism and bigotry reflects the speaker's subjective judgment—an opinion, as a matter of law—not the objectively false statement of fact that the law of defamation is intended to redress.  As such, no matter how wronged or wounded its target may feel, he or she has no cause of action for defamation.  The same is true of these four Plaintiffs.

Accordingly, the Complaint should be dismissed for failure to state a claim.

## BACKGROUND

On June 9, 2021, ten Plaintiffs filed this Complaint alleging defamation by Defendants. The next week, however, on June 16 and 17, six of them voluntarily withdrew their claims [ECF Nos. 5, 6].  This Complaint is now brought only by the four remaining plaintiffs: Steven Florio, Patrick Costello, William Millios, and Timothy Mallach.

On June 9, 2020, against the backdrop of "the tragic death of George Floyd. . . and in the midst of the resulting Black Lives matter [sic] protests. . . "  Compl. ¶ 1, Gallaudet President Cordano spoke to the University community about "Acting on our history of systemic racism." Ex. 1, at 1.[1]  She described the community as "at a threshold moment.  We are being called to deepen our demonstration of our commitment to the work of dismantling racism."  *Id.*  In the

---

[1] Transcripts of President Cordano's June 9 and July 16, 2020 remarks, incorporated by reference in the Complaint, are properly considered by the Court.  *See E.E.O.C. v. St. Francis Xavier Parochial Sch.,* 117 F.3d 621, 625 (D.C. Cir. 1997); *Marsh v. Hollander,* 339 F. Supp. 2d 1, 5 (D.D.C. 2004) (considering allegedly defamatory materials submitted as exhibits to motion to dismiss without converting the motion to one for summary judgment).

course of her address, she also reported on the reaction to recent events involving Kappa

Gamma:

> Over the past few days, with the [Student Body Government/Black
> Student Union] Town Hall last Friday, we became aware of new
> information that led to renewed demands for change with Kappa
> Gamma, a fraternity with a long history at Gallaudet.  They have
> become the face of systemic racism in our community, with
> photographs of the salute and use of robes being shared on social
> media.  This behavior is unacceptable.  Gallaudet has now taken
> action to suspend Kappa Gamma on campus….

Ex. 1; *see also* Compl. ¶¶ 13, 133.

According to Plaintiffs, Kappa Gamma began using the so-called Bellamy salute in 1901.

Compl. ¶ 105.  In the 1920s and 1930s, Italian Fascists and German Nazis adopted a salute

"having some similarities in appearance to the Bellamy salute." *Id.* ¶ 106.  The United States

Congress amended the Flag Code in 1942 to replace the Bellamy salute with the current hand-

over-heart salute. *Id.* ¶ 108.  Kappa Gamma ceased using the Bellamy salute in 1992 or 1993.

*Id.* ¶ 114.

Kappa Gamma began using its ceremonial robes in 1904. *Id.* ¶ 115.  Over time, the robes

were modified with "trims and patches." *Id.*  In 2014, the Student Body Government reported

concerns raised by students that the robes "could be viewed as similar to those used by white

supremacist organizations[.]" *Id.* ¶ 120.  On July 15, 2015, the Dean of Student Affairs

announced that "[t]he use of robes and other similar regalia during marches and other public

events on and off campus is permanently banned." *Id.* ¶¶ 122-23.

Plaintiffs allege that the following statements are defamatory:

- On June 9, 2020 (vlog and transcript): "Over the past few days, with the
  SBG/BSU Town Hall last Friday, we became aware of new information that led
  to renewed demands for change with Kappa Gamma"

- On June 9, 2020 (vlog): "Kappa Gamma, pictures distributed to media of their use of robes with hoods and of their salute, they have become the face of systemic racism.

- On June 9, 2020 (transcript): "They have become the face of systemic racism in our community, with photographs of the salute and use of robes being shared on social media.

- June 12, 2020 [*Washington Post*] article quote: *"Recent photos* posted on social media showed *the group in the outfits again"*

- June 12, 2020 [*Washington Post*] article quote: "*the return of the fraternity's* robes reignited demands for change within an organization that has previously been accused of anti-Semitism and racism."

- July 16, 2020 (vlog and transcript): "In early June 2020, new evidence emerged about the Kappa Gamma student chapter's *intention to bring back the use of robes* in their meetings and ceremonies and this information became public" and "This prompted an immediate investigation that concluded the Kappa Gamma chapter violated the 2015 policy."

- July 16, 2020 (vlog and transcript): "They were not suspended because of old photos."

- July 16, 2020 (vlog and transcript): "Kappa Gamma alone is not responsible for systemic racism."

- July 16, 2020 (vlog and transcript): Kappa Gamma used robes and a salute that is racist.

- July 16, 2020 (vlog and transcript): "The *publicly disclosed plans to reintroduce the use of robes* shone a spotlight on Kappa Gamma and they had become a face of the systemic racism that exists throughout the fabric of our racist society."

- July 16, 2020 (vlog and transcript): I will make it clear, *Kappa Gamma is not the sole culprit nor the face of systemic racism alone at Gallaudet but became a face due to the re-emergence of the use of their robes* at the same time as our national Black Lives Matter response to the brutal death of George Floyd and pictures of the racist rituals being circulated in social media.

- July 16, 2020 (vlog and transcript): *It is up to Kappa Gamma to become anti-racist* and join our broader community and Gallaudet in dismantling systemic racism.

Compl. ¶¶ 139 (a) – (l) (omission of quotation and punctuation marks in original).

Plaintiffs claim these statements about Kappa Gamma defamed both the fraternity's student members and its alumni. *E.g., id.* ¶¶ 14 ("President Cordano lobbed this false, outrageous and defamatory allegation at Kappa Gamma and therefore its current and former members. . ."), 88 ("falsely and wrongfully defaming Kappa Gamma and thereby its current and alumni members as the face of racism at Gallaudet University"), 148 ("The use of the word 'They' when speaking of 'the face of systemic racism' and when speaking of 'racist' behavior in Kappa Gamma's past clearly targeted the former student, now alumni, members of Kappa Gamma including the Plaintiffs herein in particular.").

Plaintiffs allege that President Cordano's statements caused them job loss and other harm because of their association with Kappa Gamma. *Id.* ¶¶ 166-221.

## LEGAL STANDARD

"'The Supreme Court has directed courts to expeditiously weed out unmeritorious defamation suits.'" *BYD Co. v. All. for Am. Mfg.*, No. 20-cv-03458, 2021 WL 3472386, at *2 (D.D.C. Aug. 6, 2021) (quoting *Kahl v. Bureau of Nat'l Affairs, Inc.*, 856 F.3d 106, 109 (D.C. Cir. 2017) (cleaned up)). "Early resolution of defamation cases under Federal Rule of Civil Procedure 12(b)(6) not only protects against the costs of meritless litigation, but provides assurance to those exercising their First Amendment rights that doing so will not needlessly become prohibitively expensive." *Id.* (citation and internal quotation marks omitted).

To survive a Rule 12(b)(6) motion, Plaintiffs' complaint must contain sufficient factual allegations that, accepted as true, state a plausible claim for relief. *Davis v. Wernick*, No. 19-cv-3327, 2021 WL 310999, at *2 (D.D.C. Jan. 29, 2021) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)) (Cooper, J.). The court may consider the factual allegations in the complaint, documents attached to or

incorporated in the complaint, matters under judicial notice, and matters of public record. *Davis*, 2021 WL 310999, at *2 (citations omitted).

## ARGUMENT

A claim for defamation must allege (1) that the defendant made a *false and defamatory* statement *concerning the plaintiff*; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm. *Close It! Title Servs., Inc. v. Nadel*, 248 A.3d 132, 139 (D.C. 2021) (emphasis added) (affirming dismissal of defamation claim).

Plaintiffs' defamation claims fail at least the first element. President Cordano's statements were not "concerning" Plaintiffs. Neither were they "false and defamatory" as a matter of law.

## I.   THE ALLEGEDLY DEFAMATORY STATEMENTS ABOUT "KAPPA GAMMA" WERE NOT "CONCERNING" PLAINTIFFS.

President Cordano's statements about "Kappa Gamma"—without reference to these Plaintiffs or any other individuals—were not "concerning" Plaintiffs as a matter of law and thus cannot have defamed them. *Id*. Under the group defamation (or group libel) doctrine, a defamatory statement directed at a group or class does not generally give rise to a claim on behalf of its members. *Alexis v. District of Columbia*, 77 F. Supp. 2d 35, 40 (D.D.C. 1999). "In a case of a[n allegedly] defamatory publication directed against a class, without in any way identifying [any] specific individual, no individual member of the group has any redress." *Id.* at 42 (quoting *Fowler v. Curtis Pub. Co.,* 182 F.2d 377, 378 (D.C. Cir. 1950)) (internal quotation marks omitted).

"Stated generally, '[d]efamation is personal. . . . Statements which refer to individual members of an organization do not implicate the organization. *By the same reasoning, statements which refer to an organization do not implicate its members.*'" *Jankovic v. Int'l Crisis Grp.*, 494 F.3d 1080, 1089 (D.C. Cir. 2007) (citations omitted) (emphasis added) (alteration in original).

Plaintiffs allege that President Cordano's reference to "Kappa Gamma," particularly the use of "[t]hey" rather than "it," defames both current students and alumni, including Plaintiffs in particular.  Compl. ¶ 148.  They argue, in effect, that by naming *no one*, President Cordano implicitly identified *everyone* ever associated with the fraternity.  This is a non sequitur.  The word "[t]hey," moreover, will not bear the weight Plaintiffs put on it here; they allege no facts to support the notion that "[t]hey," even if it connotes individuals rather than the group, includes Kappa Gamma alumni—much less alumni from decades ago, such as these four. [2]

The Supreme Court, in *New York Times Co. v. Sullivan*, 376 U.S. 254, 256-57 (1964), held that a similar use of the word "they" did not give rise to an individual plaintiff's defamation action.  Sullivan, Commissioner of Public Affairs for the City of Montgomery, Alabama, alleged that he was defamed by a full-page advertisement in *The New York Times,* entitled "Heed Their Rising Voices."  The advertisement reported that non-violent student demonstrators in the city had been subjected to a "wave of terror" by the police.  It also solicited money for the defense of Dr. Martin Luther King, Jr. against a pending perjury indictment in Montgomery.

Among the allegedly defamatory statements in the advertisement, Sullivan pointed to this paragraph:

---

[2] Plaintiff Florio alleges that he became a member in 1991. Compl. ¶ 168. Plaintiff Costello alleges that he joined the fraternity in 1987. *Id.* ¶ 186. Plaintiff Millios graduated from the University in 1991. *Id.* ¶ 200. Plaintiff Mallach was a member of Kappa Gamma for only a few months in 1990. *Id.* ¶ 214.

> Again and again the Southern violators have answered Dr. King's peaceful protests with intimidation and violence. They have bombed his home almost killing his wife and child. They have assaulted his person. They have arrested him seven times—for 'speeding,' 'loitering' and similar 'offenses.' And now they have charged him with 'perjury'—a *felony* under which they could imprison him for *ten years . . . .*

376 U.S. at 257-58.  Sullivan contended that "'they'" would be read to refer to the Montgomery police and, in turn, to him as the Commissioner supervising the police.  He presented six witnesses who testified at trial that they associated statements in the advertisement with Sullivan in his capacity as Commissioner.  *Id.* at 258.

The Supreme Court held that the evidence was "incapable of supporting the jury's finding that the allegedly libelous statements were made 'of and concerning' [Sullivan]."  *Id.* at 288.  Said the Court:

> There was no reference to respondent in the advertisement, either by name or official position. A number of the allegedly libelous statements—the charges that the dining hall was padlocked and that Dr. King's home was bombed, his person assaulted, and a perjury prosecution instituted against him—did not even concern the police; despite the ingenuity of the arguments which would attach this significance to the word 'They,' it is plain that these statements could not reasonably be read as accusing respondent of personal involvement in the acts in question.

*Id.* at 288-89.

Here, similarly, President Cordano's words "could not reasonably be read as accusing" these four plaintiffs of "personal involvement" in the acts she recounted.  If anything, she was clearly referring to the actions of *current* student members of the fraternity on campus, not alumni.[3]  For instance, she addressed Kappa Gamma's *recent* use of robes resembling Ku Klux Klan garb after they had been banned from campus.  *See, e.g.*, *id.* ¶¶ 139(d) (*"Recent photos* posted on social media showed *the group in the outfits again"*), (e) ("*the return of the fraternity's*

---

[3] No current student member of Kappa Gamma is or has been a plaintiff in this case or in any other lawsuit alleging defamation by President Cordano's comments.

robes . . ."), (f) ("the Kappa Gamma student chapter's *intention to bring back the use of robes* in their meetings and ceremonies"), (j) ("The *publicly disclosed plans to reintroduce the use of robes* . . ."), (k) ("*Kappa Gamma is not the sole culprit nor the face of systemic racism alone at Gallaudet but became a face due to the re-emergence of the use of their robes* . . ."). These statements about Kappa Gamma's recent activity cannot be interpreted as targeting alumni, much less as singling out Plaintiffs in particular.

Regardless of Plaintiffs' undue focus on the word "they," the general reference to the organization is not "concerning" Plaintiffs as a matter of law. "Allegations of defamation by an organization or group and its members are not interchangeable. Statements which refer to an organization or group do not necessarily implicate its members." *Alexis* 77 F. Supp. 2d at 40.

*Riss & Co. v. Ass'n of Am. R.R.*, 187 F. Supp. 323, 325 (D.D.C 1960), is instructive. In that case, the defendants, western railroads, filed counterclaims against plaintiff, Riss & Company, for defamation based on an article stating that the "railways" made unfounded statements about Riss's authority to transport explosives, that the "railroads" spent millions of dollars and used questionable techniques, and that the "railroads" were asking the government to destroy a transportation facility that was greatly aiding the Korean war effort based on competition. The counterclaim also called filing a brief in a lawsuit involving railroads of Eastern and Western territories "tantamount to treason." *Id.*

The court considered whether the defendants had stated a counterclaim for defamation. "When the alleged defamatory matter is directed at a class or group (e.g., 'the railroads'), rather than at a particular individual, the individual member must show *some application of the defamatory matter to himself*." *Id.* (emphasis added). The court observed that "railways" or "railroads" of the Eastern and Western territories are a large class; 37 railroads were members of

the Eastern Railroad Presidents' Conference and 64 railroads were members of the Association of Western Railways.  Because the article referred only to railroads as a class and did not mention an individual railroad, there was no reference to "some ascertained or ascertainable person."  *Id.* at 326.

*Service Parking Corp. v. Wash. Times Co.*, 92 F.2d 502 (D.C. Cir. 1937), further illustrates the principle that there must be some specific application of the defamatory matter to the individual plaintiff.  In that case, the plaintiff sued for libel based on an article in which the Superintendent of Police criticized parking lot owners for placing cars on the streets instead of leaving them in the lots.  *Id.* at 503.  He stated that he would confer with the District Attorney's office to stop the "chiseling" and see whether lot owners could be charged with "conducting an illegal business" or "obtaining money under false pretenses."  *Id.*

The plaintiff showed that the article complained of 20-30 parking lots operated by 10-12 owners, and that he was the owner and operator of nine of the lots.  *Id.*  The court granted the defendant's motion for a directed verdict on the ground that there was no showing that the article applied to the plaintiff and there were no circumstances that would reasonably permit the jury to find the article could be understood to refer to him.  *Id.*  This was so even though the plaintiff offered a witness to establish that he understood that the article referred to the plaintiff and that he was guilty of the conduct described.  *Id.*

The D.C. Circuit affirmed.  "It was necessary for [the plaintiff] to prove that the defamatory words referred to him."  *Id.* at 504.  The defamatory words must refer to "some ascertained or ascertainable person, and that person must be the plaintiff."  *Id.*  (quoting Odgers, Libel and Slander (6th Ed. 1929) at 123) (citation omitted).  The court concluded that the plaintiff had failed to show that the article referred to him.  *Id.* at 506.

To state a claim based on group defamation, a member of the group must show either that (1) the "small group" exception applies—*i.e.*, "each and every member of the group or class is referred to"—or (2) "the circumstances of publication reasonably give rise to the conclusion that there is *particular reference* to the member." *Alexis*, 77 F. Supp. 2d at 40-41. Plaintiffs' Complaint does not does not satisfy either exception.

The first exception does not apply because the alleged defamatory statements about "Kappa Gamma" do not refer to each and every member of the fraternity or otherwise implicate the small group exception. A small group, for purposes of this exception, typically is not more than 20 to 30 members. *Id.* at 41. "Conversely, when a group consists of more than about 25 people, the courts have traditionally found that defamation of the group does not constitute defamation of a particular group member who was neither named nor singled out in the remarks." *Id.* Cases from other state and federal jurisdictions have established a "consistent rule of thumb" that unnamed group members generally are not permitted to sue for group defamation if the group has more than 25 members and "almost invariably" are not permitted to sue if the group has more than 100 members. *Id.*

Here, although Plaintiffs refrain from saying so in the Complaint, there can be little doubt that Kappa Gamma has more than 25 members—particularly as Plaintiffs define it to include alumni—and even more than 100. The 30-year-old photo of Kappa Gamma members engaged in the salute shows "more than 30 men." *See* Compl. ¶¶ 128-31; Ex. 3, Lauren Lumpkin, *Gallaudet University Suspends Fraternity After Anti-Semitic Photo Resurfaces*, WAPO.com (June 12, 2020), https://www.washingtonpost.com/local/education/gallaudet-university-suspends-fraternity-after-anti-semitic-photo-resurfaces/2020/06/12/06b1eb2e-ac45-11ea-94d2-d7bc43b26bf9_story.html. The Complaint alleges, moreover, that Kappa Gamma has been in

existence since at least 1901.  Compl. ¶¶ 102, 105.  It follows that its living membership stretches back decades and must number in the hundreds or thousands.

The second exception does not apply because none of President Cordano's statements makes "particular reference" to any Plaintiff—or any individual, for that matter.  "'[T]he words must be capable of bearing such special application to the plaintiff . . .'" *Serv. Pkg. Corp.*, 92 F.2d at 505 (quoting Martin L. Newell, The Law of Slander and Libel in Civil and Criminal Cases (4th ed. 1924) Sec. 220, at 262-63).  President Cordano used no names.  She did not identify, describe, reference, or even allude to any Plaintiff. Instead, Plaintiffs are alleging that their mere association with Kappa Gamma is enough to give rise to a defamation claim.  But guilt by association is not the "special application" required by the case law.

Accordingly, President Cordano's statements about "Kappa Gamma" are not "concerning" any of the Plaintiffs as a matter of law, and they have failed to state claims for defamation.

## II.   CALLING KAPPA GAMMA THE "FACE OF SYSTEMIC RACISM" AT GALLAUDET AND COMMENTING ON RACIST CONDUCT ARE PROTECTED EXPRESSIONS OF OPINION AND HYPERBOLE, NOT ASSERTIONS OF FACT.

The law of defamation distinguishes statements that are objectively "true" from statements that are demonstrably "false"; it does not resolve differences of opinion.  To state a viable claim for defamation, Plaintiffs must allege—and ultimately have the burden to prove— that Defendants made a *factual* statement that was *false.*  They have not done so.  President Cordano's judgment that Kappa Gamma was viewed as "the face of systemic racism" at Gallaudet was her subjective, figurative characterization of the facts—Kappa Gamma's use of the salute and robes and the ensuing social media reaction.  It is not susceptible to the objective proof or disproof that distinguishes actionable defamation from non-actionable opinion.

Far from being a proper subject of a defamation claim, President Cordano's opinions about Kappa Gamma are constitutionally protected.  "A statement of opinion that 'does not contain a provably false factual connotation' is not actionable under the First Amendment, and receives 'full constitutional protection.'"  *Montgomery v. Risen*, 197 F. Supp. 3d 219, 247-49 (D.D.C. 2016) (quoting *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 20 (1990) ("The assertion that [Plaintiff] was motivated [by] greed or ambition is a subjective judgment that is not verifiable. . . . [Defendant's] own subjective opinion that [Plaintiff] is a con artist is also a non-actionable opinion."), *aff'd,* 875 F.3d 709 (D.C. Cir. 2017).  *See also Ruifang Hu v. K4 Sols., Inc.*, No. 18-cv-1240, 2020 WL 1189297, at *13 (D.D.C. Mar. 12, 2020) ("Expressions of opinion can be actionable only if they imply a provably false fact, or rely upon stated facts that are provably false.") (internal quotation marks and citation omitted).  "However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas."  *Gertz* v. *Robert Welch, Inc.,* 418 U. S. 323, 339-40 (1974).[4]

Courts have repeatedly applied this distinction between fact and opinion in holding that commentary on racism or bigotry does not constitute defamation.  *See, e.g., Brimelow v. N.Y. Times Co.*, No. 20 Civ. 222, 2020 WL 7405261, at *9 (S.D.N.Y. Dec. 16, 2020) ("In any event, the characterization of some individuals who post on VDARE as 'white nationalists' is the same sort of non-actionable opinion commentary discussed previously.");  *Ratajack v. Brewster Fire*

---

[4] The Complaint implicitly acknowledges that only a false statement of fact, and not an opinion, can constitute defamation.  Plaintiffs allege that President Cordano's statements "were understood to be statements of fact and not opinion." Compl. ¶ 140.  But this purely conclusory assertion is unsupported by any factual allegations and thus should not be accepted as true for purposes of this motion.  *Hopkins v. Women's Div., Gen. Bd. of Glob. Ministries*, 238 F. Supp. 2d 174, 178 (D.D.C. 2002) ("[T]he Court need not accept inferences or conclusory allegations that are unsupported by the facts set forth in the complaint.").  Whether a statement is fact or opinion is an issue of law for the court to decide.  *Sigal Const. Corp. v. Stanbury*, 586 A.2d 1204, 1210 (D.C. 1991)

*Dep't Inc.*, 178 F. Supp. 3d 118, 165 (S.D.N.Y. 2016) (holding that claims that plaintiff was a "racist" were non-actionable opinion); *Reilly v. WNEP*, No. 557 MDA 2020, 2021 WL 1017154, at *7 (Pa. Super. Ct. Mar. 17, 2021) ("Even if [Defendant] referred to [Plaintiff] as a bigot, racist, and Neo-Nazi, such comments are merely his opinion under our precedents. They are legally incapable of defamatory meaning.") (citation omitted); *Rybas v. Wapner*, 457 A.2d 108, 110 (Pa. Super. Ct. 1983) (concluding that letter referring to plaintiff as "anti-Semitic" was not capable of defamatory meaning).[5]

In *Smith v. School District of Philadelphia*, 112 F. Supp. 2d 417, 420 (E.D. Pa. 2000), plaintiff, the father of two school children, wrote a letter to their school's principal seeking changes at the school based on his view that the "white/Jewish teachers" were racist and discriminated against African American students.  Plaintiff advocated for the removal of certain school teachers and staff members, including assistant principal Steven Miller and teacher Avi Barr.  *Id.* at 421.  Plaintiff wrote a petition in the form of a letter to the principal seeking the termination of Miller and Barr.  *Id.* at 421-22.  The Philadelphia Board of Education passed a resolution condemning plaintiff and calling his letter "clearly racist and anti-Semitic."  *Id.* at 422.

Plaintiff sued for defamation, among other counts, against Barr and Miller because they "'made public statements that plaintiff is racist and anti-Semitic which were false . . . .'"  *Id.* at 429.  The court concluded that the statements, if made, were expressions of opinion that cannot establish the basis for a defamation action.  *Id.*  "While the Court acknowledges that a statement

---

[5] *See also, e.g.*, *Steadman v. Sinclair*, 223 A.D.2d 392, 393 (N.Y. App. Div. 1996) (letter to plaintiff's employer complaining about his racism in hope that employer would correct these "ongoing injustices" stated nonactionable expressions of opinion); *Ward v. Zelikovsky*, 643 A.2d 972, 975 (N.J. 1994) (defendant's claim that plaintiffs "hate" or "don't like" Jews is hurtful name calling that is not slander); *Sall v. Barber*, 782 P.2d 1216, 1218 (Colo. App. 1989) (letter calling plaintiff a "'bigot'" who should be exiled to sagebrush country with "'skunks and coyotes'" expressed opinion).

that plaintiff is 'racist and anti-Semitic,' if it was made, would be unflattering, annoying and embarrassing, such a statement does not rise to the level of defamation as a matter of law because it is merely non-fact based rhetoric." *Id.*

President Cordano's portrayal of Kappa Gamma as "the face of systemic racism" is even one more step removed from defamation. It not only reflects her own subjective take on the facts but also captures the opinions of *others*: Kappa Gamma had become the face of systemic racism in the Gallaudet community after "renewed demands for change with Kappa Gamma" and "with photographs of the salute and use of robes *being shared on social media.*" That is, the fraternity had come to be associated with racism because of a broader audience's interpretation of its actions. *See, e.g.*, Ex. 1; Compl. ¶¶ 131 ("30/31 year old photo of Kappa Gamma members using the Bellamy salute…re-emerged on social media in May or June, 2020"), 139(b) (referencing "pictures distributed to media"), 139(c) ("with photographs of the salute and use of robes being shared on social media"), 139(d) ("*Recent photos* posted on social media"), 139(k) ("pictures of the racist rituals being circulated in social media").

Courts distinguishing false statements of fact from opinion also often look to the speaker's choice of words. The Supreme Court has recognized that figurative language is typically indicative of opinion rather than fact. *Milkovich,* 497 U.S. at 21 ("[L]oose, figurative, or hyperbolic language []negate[d] the impression that the writer was seriously maintaining that petitioner committed the crime of perjury"); *Bauman v. Butowsky*, 377 F. Supp. 3d 1, 13 (D.D.C. 2019) ("Here again, '[c]ontext is crucial,' as it 'can turn what, out of context, appears to be a

statement of fact into "rhetorical hyperbole," which is not actionable.'") (quoting *Ollman v. Evans*, 750 F.2d 970, 1000 (D.C. Cir. 1984) (Bork, J., concurring)).[6]

President Cordano's use of the phrase "the face of systemic racism" is inherently figurative. In common parlance, "the face of" a concept or group evokes a subjective mental association, not any literal fact.[7] Calling someone the face of, for example, a product, political party, business, or sports franchise entails no statement that can be proved true or false. Indeed, "face" is used in a plethora of metaphorical and idiomatic phrases ("at face value," "fly in the face of," "on the face of it," "disappeared from the face of the earth," "tell him to his face," "do an about-face," "save face," "face off," "two-faced," "with a straight face," "face up to it," "come face to face"). *See, e.g.*, *Tagliaferri v. Szulik*, No. 15 Civ. 2685, 2016 WL 3023327, at *2 (S.D.N.Y. May 25, 2016) (colorful language such as "'face of evil'" not actionable).

Accordingly, Defendants' protected expressions of opinion and hyperbole are not assertions of false fact, a required element for an actionable defamation claim.

## III.   IN THE EVENT THE CHALLENGED STATEMENTS ARE FOUND TO BE ACTIONABLE—WHICH THEY ARE NOT—PLAINTIFFS' CLAIMS SHOULD STILL BE DISMISSED BECAUSE PRESIDENT CORDANO'S STATEMENTS WERE SUBSTANTIALLY TRUE.

Truth is an absolute defense to a defamation claim. *Lohrenz v. Donnelly,* 223 F. Supp. 2d 25, 59 (D.D.C. 2002), *aff'd*, 350 F.3d 1272 (D.C. Cir. 2003). So long as the "gist or 'sting' of the statement is substantially true, 'minor inaccuracies will not give rise to a defamation claim.'"

---

[6] Even the *denial* of an allegation of racism often comes in figurative language—*e.g.*, "I don't have a racist bone in my body"—precisely because it is not susceptible to the binary "true or false" analysis that distinguishes fact from opinion in defamation law.

[7] President Cordano elaborated on this very point in her July 16, 2020 message to Gallaudet alumni, using the "face of" language again in acknowledging that racism is felt differently by different people. In language nowhere mentioned in the Complaint, she said: "There are many faces of racism – racism shows up in our daily lives, often it is and feels invisible to those with privilege, most often white and hearing people; but people of color, and people of color who are deaf, hard of hearing or deafblind, they see it, they experience it." Ex. 2 at 3-4.

*Copeland-Jackson v. Oslin,* 555 F. Supp. 2d 213, 217 n.5 (D.D.C. 2008); *see also Masson v. New Yorker Mag., Inc.,* 501 U.S. 496, 517 (1991).  Courts regularly dismiss defamation cases on the ground that the defendants' statements were substantially true.  *See, e.g., Copeland-Jackson,* 555 F. Supp. 2d at 217; *Robertson v. Cartinhour,* 867 F. Supp. 2d 37, 59 (D.D.C. 2012), *aff'd per curiam,* 553 F. App'x 1 (D.C. Cir. 2014); *Tannerite Sports, LLC v. NBCUniversal News Grp.,* 864 F.3d 236, 247 (2d Cir. 2017).  "Where the question of truth or falsity is a close one, a court should err on the side of nonactionability."  *Libre by Nexus v. Buzzfeed, Inc.,* 311 F. Supp. 3d 149, 158 (D.D.C. 2018) (internal quotation marks omitted).

Should this Court find that President Cordano's statements about Kappa Gamma give rise to a defamation claim by these individual Plaintiffs, and that they were statements of fact rather than opinion, it should also find that the statements were substantially true.  Plaintiffs contend, in essence, that their former fraternity and its recent actions could not truly be perceived as racist.  But the facts, as alleged in the Complaint and as narrated by President Cordano in her two video addresses, compel the conclusion that Kappa Gamma had indeed come to be seen as exemplifying racism on the Gallaudet campus.

President Cordano recited, in her June 9 vlog, that the University had "bec[o]me aware of new information that led to renewed demands for change with Kappa Gamma. . . "; that photographs of the salute and use of robes had been shared on social media; and that the fraternity's behavior was "unacceptable."  Ex. 1 at 1.  In her July 16, 2002 message to alumni, she laid out the facts in even more detail:

> In 2015, Gallaudet issued a policy that prohibited the use of robes in public in response to concerns about the racist impact of the robes brought up by SBG and BSU.  In early June 2020, new evidence emerged about the Kappa Gamma student chapter's intention to bring back the use of robes in their meetings and ceremonies and this information became public, triggering many

> members of the Gallaudet community. This prompted an
> immediate investigation that concluded the Kappa Gamma chapter
> violated the 2015 policy and resulted in the immediate suspension
> of the chapter while their case is progressing through the Office of
> Student Conduct. They were <u>not</u> suspended because of old photos.

Ex. 2, Roberta Cordano, *President Cordano's Message to Gallaudet Alumni* (July 16, 2020), Tr.

at 3, https://us3.campaign-archive.com/?u=1f4f6deee1b97fac6e5179a64&id=24b15e2cec.

Plaintiffs do not, in their Complaint, dispute the key factual underpinnings of President

Cordano's "face of systemic racism" statement. They do not contest the existence of the 2015

prohibition on the use of the robes. They do not deny that this prohibition followed on the heels

of "concerns about the racist impact of the robes brought up by [Student Body Government] and

[Black Student Union]"; nor that the University learned of Kappa Gamma's intention to resume

use of the banned robes; nor that this information "became public," "triggering many members

of the Gallaudet community." They do not dispute that there was an investigation or that Kappa

Gamma was found to be in violation of a policy that originated in concerns about racism. They

allege nothing to belie President Cordano's clarification that the suspension of Kappa Gamma

was based only on the robes, not photos of the salute.[8] Indeed, nowhere in the Complaint do

Plaintiffs allege that Kappa Gamma itself denies any of the above.

The Complaint agrees that President Cordano became aware, at a Town Hall meeting on

June 5, 2020 of "'new information resulting in renewed demands for change with Kappa

Gamma.'" Compl. ¶¶ 8-9. The Complaint also acknowledges that the Bellamy salute has

"similarities in appearance" to the Italian Fascist and Nazi salutes, *id.* ¶ 106, and had been

voluntarily discontinued by Kappa Gamma almost three decades ago. *Id.* ¶ 114. Plaintiffs

volunteer in the Complaint that the use of the robes had been "permanently banned" in 2015 as a

---

[8] Close reading of the June 9 transcript reveals that President Cordano had not said that Kappa
Gamma was suspended *because of* photographs of the salute.

result of Student Body Government concerns, *id.* ¶¶ 121-123, and that then Dean of Student

Affairs Benedict, in announcing the ban, had written: "Conduct that was tolerated decades ago, is

no longer acceptable." *Id.* ¶ 124.  Finally, the Complaint acknowledges a Facebook post by

Kappa Gamma denouncing the Nazi-like salute as contrary to its current standards of conduct.

*Id.* ¶ 130.

     If "the face of systemic racism" is a statement of fact at all, it does not misrepresent the

evidence or lead to any false impression.  Its "gist" or "sting" is no different than the sum of the

facts stated in President Cordano's addresses and those alleged in the Complaint.  It is

substantially true.  As such, it gives rise to no cause of action in defamation.

## IV.    THE BOARD OF TRUSTEES SHOULD BE DISMISSED BECAUSE PLAINTIFFS HAVE NOT PLEADED A PLAUSIBLE CLAIM AGAINST IT.

     Plaintiffs' sparse allegations against Gallaudet's Board of Trustees lack the factual

support needed to state a defamation claim.  *Ashcroft*, 556 U.S. at 678 ("To survive a motion to

dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to

relief that is plausible on its face.'") (quoting *Twombly*, 550 U.S. at 570).  Their attempt to plead

liability of the Board of Trustees is limited to a single paragraph and the conclusory allegation

that the Board of Trustees is liable for President Cordano's statements.  Compl. ¶ 149.  There are

no allegations that the Board of Trustees is either liable for President Cordano's statements by

respondeat superior or in its own right by making any defamatory statements.  As this allegation

of Board liability lacks any factual basis, the Court need not accept it as true.  *Hopkins*, 238 F.

Supp. 2d at 178.

     Accordingly, Plaintiffs have failed to state a claim against the Board of Trustees, and the

Board should be dismissed.

## CONCLUSION

The Gallaudet defendants did not defame Steven Florio, Patrick Costello, William Millios, or Timothy Mallach.  President Cordano did not identify them or describe any conduct attributable to them, much less call them "the face of systemic racism" in the Gallaudet community.  She opined on fully disclosed facts in figurative language; her comments were constitutionally protected as expressions of opinion and hyperbole.  For all of the foregoing reasons, Gallaudet University, the Board of Trustees of Gallaudet University, and Roberta Cordano respectfully request that the Court dismiss all of Plaintiffs' claims in their entirety.

October 25, 2021                              Respectfully submitted,


                                              /s/ Laura Offenbacher Aradi
                                              Clifford J. Zatz (D.C. Bar No. 298596)
                                              czatz@crowell.com
                                              Laura Offenbacher Aradi (D.C. Bar No. 1000199)
                                              laradi@crowell.com
                                              CROWELL & MORING LLP
                                              1001 Pennsylvania Avenue, NW
                                              Washington, DC  20004
                                              Telephone:    (202) 624-2500
                                              Facsimile:     (202) 628-5116

                                              *Attorneys for Gallaudet University,*
                                              *The Board of Trustees of Gallaudet University,*
                                              *and Roberta Cordano*

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of October, 2021, a true copy of the above document was served via CM/ECF on all counsel of record.

/s/ Laura Offenbacher Aradi
Laura Offenbacher Aradi