UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| STEVEN FLORIO, PATRICK COSTELLO, WILLIAM MILLIOS, and TIMOTHY MALLACH, | | |
| Plaintiffs, | | |
| v. | | No. 1:21-cv-01565-CRC |
| GALLAUDET UNIVERSITY, THE BOARD OF TRUSTEES OF GALLAUDET UNIVERSITY, ROBERTA CORDANO, AND WP COMPANY LLC, d/b/a THE WASHINGTON POST, | | |
| Defendants. | | |

**MEMORANDUM OF POINTS AND AUTHORITIES
<u>IN SUPPORT OF DEFENDANT THE WASHINGTON POST'S MOTION TO DISMISS</u>**

Thomas G. Hentoff
Nicholas G. Gamse
Anna Johns Hrom
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, DC  20005
Telephone:  (202) 434-5000
thentoff@wc.com
ngamse@wc.com
ahrom@wc.com

*Counsel for The Washington Post*

**TABLE OF CONTENTS**

INTRODUCTION ..........................................................................................................................1

BACKGROUND .........................................................................................................................2

LEGAL STANDARD...................................................................................................................7

ARGUMENT .............................................................................................................................8

I.     THE STATEMENTS AT ISSUE ARE NOT "OF AND CONCERNING"
PLAINTIFFS. ..................................................................................................................9

     A.     The Group Libel Doctrine Bars Plaintiffs' Claims. ..................................................9

     B.     The Article Does Not Describe Any Plaintiff. .......................................................12

II.     THE STATEMENTS AT ISSUE ARE PROTECTED OPINION, OR, IN THE
ALTERNATIVE, NOT MATERIALLY FALSE. .............................................................13

     A.     The Statements at Issue Are Constitutionally Protected Opinion..........................13

     B.     Alternatively, the Statements Are Not Materially False. .......................................18

CONCLUSION..........................................................................................................................20

# TABLE OF AUTHORITIES

## CASES

*Abbas v. Foreign Pol'y Grp.*, 783 F.3d 1328 (D.C. Cir. 2015) ................................................9, 20

*Abbas v. Foreign Pol'y Grp.*, 975 F. Supp. 2d 1 (D.D.C. 2013) ...................................................4

*Alexis v. District of Columbia*, 77 F. Supp. 2d 35 (D.D.C. 1999) .........................................*passim*

*Am. Legion v. Am. Humanist Ass'n*, 139 S. Ct. 2067 (2019) ........................................................20

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..................................................................................8, 12

*Bauman v. Butowsky*, 377 F. Supp. 3d 1 (D.D.C. 2019)....................................................5, 14, 19

*Buckley v. Littell*, 539 F.2d 882 (2d Cir. 1976)..............................................................................14

*BYD Co. Ltd. v. All. for Am. Mfg.*, 2021 WL 3472386 (D.D.C. Aug. 6, 2021) ...............................7

*Church of Scientology v. Time Warner, Inc.*, 806 F. Supp. 1157 (S.D.N.Y. 1992)......................10

*Copeland-Jackson v. Oslin*, 555 F. Supp. 2d 213 (D.D.C. 2008)..............................................2, 18

*Deripaska v. AP*, 282 F. Supp. 3d 133 (D.D.C. 2017)...................................................................20

*Doe No. 1 v. Burke*, 91 A.3d 1031 (D.C. 2014)...............................................................................8

*EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621 (D.C. Cir. 1997)............................4, 5

*Farah v. Esquire Mag.*, 736 F.3d 528 (D.C. Cir. 2013) ...................................................2, 5, 7, 13

*Fowler v. Curtis Publ'g Co.*, 182 F.2d 377 (D.C. Cir. 1950) .......................................1, 10, 11, 12

*Holy Spirit Ass'n for Unification of World Christianity v. Sequoia Elsevier Pub. Co.*, 426 N.Y.S.2d 759 (App. Div. 1980) ................................................................................15

*Kahl v. BNA*, 856 F.3d 106 (D.C. Cir. 2017)...................................................................................7

*Khodorkovskaya v. Gay*, 5 F.4th 80 (D.C. Cir. 2021)......................................................................8

*Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287 (D.C. Cir. 1988) ..................................15

*Lohrenz v. Donnelly*, 223 F. Supp. 2d 25 (D.D.C. 2002) ..........................................................9, 18

*Luhn v. Scott*, 2019 WL 5810309 (D.D.C. Nov. 7, 2019) ...............................................................9

*Marsh v. Hollander*, 339 F. Supp. 2d 1 (D.D.C. 2004) ..................................................................4

*Masson v. New Yorker Mag., Inc.*, 501 U.S. 496 (1991) ..........................................18, 20

*McCafferty v. Newsweek Media Grp., Ltd.*, 955 F.3d 352 (3d Cir. 2020) ..............................15, 16

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990) ....................................................13

*Moldea v. N.Y. Times Co.*, 22 F.3d 310 (D.C. Cir. 1994) ...........................................9, 14

*Montgomery v. Risen*, 197 F. Supp. 3d 219 (D.D.C. 2016)..........................................2, 13, 14, 15

*Ollman v. Evans*, 750 F.2d 970 (D.C. Cir. 1984) ........................................................13

*Provisional Gov't of Republic of New Afrika v. Am. Broad. Cos.*, 609 F. Supp. 104 (D.D.C. 1985) ....................................................................................10

*Riss & Co. v. Ass'n of Am. R.R.*, 187 F. Supp. 323 (D.D.C. 1960) ...............................11

*Robertson v. Cartinhour*, 867 F. Supp. 2d 37 (D.D.C. 2012) ......................................18

*Serv. Parking Corp. v. Wash. Times Co.*, 92 F.2d 502 (D.C. Cir. 1937)....................................11

*Shipkovitz v. Wash. Post. Co.*, 408 F. App'x 376 (D.C. Cir. 2010) ..................................18, 19, 20

*Smith v. Sch. Dist. of Phila.*, 112 F. Supp. 2d 417 (E.D. Pa. 2000) ................................14

*Standing Comm. on Discipline of U.S. Dist. Court v. Yagman*, 55 F.3d 1430 (9th Cir. 1995) .............................................................................................15

*Stevens v. Tillman*, 855 F.2d 394 (7th Cir. 1988) ........................................................15

*Weyrich v. New Republic, Inc.*, 235 F.3d 617 (D.C. Cir. 2001) ...................................13

## CONSTITUTIONAL PROVISIONS AND RULES OF PROCEDURE

Fed. R. Civ. P. 8 ...........................................................................................................8

Fed. R. Civ. P. 12(b)(6)................................................................................................1, 7, 8

U.S. Const. amend. I ........................................................................................... *passim*

## OTHER AUTHORITIES

Restatement (Second) of Torts (Am. Law Inst. 1977)......................................................10, 11, 13

## INTRODUCTION

In June 2020, Gallaudet University President Roberta J. Cordano announced that the Gallaudet administration was suspending Kappa Gamma fraternity from campus after photos were circulated on social media of fraternity members wearing controversial hooded robes, which had been banned years earlier because of their similarity to the infamous Ku Klux Klan dress.  The Washington Post covered that important announcement with citation to and quotation of a variety of on- and off-campus sources, but without any reference to any of the four Plaintiffs who have brought this lawsuit, none of whom had any specific connection to the controversy and who were not named, pictured, or otherwise personally identified in any way in the Post's coverage (or President Cordano's announcement).  Plaintiffs sued Gallaudet, President Cordano, the Gallaudet Board of Trustees, and the Post for a variety of different statements related to the controversy, alleging that because Plaintiffs are known to be former student and alumni members of the fraternity, each of them "*is* Kappa Gamma" and may recover for statements implicating the fraternity. Compl. ¶¶ 49, 170, 188, 202, 215 (emphasis added).  But that is not the way defamation law works.

The Complaint's allegations against the Post fail to state a claim for multiple reasons, each of which independently requires dismissal under Federal Rule of Civil Procedure 12(b)(6).

First, Plaintiffs' claims fail because the Post's article is not "of and concerning" them.  In particular, the group libel doctrine bars their claims because "'[i]n a case of a[n allegedly] defamatory publication directed against a class, without in any way identifying any specific individual, no individual member of the group has any redress.'" *Alexis v. District of Columbia*, 77 F. Supp. 2d 35, 42 (D.D.C. 1999) (quoting *Fowler v. Curtis Publ'g Co.*, 182 F.2d 377, 378 (D.C. Cir. 1950)).  Plaintiffs were not identified in any way in the allegedly defamatory

publications.   Neither they nor any of the other scores of Kappa Gamma alumni "ha[ve] any redress." *Id.*

Second, the allegedly defamatory statements are constitutionally protected statements of opinion.  The statements at issue do "'not contain a provably false factual connotation,'" as they simply convey normative conclusions about the offensiveness of the fraternity's practices. *Montgomery v. Risen*, 197 F. Supp. 3d 219, 247–48 (D.D.C. 2016) (citation omitted), *aff'd*, 875 F.3d 709 (D.C. Cir. 2017).   In addition, the Article fully discloses the facts upon which these opinions are based and "does not otherwise imply unstated defamatory facts." *Farah v. Esquire Mag.*, 736 F.3d 528, 539 (D.C. Cir. 2013).   Accordingly, none of the statements is actionable.

Third, even if the allegedly defamatory statements were verifiable statements of fact, they would not be materially false.  Plaintiffs do not and cannot dispute that the fraternity's robes were banned from campus and that the fraternity's salute has been denounced and discontinued for evoking racist and anti-Semitic imagery.  Plaintiffs admit that the robes are "similar to those used by white supremacist organizations," Compl. ¶ 120, and that the salute has "similarities in appearance" to the Nazi salute, *id.* ¶ 106.  Since the "gist or 'sting' of the statement[s are] substantially true," Plaintiffs have no cognizable claim. *Copeland-Jackson v. Oslin*, 555 F. Supp. 2d 213, 217 n.5 (D.D.C. 2008).

Each of these deficiencies is independently fatal to Plaintiffs' claims against the Post.  The Complaint should be dismissed with prejudice.

## BACKGROUND

The Kappa Gamma fraternity has operated on the Gallaudet University campus since at least 1901.  Compl. ¶ 102.  For many years, members of the fraternity wore hooded robes, over time emblazoned with various "trims and patches," until other students complained in 2014 that "specific elements of the regalia could be viewed as similar to those used by white supremacist

2

organizations." Compl. ¶¶ 115–20.  In 2015, the University banned Kappa Gamma and other Greek organizations from using ceremonial robes in public spaces both on and off campus, having found the conduct "no longer acceptable." Compl. ¶¶ 122–26 (emphasis omitted).

The fraternity also officially practiced the "Bellamy salute," characterized by rigidly extending one's right arm straight forward at a slight upward angle, through at least the 1990s. Compl. ¶¶ 101–14.  However, the salute was discontinued in the United States by the 1940s because European fascists had "adopted a salute with similarities to the Bellamy salute." Compl. ¶¶ 102–14.  From 1992 or 1993, the fraternity continued to use the salute, if "at all, . . . in private only." Compl. ¶ 114.

"[I]n the midst of the resulting Black Lives Matter" demonstrations following George Floyd's death in May 2020, photographs circulated on the internet that caused an uproar and propelled the fraternity's traditions to the center of public debate, including one of a group of Kappa Gamma students in the 1980s performing the raised-arm salute, as well as of fraternity members wearing the robes.  *Id.* ¶¶ 1, 128–30, 133–34, 157.

On June 9, 2020, Gallaudet University President Roberta J. Cordano addressed the controversy via the University's YouTube account, announcing that Gallaudet was suspending the fraternity.  She stated, in part:

> Over the past few days, with the SBG/BSU Town Hall last Friday, we became aware of new information that led to renewed demands for change with Kappa Gamma, a fraternity with a long history at Gallaudet. They have become the face of systemic racism in our community, with photographs of the salute and use of robes being shared on social media.  This behavior is unacceptable.  *Gallaudet has now taken action to suspend Kappa Gamma on campus*.

Ex. A (emphasis added); *see* Compl. ¶¶ 123–33, 139(a)–(c).[1]

A few days later, on June 12, 2020, the Post published an Article reporting on President Cordano's statement and the University's decision to suspend Kappa Gamma from campus.  Ex. B.  The Article stated that the University had suspended the fraternity "after members were identified wearing prohibited ceremonial robes."  Ex. B.  For context, the Article explained that "Kappa Gamma Fraternity [had previously drawn] campuswide criticism in 2014 after members wore their 'traditional blue-hooded robes' with pointed hoods that resemble Ku Klux Klan garb, campus newspaper the Buff and Blue reported."  *Id.*  The words "Buff and Blue" provided a hyperlink to a 2015 Buff and Blue article, which described the robes as "traditional blue-hooded robes" with "pointed hoods, which were reflective of the Ku Klux Klan."  Ex. B; Ex. C.[2]  Citing

---

[1] Exhibit A is a transcript of President Cordano's June 9, 2020 YouTube address.  The video is available at https://www.youtube.com/watch?v=hqdA3Zmtay0.  Exhibit B is an early online version of the Post's June 12, 2020 Article.  Exhibit C is a 2015 article from Gallaudet's student newspaper, the Buff and Blue, quoted and linked in the Article.  Exhibit D is a statement by Hillel at Gallaudet, also quoted and linked in the Article.  Exhibit E is an updated online version of the Article, and Exhibit F is the print version of the Article that appeared in the Metro section on June 13, 2020.  Although the Complaint did not link to or physically attach the Article, the Court may consider it (Exhibits B, E, and F) and President Cordano's public address (Exhibit A) because they are directly at issue and incorporated by reference in the Complaint.  *See EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 625 (D.C. Cir. 1997); *Marsh v. Hollander*, 339 F. Supp. 2d 1, 5 & n.4 (D.D.C. 2004) (granting motion to dismiss based in part on letters submitted as exhibits to defendant's motion to dismiss); *Abbas v. Foreign Pol'y Grp.*, 975 F. Supp. 2d 1, 16–18 & n.7 (D.D.C. 2013) (granting motion to dismiss defamation complaint where hyperlinked source material supported opinion and fair report privilege defenses), *aff'd*, 783 F.3d 1328 (D.C. Cir. 2015).

[2] The linked Buff and Blue article described a 2014 "ten-page letter outlining complaints" made through the Gallaudet Student Body Government and Black Student Union about Kappa Gamma's robes.  Ex. C.  In particular, the article explained:  "The robes were made in royal blue with gold trim, and it had various designs embroidered on [them]. The complaints especially focused on the fact that the robes had pointed hoods, which were reflective of the Ku Klux Klan, and some insignia on it, such as a red diamond with crossed bones inside, which they connected with Nazism." Ex. C; *see* Compl. ¶ 120 (describing same student complaints).  The Court may consider sources the Post article quoted, cited, and/or linked (Exhibits A, C and D, as well as those integrated into the text of the article) on a motion to dismiss because they constitute the substance

President Cordano, The Article reported that "recent photos posted on social media showed the group in the outfits again . . . leading to their suspension."  Ex. B.

To provide broader context, the Article also explained the fraternity's controversial use of the Bellamy salute, including as reflected in "a 1988 photo," which showed former fraternity members performing "an apparent Nazi salute."  Ex. B.  The 1988 photo, the Article explained, had "resurfaced around the same time members were caught wearing the robes."  Ex. B; *see* Compl. ¶¶ 128–31, 134–26 (noting that the 1988 photo "re-emerged . . . in May or June, 2020").

Kappa Gamma's perspective was also represented in the Article.  "[A] public statement from Kappa Gamma International, the fraternity's alumni organization," acknowledged:  "It was wrong for us to force this salute on our pledges, no matter what is their background.  Most of all, it was wrong for us to ignore the calls for its complete cessation."  Ex. B.  The Article also quoted and linked to a statement in a Facebook video by Kappa Gamma President, Setthawut Snow:

> We want to emphasize that the circulated pictures are over 30 years old. . . .  We have long since denounced these such gestures and the practices associated with what were shown in the circulation.  They are no longer accepted in any form by the present-day administration.

Ex. B.  The Article noted his point "that the actions portrayed in the photo . . . are no longer part of the fraternity."  Ex. B.

The Article also included statements from two Jewish organizations.  First, the Article cited and linked a statement from the Gallaudet chapter of Hillel, a Jewish life organization, which

---

of the publication at issue and therefore are clearly integral to Plaintiff's defamation claim.  *See EEOC*, 117 F.3d at 625; *Bauman v. Butowsky*, 377 F. Supp. 3d 1, 6 (D.D.C. 2019); *see also Farah v. Esquire Mag.*, 736 F.3d 528, 534 (D.C. Cir. 2013) ("Judicial notice is properly taken of publicly available historical articles such as were attached to [defendant's] motions to dismiss.").

"condemned the image of members posing in the apparent Nazi salute."   Ex. B; Ex. D.

Specifically, the statement said:

> The use of the salute and the robes insults the memory of millions
> of Jewish, LGBT, and disabled individuals, and others who were
> murdered during the Holocaust, as well as the memory of countless
> black men and women who have lost their lives to white supremacy.

Ex. B; Ex. D.  Second, the Article included comment from Rabbi Abraham Cooper, the director

of the Simon Wiesenthal Center's Ed Snider Social Action Institute, a Los Angeles-based Jewish

human rights organization.  He "applauded Cordano for taking action against the fraternity," but

said "'more must be done to remove the stain of racism and anti-Semitism.'"  Ex. B.

The original online article, "Gallaudet University suspends fraternity after anti-Semitic

photo resurfaces," was updated on June 12, 2020 to clarify that while Gallaudet "officials

denounced the salute . . . it was not a factor in the suspension" of the fraternity.  Ex. E.  The updated

online article opened:  "Gallaudet University's oldest fraternity has been suspended from campus

after members were identified wearing prohibited ceremonial robes that resemble Ku Klux Klan

garb, officials said."  *Id.*  A print article substantially similar to the updated online article appeared

in the Post's Metro section on June 13, 2020 with a shorter headline:  "Gallaudet suspends its

oldest fraternity."  Ex. F.  The print version included only text, while the online version included

only a photo of the Gallaudet campus; no version included images of any fraternity members.  Exs.

B, E, F; *see* Compl. ¶ 155 (the Post did not "includ[e] the actual picture with the story").

This lawsuit was initially filed on behalf of ten Plaintiffs.  Six withdrew from the suit a

week later.  *See* Notice of Voluntary Dismissal, ECF No. 5; Notice of Voluntary Dismissal, ECF

No. 6.  Four remain: Plaintiffs Florio, Costello, Millios, and Mallach.  The Complaint alleges

defamation by Gallaudet, its Board of Trustees, and President Cordano for statements made about

the fraternity and its suspension from campus.   It also alleges defamation by the Post,

notwithstanding the fact that not one of the Plaintiffs is named, pictured, or personally identified in the Post's Article in any way.

In a section titled "The False and Defamatory Statements of the Washington Post," the Complaint alleges specific statements from the Post Article are actionable against the Post in paragraphs 153–65.  Specifically, Plaintiffs allege that three statements published in the online and/or print versions of the Article defamed them:

- the headline used on the online versions of the Article:  "Gallaudet University suspends fraternity after anti-Semitic photo resurfaces," Compl. ¶ 155;

- the description of "ceremonial robes that resemble Ku Klux Klan garb," *id.* ¶ 160; and

- the characterization of the salute as an "apparent Nazi salute," *id.* ¶ 163.[3]

## LEGAL STANDARD

"[T]he Supreme Court has directed courts to expeditiously weed out unmeritorious defamation suits" in order "[t]o preserve First Amendment freedoms and give reporters, commentators, bloggers, and tweeters (among others) the breathing room they need to pursue the truth." *Kahl v. BNA*, 856 F.3d 106, 109 (D.C. Cir. 2017).  Indeed, courts in this Circuit have long recognized that "summary proceedings are essential in the First Amendment area because if a suit entails 'long and expensive litigation,' then the protective purpose of the First Amendment is thwarted even if the defendant ultimately prevails." *Farah v. Esquire Mag.*, 736 F.3d 528, 534 (D.C. Cir. 2013) (citation omitted) (affirming Rule 12(b)(6) dismissal); *BYD Co. Ltd. v. All. for Am. Mfg.*, 2021 WL 3472386, at *2 (D.D.C. Aug. 6, 2021) ("Rule 12 plays an especially important role in defamation cases, such as this one. . . .  'Early resolution of defamation cases under Federal

---

[3] The Complaint does not assert claims against the Post for other statements in the Article, some of which it asserts against the Gallaudet defendants.  Even if they had, the statements are non-actionable for similar reasons.

Rule of Civil Procedure 12(b)(6) not only protects against the costs of meritless litigation, but provides assurance to those exercising their First Amendment rights that doing so will not needlessly become prohibitively expensive.'") (citation omitted) (granting motion to dismiss).

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint must be dismissed if it "fail[s] to state a claim upon which relief can be granted." To survive dismissal, a complaint must plead facts sufficient to support every element of each cause of action, and the claim to relief must be plausible on the face of the complaint. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also* Fed. R. Civ. P. 8.

## ARGUMENT

To recover for defamation under District of Columbia law, a plaintiff must establish, "(1) that the defendant made a false and defamatory statement concerning the plaintiff," the "of and concerning" requirement; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm." *Doe No. 1 v. Burke*, 91 A.3d 1031, 1044 (D.C. 2014).

Here, the Complaint fails to state a claim for multiple, independently dispositive reasons. First, none of the alleged statements at issue is "of and concerning" any Plaintiff, and Plaintiffs' claims are barred by the group libel doctrine. Second, the statements express constitutionally protected opinions, or, in the alternative, are not materially false.[4] Because Plaintiffs cannot plead

---

[4] The Complaint appears to allege only defamation. *See* Compl. To the extent that the Complaint's passing mention of "false light" is intended to state a claim for false light invasion of privacy, *see* Compl. ¶ 154, any such claim fails for the same reasons. *Khodorkovskaya v. Gay*, 5 F.4th 80, 85 (D.C. Cir. 2021) ("'the same First Amendment protections apply'" to false light claims (citation

around the undisputed text of the Article, dismissal should be with prejudice.  *See, e.g.*, *Abbas v. Foreign Pol'y Grp.*, 783 F.3d 1328, 1340 (D.C. Cir. 2015) (affirming dismissal of defamation action, and emphasizing that "[d]ismissal with prejudice is warranted when the 'allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency.'" (citation omitted)).

## I.     THE STATEMENTS AT ISSUE ARE NOT "OF AND CONCERNING" PLAINTIFFS.

"Defamation is personal; a plaintiff who alleges defamation must show that the allegedly defamatory statement was published 'of and concerning' him." *Alexis v. District of Columbia*, 77 F. Supp. 2d 35, 40 (D.D.C. 1999) (cleaned up); *see Luhn v. Scott*, 2019 WL 5810309, at *4 (D.D.C. Nov. 7, 2019) (granting motion to dismiss where article did not concern plaintiff), *aff'd*, 843 F. App'x 326 (D.C. Cir. 2021)).

The Complaint should be dismissed because the Article is not "of and concerning" Plaintiffs.  The Article discusses only the fraternity Kappa Gamma generally.  It does not contain any description, implicit or explicit, of any particular Plaintiff, and the law does not recognize a defamation claim based on nothing more than one's anonymous membership in a large fraternity organization.  On this ground alone, the Complaint must be dismissed.

### A.     The Group Libel Doctrine Bars Plaintiffs' Claims.

Plaintiffs argue that because they are known to be former student and alumni members of Kappa Gamma, each of them "*is* Kappa Gamma" and may recover in defamation for statements

---

omitted)); *Moldea v. N.Y. Times Co.*, 22 F.3d 310, 319 (D.C. Cir. 1994) ("[A] plaintiff may not avoid the strictures of the burdens of proof associated with defamation by resorting to a claim of false light invasion." (citation omitted)); *Lohrenz v. Donnelly*, 223 F. Supp. 2d 25, 40 (D.D.C. 2002), *aff'd*, 350 F.3d 1272 (D.C. Cir. 2003) (false light requires that statement is "understood to be of and concerning the plaintiff").

implicating the fraternity.  Compl. ¶¶ 49, 170, 188, 202, 215 (emphasis added).  They do not allege how the Article singled them out; to the contrary, they argue that the effects of the allegedly defamatory statements were spread across all "Kappa Gamma members and alumni."  Compl. ¶ 151; *see id.* ¶¶ 144, 146, 147.  Because the cadre of Kappa Gamma members and alumni numbers in at least the hundreds, the group libel doctrine bars Plaintiffs' claims.

"Allegations of defamation by an organization and its members are not interchangeable." *Provisional Gov't of Republic of New Afrika v. Am. Broad. Cos.*, 609 F. Supp. 104, 108 (D.D.C. 1985).  Hence, it has been the longstanding rule in this Circuit that "'[i]n a case of a defamatory publication directed against a class, without in any way identifying any specific individual, no individual member of the group has any redress.'"  *Alexis*, 77 F. Supp. 2d at 42 (quoting *Fowler v. Curtis Publ'g Co.*, 182 F.2d 377, 378 (D.C. Cir. 1950)); Restatement (Second) of Torts § 564A, cmt. a (Am. Law Inst. 1977) (explaining the "general rule [that] no action lies for the publication of defamatory words concerning a large group or class of persons" unless statement is reasonably understood to have particular application to a specific individual); *accord Church of Scientology v. Time Warner, Inc.*, 806 F. Supp. 1157, 1160 (S.D.N.Y. 1992) ("Under the group libel doctrine, a plaintiff's claim is insufficient if the allegedly defamatory statement referenced the plaintiff solely as a member of a group.").  The group libel doctrine provides that, in order to actionably defame an individual, "a member of the derogated group must demonstrate either that '(a) the group or class is so small that the matter can reasonably be understood to refer to the member, . . . or (b) the circumstances of publication reasonably give rise to the conclusion that there is *particular reference* to the member.'"  *Alexis*, 77 F. Supp. 2d at 40 (quoting Restatement (Second) of Torts § 564A).

As the *Alexis* court noted after surveying group libel law from this Circuit and across the country, "unnamed group members generally are not permitted to sue for group defamation if the group has more than 25 members." *Id.* at 41; *see also id.* at 44 (explaining that "the drafters of the Second Restatement of Torts suggest that 25 members is the de facto maximum group size for unnamed individuals to have a right to sue for defamation of the group"); *Fowler*, 182 F.2d at 378 (group of 59 taxi drivers too large to support defamation claim under on group libel doctrine); *Serv. Parking Corp. v. Wash. Times Co.*, 92 F.2d 502, 503, 506 (D.C. Cir. 1937) (group of 10 to 12 persons too large to support defamation claim under group libel doctrine where plaintiff failed to show "that the article referred 'solely or especially' to him").  This rule applies even when a reader might be able to find out the identities of members from outside sources; group members still "do not gain the right to sue for defamation of the group merely because a listener could have gone on to find out who comprised the group." *Alexis*, 77 F. Supp. 2d at 43.

Here, Kappa Gamma student and alumni members number at least in the hundreds.  The fraternity is the "oldest" on Gallaudet's campus, with membership reaching back at least as far as 1901.  Exs. B, E, F; Compl. ¶ 102.  The alumni base is large enough to be susceptible of division into regional chapters.  *See id.* ¶ 169.  And the 1988 photo alone depicted "more than 30 men" affiliated with the fraternity.  Exs. B, E, F.

This is dispositive.  While classes larger than 25 are generally barred under the group libel doctrine, where, as here, a "group has more than 100 members," "they will almost *invariably* not be permitted to sue." *Alexis*, 77 F. Supp. 2d at 41 (emphasis added); *see also, e.g.*, *Fowler*, 182 F.2d at 378; *Riss & Co. v. Ass'n of Am. R.R.*, 187 F. Supp. 323 (D.D.C. 1960) (group of more than 100 railroads).  Accordingly, "no individual member of the group has any redress" on the basis of his membership in the group. *Fowler*, 182 F.2d at 378.

11

**B.      The Article Does Not Describe Any Plaintiff.**

Because the large group libel doctrine applies, the Plaintiffs cannot recover unless there is "particular reference" to them individually in Article.  There is not.  The Article does not identify a single one of them, and nothing in the Article concerns any individual Plaintiff.

The Complaint offers nothing more than mere conclusory allegations on this point.  In each instance in which it alleges that the statements at issue pertained "in particular" to Plaintiffs, it fails to provide *any* factual allegations.  *See* Compl. ¶¶ 22, 33, 98, 148, 151, 153.  Such "threadbare recitals" cannot state a claim.  *Iqbal*, 556 U.S. at 678.

No Plaintiff is named or depicted in any version of the Article.  Exs. B, E, F.  The Article references only three individual Kappa Gamma fraternity members, past or present, by name or description: Greg Hlibok, President Cordano's father, and Kappa Gamma President Setthawut Snow.  Exs. B, E, F.  None is a Plaintiff here.

In addition, none of the statements at issue identifies any individual Plaintiff in any way. The Article's descriptions of "ceremonial robes that resemble Ku Klux Klan garb," Compl. ¶ 160, and the characterization of the fraternity's salute as an "apparent Nazi salute," *id.* ¶ 163, describe clothing and gestures, not people.  Similarly, the Complaint does not and cannot allege that the Article's generic references to the "older photo . . . from 1988," Ex. E, F, constitute a "particular reference," *Alexis*, 77 F. Supp. 2d at 40, to any individual Plaintiff.  And the Complaint does not allege that any Plaintiff is depicted therein.

In short, because the Article does not "'identify[] [an]y specific individual, no individual member of the group has any redress.'"  *Alexis*, 77 F. Supp. 2d at 42 (quoting *Fowler*, 182 F.2d at 378).  The Complaint should be dismissed with prejudice.

## II.   THE STATEMENTS AT ISSUE ARE PROTECTED OPINION, OR, IN THE ALTERNATIVE, NOT MATERIALLY FALSE.

"A statement is actionable in defamation under District of Columbia law if it is both false and defamatory." *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 627 (D.C. Cir. 2001).   The Complaint fails to state a claim as a matter of law because it challenges statements of opinion, which by their nature are not capable of being proven false and which are protected under the First Amendment and District of Columbia law.   Alternatively, to the extent that any statement conveys facts, those facts are not materially false.

### A.   The Statements at Issue Are Constitutionally Protected Opinion.

"A statement of opinion that 'does not contain a provably false factual connotation' is not actionable under the First Amendment, and receives 'full constitutional protection.'" *Montgomery v. Risen*, 197 F. Supp. 3d 219, 247–48 (D.D.C. 2016) (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990)), *aff'd*, 875 F.3d 709 (D.C. Cir. 2017).   To determine whether a statement is one of opinion or fact, "the publication must be taken as a whole, and in the sense in which it would be understood by the readers to whom it was addressed.   The First Amendment demands that the court assess the disputed statements in their proper context." *Farah v. Esquire Mag.*, 736 F.3d 528, 535 (D.C. Cir. 2013) (cleaned up).

The First Amendment also provides complete protection to statements of opinion that are based on disclosed facts.   "'[W]hen a writer gives a statement of opinion that is based upon *true* facts that are revealed to readers or which are already known to readers, such opinions generally are not actionable so long as the opinion does not otherwise imply unstated defamatory facts.'" *Id.* at 539; *see also Ollman v. Evans*, 750 F.2d 970, 984–85 (D.C. Cir. 1984) (en banc); Restatement (Second) of Torts § 566 cmt. c.   "Thus, even if the [allegedly defamatory assertion] is verifiable," where "that assessment is supported by revealed premises," "'the reader is free to draw his or her

13

own conclusions based upon those facts, [and] this type of statement is not actionable in defamation.'" *Moldea v. N.Y. Times Co.*, 22 F.3d 310, 313–15 (D.C. Cir. 1994) (citation omitted).

Here, the statements at issue are non-actionable both because they are classic statements of non-verifiable opinion, and also because they represent opinions based on disclosed facts.

The Article's statements that the fraternity's robes "resemble Ku Klux Klan garb," or that the fraternity's salute was "anti-Semitic," or an "apparent Nazi salute," are all constitutionally protected statements of opinion. The Article expressed subjective comparisons between Kappa Gamma's salute and robes and the salute used by Nazis and the robes worn by the Ku Klux Klan, conveying the normative conclusion (drawn by the University and many others) that similarities rendered the salute and robes offensive. *See Buckley v. Littell*, 539 F.2d 882, 894–95 (2d Cir. 1976) (allegation that plaintiff was a "fascist" held not actionable); *Smith v. Sch. Dist. of Phila.*, 112 F. Supp. 2d 417, 429 (E.D. Pa. 2000) ("[A] statement that plaintiff is 'racist and anti-Semitic,' if it was made, would be unflattering, annoying and embarrassing, [but] such a statement does not rise to the level of defamation as a matter of law because it is merely non-fact based rhetoric."). Both the use of the word "resemble" to describe the Article's connection between the fraternity's and Ku Klux Klan's robes and the word "apparent" to describe the Article's connection between the fraternity's and Nazis' salute are the type of "'cautionary language'" that signals to both readers and courts that the statements that follow express opinions. *Bauman v. Butowsky*, 377 F. Supp. 3d 1, 11 (D.D.C. 2019) (citation omitted); *Montgomery*, 197 F. Supp. 3d at 248.

Further, the fuller context of how the statements at issue fit within the Article signals that they are opinion rather than verifiable fact. *See Bauman*, 377 F. Supp. 3d at 11. The Article contained both verifiable, factual reporting—that Kappa Gamma had been suspended from Gallaudet's campus—as well as analysis of the author's and other observers' subjective

14

perceptions of the controversies that led to the suspension.  Exs. B, E, F; *see Montgomery*, 197 F. Supp. 3d at 249.  Drawing comparisons between the appearances of gestures or garments is inherently a matter of perception, as is the viewer's conclusion as to whether to find offense.  In both instances, the perception "depends . . . entirely upon [individuals'] particular viewpoints; it is difficult to prove false the assertion that someone *thought* or *believed* a particular thing." *Montgomery*, 197 F. Supp. 3d. at 250.  Hence, the statements at issue, in context, are subjective statements are of opinion, not verifiable fact.[5]

Courts have repeatedly held that an allegation of anti-Semitism, Nazism, or racism is "not actionable unless it implies the existence of undisclosed, defamatory facts."  *Stevens v. Tillman*, 855 F.2d 394, 402 (7th Cir. 1988); *see, e.g.*, *Standing Comm. on Discipline of U.S. Dist. Court v. Yagman*, 55 F.3d 1430, 1440 (9th Cir. 1995) (accusation of judge's "Anti-Semitism" held non-actionable opinion based on the disclosed fact that judge had sanctioned three Jewish lawyers, including the speaker); *Holy Spirit Ass'n for Unification of World Christianity v. Sequoia Elsevier Pub. Co.*, 426 N.Y.S.2d 759, 760 (App. Div. 1980) (accusation of organization's "Nazi-style anti-Semitism" held not actionable where factual basis, though "bizarre," was set out in defendant's manual).  For example, in *McCafferty v. Newsweek Media Grp., Ltd.*, the Third Circuit upheld dismissal of a claim based on a professor's comment that a twelve-year-old plaintiff's presence on a talk show hailing "resistance to the 'globalists'—a term the Anti-Defamation League considers

---

[5] While the D.C. Circuit has declined to hold that the word "anti-Semitic" is *always* one of opinion because it can have "both descriptive and normative content," *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1297 (D.C. Cir. 1988), the usage here is clearly protected.  The Article used the term to express a value judgment about the offensiveness of a gesture, not to make a descriptive, factual statement that the fraternity maintained a formal affiliation with Nazis or the Ku Klux Klan.  *See id.* ("Compare, for example, the use of 'fascist' as a generic epithet . . . with its use in such a statement as 'He was a close companion of Mussolini and a Fascist.'" (citation omitted)).

an anti-Semitic dog whistle" merely camouflaged "raw racism."  955 F.3d 352, 356 (3d Cir. 2020).

The Court emphasized that the professor's description of the "resistance to the 'globalists'" discussion as employing an "anti-Semitic dog whistle" and evidencing "raw racism" were protected opinions based on disclosed facts, as the professor responded only to the content of the interview and did not imply any external, undisclosed wrongdoing.  *Id*.  "Under the First Amendment, opinions based on disclosed facts are absolutely privileged, no matter how derogatory they are."  *Id.* at 357 (cleaned up).

So too here.  Plaintiffs' claims against the Post rest solely on statements of opinion as to whether Kappa Gamma's historical robes and salute may be perceived or characterized as being racist and/or anti-Semitic.  Each statement was based on disclosed facts that appear on the face of the Article and in sources clearly identified in the Article.  All such statements are therefore protected opinions under the First Amendment.

First, with regard to the salute, Plaintiffs challenge the Article characterizing it as an "apparent Nazi salute" and an old photo of a group of students performing the salute as "anti-Semitic."  Compl. ¶¶ 155, 167.  These characterizations are protected opinions based on disclosed facts.  The Article described the 1988 photo of fraternity members performing the salute as "more than 30 men . . . extending their arms in a salute."  Exs. B, E, F.  The Article also explained (correctly) that multiple sources had connected this raised-arm salute with Nazism, and that it had been discontinued by the fraternity because of its offensiveness.[6]  The Article did not imply the

---

[6] The Article quoted and linked a Gallaudet Jewish life organization's public statement expressing offense at the gesture, including that the "salute . . . insults the memory of millions of Jewish, LGBT, and disabled individuals, and others who were murdered during the Holocaust."  Ex. D (quoted and cited in Exs. B, E, and F).  The Kappa Gamma President is similarly quoted as acknowledging the offense the salute caused, explaining that the fraternity had "long since denounced" the salute and that it was "no longer accepted in any form."  Exs. B, E, F.  This factual

existence of other, undisclosed facts—the characterization is based solely on the salute's appearance and its reception in the Gallaudet community.  Hence, when the Article characterized the fraternity's salute as "an apparent Nazi salute" and the photo of a group of men performing the salute as "anti-Semitic," it did so with disclosed factual support, including a description of both the salute itself and its historical opprobrium.  *See* Exs. B, E, F.  These statements, therefore, are non-actionable statements of opinion.

The description of the group's robes as "resembl[ing] Ku Klux Klan garb" is non-actionable for similar reasons.  The Article described the fraternity's "prohibited ceremonial robes" as "'traditional blue-hooded robes' with pointed hoods" "that resemble Ku Klux Klan garb."  Exs. B, E, F.  The quotation "traditional blue-hooded robes" is a direct quotation from a 2015 article in Gallaudet's campus newspaper, The Buff and Blue, to which the quotation is attributed by text and, in online versions, by hyperlink—making clear that this article formed part of the factual basis for the Article's characterization of the robes.  Exs. B, E, F; *see* Ex. C.  The Buff and Blue article describes the robes in even further detail, explaining that student "complaints especially focused on the fact that the robes had pointed hoods, which were reflective of the Ku Klux Klan, and some insignia on it, such as a red diamond with crossed bones inside, which they connected with Nazism."  Ex. C; *see also* Compl. ¶ 120 (describing same student complaints).  The allegation that "[t]he Post and its[] reporter had never seen the robes nor a picture of them," Compl. ¶ 162, is therefore inapposite.  The Article clearly disclosed all facts on which its opinion that the robes "resemble Ku Klux Klan garb" was based: that the robes were "traditional," "ceremonial robes"

---

context explained the significance of President Cordano's June 2020 reference, quoted in the article, to a "photograph[] of the salute . . . shared on social media" and the resulting offense that it caused.  Ex. A (quoted and cited in Exs. B, E, and F).

"with pointed hoods," and that the robes were "prohibited" from campus because students perceived them as resembling the attire of hate groups.  Exs. B, E, F; *see also* Ex. C (Buff and Blue article); Ex. D (hyperlinked Hillel at Gallaudet statement that the "hooded robes" "have become well-known symbols of neo-Nazi, antisemitic, and white supremacist organizations"). The Article did not imply the existence of any other undisclosed facts on which the characterization of the robes would be based.   Hence, the Post's description of the fraternity's robes is constitutionally protected opinion.

Because all of the statements at issue relay constitutionally protected opinions, the Complaint must be dismissed with prejudice.

### B.      Alternatively, the Statements Are Not Materially False.

To the extent any statement at issue communicates a verifiable fact rather than an opinion, it is substantially true.   "It is established law that truth is an absolute defense to an action for defamation."  *Lorenz v. Donnelly*, 223 F. Supp. 2d 25, 59 (D.D.C. 2002), *aff'd*, 350 F.3d 1272 (D.C. Cir. 2003) (citation omitted).  A materially false statement has "a different effect on the mind of the reader from that which the pleaded truth would have produced."  *Shipkovitz v. Wash. Post. Co.*, 408 F. App'x 376, 378 (D.C. Cir. 2010) (quoting *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 517 (1991)).   So long as the "gist or sting of the statement is substantially true, minor inaccuracies will not give rise to a defamation claim."  *Copeland-Jackson v. Oslin*, 555 F. Supp. 2d 213, 217 n.5 (D.D.C. 2008) (cleaned up); *see Masson*, 501 U.S. at 517 (similar).   Courts regularly dismiss defamation cases on substantial truth grounds.  *See, e.g.*, *Copeland-Jackson*, 555 F. Supp. 2d at 217; *Robertson v. Cartinhour*, 867 F. Supp. 2d 37, 59 (D.D.C. 2012) (granting motion to dismiss where "the statements are not capable of conveying a defamatory meaning because they are substantially true"), *aff'd per curiam*, 553 F. App'x 1 (D.C. Cir. 2014).  And,

"[w]here the question of truth or falsity is a close one, a court should err on the side of nonactionability." *Bauman*, 377 F. Supp. 3d at 15 (granting motion to dismiss) (cleaned up).

First, it was not materially false to say that Kappa Gamma's raised-arm salute is an "apparent Nazi salute" and that performance of the salute was therefore "anti-Semitic." *See* Compl. ¶¶ 155, 163. Plaintiffs concede that the salute has "similarities in appearance" to the salute adopted by "Italian Fascist[s] and German Nazis." *Id.* ¶ 106; *see also id.* ¶ 109. Plaintiffs also acknowledge that the fraternity discontinued the use of the raised-arm salute in the 1990s *because its use was offensive. Id.* ¶¶ 102, 114, 130. Indeed, the Article and Complaint both reference public statements *by the fraternity and its alumni association* noting that the fraternity had "long since denounced these such gestures" and that they were "no longer accepted in any form." Exs. B, E, F; *see* Compl. ¶ 130; *see also* Compl. ¶¶ 102, 114. The bottom line is that the sting of the Article would have been the same if it had described the salute with the pleaded truth that the salute was denounced and no longer accepted in any form because it looked like the salute used by Italian Fascists and German Nazis. *See* Compl. ¶¶ 106, 114, 130. It is, for that reason, not actionable. *See, e.g.*, *Shipkovitz*, 408 F. App'x at 378.

The same goes for the Article's characterization of the fraternity's robes: It was not materially false to say that the robes "resemble Ku Klux Klan garb." *See* Compl. ¶ 160. Plaintiffs admit that the fraternity wore robes emblazoned with "trims and patches" for over a hundred years and that the robes were *banned from campus* in 2015 because of concerns that they "*could be viewed as similar to those used by white supremacist organizations*." *Id.* ¶¶ 103, 115–16, 120–26 (emphasis added). The Complaint also does not (and cannot) dispute that Gallaudet suspended the fraternity because "recent photos" showed fraternity members wearing the banned robes. *Id.*

¶¶ 156–57.  And the sting of the Article would have been the same if it had instead said the robes were "*similar to those used by white supremacist organizations*."[7]

Hence, because any factual content in the statements at issue is not materially false, Plaintiffs have failed to state a claim, and the Complaint should be dismissed with prejudice.  *See, e.g.*, *Shipkovitz*, 408 F. App'x at 378; *Masson*, 501 U.S. at 517.

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed with prejudice.  *See, e.g.*, *Abbas*, 783 F.3d at 1340; *Deripaska v. AP*, 282 F. Supp. 3d 133, 149 (D.D.C. 2017).

Date: October 25, 2021        Respectfully submitted,

/s/ Thomas G. Hentoff

Thomas G. Hentoff (D.C. Bar No. 438394)
Nicholas G. Gamse (D.C. Bar No. 1018297)
Anna Johns Hrom (D.C. Bar No. 1657785)
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, DC  20005
Telephone:  (202) 434-5000
thentoff@wc.com
ngamse@wc.com
ahrom@wc.com

*Counsel for The Washington Post*

---

[7] To the extent Plaintiffs allege that some readers believed that the word "anti-Semitic" was meant to refer to the wearing of the robes instead of performing the raised-arm salute, *see* Compl. ¶¶ 155–58, this is distinction without a difference, as wearing hooded robes evoking the Ku Klux Klan is as much an anti-Semitic gesture as it is a racist one.  As the Supreme Court has recognized, the Ku Klux Klan has long "preached hatred of Blacks, Catholics, and Jews" and is known for participating in "robed" marches.  *Am. Legion v. Am. Humanist Ass'n*, 139 S. Ct. 2067, 2089 (2019) (citing Ronald G. Fryer & Steven Levitt, *Hatred and Profits: Under the Hood of the Ku Klux Klan*, 127 Q. J. Econ. 1883 (2012)); *see* Exs. B, E, F (quoting Hillel statement that "The use of the salute and the robes insults the memory of millions of Jewish, LGBT, and disabled individuals, and others who were murdered during the Holocaust").