UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA
-------------------------------------------------------------------------x Docket No.: 1:21-cv-01565-CRC
STEVEN FLORIO, PATRICK COSTELLO, WILLIAM
MILLIOS, TIMOTHY MALLACH, SCOTT PLUMMER
ROGER KRAFT, JOEL BARISH, BRANDON R. HILL,
JAMES BELDON, JR., and ERNEST WILLMAN,

                         Plaintiffs,                         AMENDED
                                                           COMPLAINT

           against                                    Plaintiffs Demand
                                                              Trial By Jury

GALLAUDET UNIVERSITY, THE BOARD OF TRUSTEES
OF GALLAUDET UNIVERSITY, ROBERTA CORDANO,
and WP COMPANY LLC d/b/a THE WASHINGTON POST,

                                    Defendant.
-------------------------------------------------------------------------x

       COME NOW the Plaintiffs Steven Florio, Patrick Costello, William Millios, and

Timothy Mallach, who by and through their counsel state their Complaint against the Defendants

Gallaudet University ("Gallaudet"), The Board of Trustees of Gallaudet University ("The

Gallaudet Board"), Roberta Cordano ("President Cordano") individually and in her capacity as

President of Gallaudet University, and WP Company LLC d/b/a The Washington Post, ("The

Post") as follows:

## <u>NATURE OF THE ACTION</u> <u>AND INTRODUCTION</u>

       1.  This is an action on behalf of four Deaf plaintiffs who are alumni of the Defendant

Gallaudet University and alumni of Gallaudet's oldest fraternity Kappa Gamma.  These Plaintiffs

were subjected to defamation, defamation by implication, and false light invasion of privacy as a

result of false and defamatory statements made of and concerning them and the Kappa Gamma

fraternity by video (vlogs), printed (but not verbatim) "transcripts" of the vlog, and newspaper

stories published online and in print, all negligently and/or with malice, and without privilege.

2.  These Plaintiffs, by implication if not expressly, were falsely depicted as being Nazis, Nazi Supporters and White Supremacists, resulting in extraordinary damage to their respective good names, their highly regarded reputations, their highly regarded standings in their professions, their highly regarded standing in their communities and their livelihoods.  Each plaintiff had professional employment in the Deaf community, lost such employment and has not been able to obtain new employment.

3.  This case is unique in that except for the claims against the Washington Post, all parties are individual or organizational members of a relatively small and intimate community known as the Deaf Community[1].  All parties are prominent in the Deaf Community, as is the Kappa Gamma Fraternity with which all deaf individual and organizational parties have affiliations, and Plaintiffs counsel is also a member of that Deaf Community.

4.  The Washington Post however is not a stranger to the Deaf world, as in the distant but perhaps not too distant past, when newspapers were printed with "hot type" as opposed to the more recent "cold type" or "automated composition" technology, the composing room of the Post and most other newspapers were filled with Deaf printers, in large part because they were not troubled or disturbed by the sounds of the noisy printing presses surrounding them.

5.  This case is also unique in that it arises out of an attack by the first and oldest institute

---

[1] It should be noted that the word "deaf" (with a lower case "d:) is reference to individuals comprising the larger deaf population with varying degrees of hearing loss, some of whom speak orally and others who do not speak orally and still others who, regardless of an ability to speak orally to some degree or not, communicate primarily, if not exclusively, in sign language, American Sign Language. These Deaf are a smaller segment of the wider deaf population and consider themselves members of a community that shares a culture, Deaf Culture. References to these Deaf individuals are spelled with an upper case "D."  This case primarily involves individuals and entities whose community is the Deaf Community and whose culture is Deaf Culture.

for the Higher Education of the Deaf in the United States against that institution's oldest and most prominent fraternity and its members.

6.   In the Deaf Community "everybody knows everybody" and news, good and bad, involving the deaf community reaches members of that community all over the country with lightning speed, regardless of when and where the news originated.

7.   This case evokes the old adage that those who troubleth their own house, or in this case, their own community, shall Inherit the Wind.

## JURISDICTION AND VENUE

8.   Pursuant to 28 U.S.C. 1332( c) "a corporation shall be deemed a citizen of any State by which it has been incorporated and of the State where it has its principal place of business."

9.   There is complete diversity of citizenship between all of the Plaintiffs and the Defendants Gallaudet University, The Board of Trustees of Gallaudet University, and Roberta Cordano.

10.   There is complete diversity of citizenship between all of the Plaintiffs and the Defendant WP Company LLC d/b/a The Washington Post.

11.   The amount in controversy for each Plaintiff individually exceeds Seventy Five Thousand  Dollars ($75,000.00) exclusive of interest, costs and attorneys fees, as required to sustain subject matter jurisdiction in this Court.

12.   This Court has subject matter jurisdiction of this action pursuant to 28 USC 1332(a).

13.   Venue is proper in this district pursuant to 28 U.S.C. 1391(b) because each of the defendants are present and/or reside in this District and are subject to personal jurisdiction in this District and a substantial part of the events giving rise to the claims asserted herein occurred in

this District.

## STANDING

14.  Each plaintiff has standing to bring this action because they have been directly and actually affected and victimized by the unlawful conduct complained of herein.  Each plaintiff's injuries and losses are proximately related to the misconduct of each and every one of the defendants, jointly and severally

## PARTIES

15.  Plaintiff Steven Florio is a resident of Franklin, Norfolk County, Massachusetts.

16.  Plaintiff Patrick Costello is a resident of Upton, Worcester County, Massachusetts.

17.  Plaintiff William Millios is a resident of Montpelier, Washington County, Vermont..

18.  Plaintiff Timothy Mallach is a resident of Coquitlam, British Columbia, Canada.

19.  Each of the individual Plaintiffs herein have been members of Kappa Gamma Fraternity during part or all of their time as students of Gallaudet University.

20.  Apart from having been members of the Kappa Gamma Fraternity during their days as students at Gallaudet each of the Plaintiffs herein are or have been affiliated with and/or members of Kappa Gamma International, the organization of Kappa Gamma alumni, subsequent to their graduation from Gallaudet University and during the time of the wrongful conduct complained of herein.

21.  Within the Gallaudet community and within the wider Deaf community, Gallaudet alumni who were previously members of Kappa Gamma fraternity in their student days are recognized by their affiliation and association with Kappa Gamma and are referred to as being "Kappa Gamma," such as "John Doe is Kappa Gamma."

4

22.  Defendant Gallaudet University is a federally charted private university for the education of the deaf and hard of hearing founded in 1864 at the District of Columbia with a principal place of business at Washington, D.C.

23.  The Defendant Board of Trustees of Gallaudet University is the governing body of Gallaudet University with a principal place of business at Washington, D.C.

24.  Roberta Cordano is now and was at all relevant times herein employed as the President of Gallaudet University and resides on the University campus at Washington, D.C.  She is sued herein in her individual capacity and in her capacity as President of Gallaudet University.

25.  Gallaudet University is the oldest University in the United States specifically organized to provide Higher Education to the Deaf.  Due to its long existence and the weight of its history and traditions, and the prominence and achievements of its administrators, trustees, faculty, students, and alumni, it is recognized and generally respected throughout the nation and world and has exercised and does exercise great influence in deaf and Deaf Communities throughout this United States and internationally, with which it is able to do much good . . . and much harm. Its power and influence over the lives of the Deaf cannot be overstated.

26.  As President of Gallaudet University, Roberta Cordano is the face of the Deaf community world-wide.  As Gallaudet University President she has the power to shape public opinion with respect to individuals and organizations as her words and actions carry the weight of her office, and the weight of the history and prestige of Gallaudet University.

27.  WP Company LLC d/b/a The Washington Post ("the Post") is a foreign corporation organized under the laws of the State of Delaware with a principal place of business at Washington, D.C.

5

28.  WP Company LLC d/b/a The Washington Post is a foreign limited liability company organized under the laws of the State of Delaware with a principal place of business at Washington, D.C.

29.  The Post publishes nationwide and worldwide a daily and weekly newspaper known as "The Washington Post," both as a printed publication and as an online publication of the internet.

30.  The power and influence of the Washington Post is and has been extraordinary.  Such as it was a prime force in taking down a President of the United States, so too it has been a prime force, together with the Gallaudet/Cordano Defendants in taking down the professional and personal lives, standings and reputations of the four Deaf Plaintiffs' herein.

### FACTS COMMON TO ALL CLAIMS

31.  Gallaudet University, previously Gallaudet College, was founded in 1864, its enabling legislation having been signed by President Lincoln on April 8, 1864.

32.  Prior to receiving its charter on April 8, 1864, what later became Gallaudet College and thereafter Gallaudet University was then a grammar school established in 1857 and named Columbia Institution for the Instruction of the Deaf and Dumb and the Blind, subsequently changed to Columbia Institution for the Instruction of the Deaf and Dumb.  That would continue to be the corporate name until 1911 when the corporate name was changed to the Columbia Institution for the Deaf.

33.  With receipt of its 1864 charter authorizing it to grant and confer college degrees, the Columbia Institution for the Instruction of the Deaf and Dumb established a Collegiate Department named the National College for the Deaf and Dumb which name was used from

6

1864 to 1865.

34.  From 1865 to 1894 the Collegiate Department was re-named the National Deaf Mute College.

35.  In 1894 the Collegiate Department was re-named Gallaudet College,

36.  In 1911 the corporate name of the entire institution was changed from Columbia Institution for the Instruction of the Deaf and Dumb to Columbia Institution for the Deaf.

37. In 1954 the corporate name of the entire institution was changed from Columbia Institution for the Deaf to Gallaudet College.

38.  In 1986 Gallaudet College became Gallaudet University.

39.  While the use of names and terminology in reference to deaf individuals and the deaf community such as "Columbia Institution for the Instruction of the Deaf and Dumb and the Blind," "Columbia Institution for the Instruction of the Deaf and Dumb," "National College for the Deaf and Dumb," and "National Deaf Mute College" may have been acceptable during the late 1800s and early 1900s, terminology such as "Deaf and Dumb" and "Deaf Mute" have since been recognized as being offensive to and derogatory of Deaf individuals and the Deaf community and with such recognition, such terminology, at least among enlightened individuals and organizations, has been abandoned.

40.  Despite its history of names referring to the Deaf as "Deaf and Dumb" and "Deaf Mute" in its charter and in its corporate name and in identifying its schools and organization, Gallaudet University has never found it necessary or appropriate to recognize and acknowledge and express regret for the wrongfulness of its past use of such terminology.

41.  To this day and continuously during the tenure of President Cordano, Gallaudet's

7

"History and Traditions Page" expressly publicizes its past use of such offensive terminology with a "What's In A Name" page. (See: https://www.gallaudet.edu/about/history-and-traditions/whats-in-a-name).

42.  Such "What's In A Name" page does not even acknowledge that its past use of such terminology is no longer acceptable and is in fact offensive to and derogatory of the Deaf Community it exists to serve.

43.  Indeed, Gallaudet University continues to celebrate April 8th as "Charter Day" and on April 8, 2014 held a 150th anniversary celebration named "Charter Day Festival of Learning" to commemorate its charter which created the National College for the Deaf and Dumb as part of the  Columbia Institution for the Instruction of the Deaf and Dumb.

44.  Presumably Defendant Cordano and Gallaudet University and the Gallaudet Board of Trustees feel it is proper to celebrate the heritage of Gallaudet's past when the individuals it was established to serve were referred to as "Deaf and Dumb" and "Deaf Mutes" and they see no need to apologize for that past or make amends for that past because they perceive that such terminology was acceptable in those times notwithstanding that such terminology is no longer acceptable today.

45.  Gallaudet University graduated its first Black Deaf student in 1954, the same year that the US Supreme Court issued its landmark decision in *Brown v Board of Education of Topeka,* 347 U.S. 483.

46.  Notwithstanding that it finally opened its doors to Black Deaf students in 1950, Gallaudet University has continued to be  plagued with systemic racism issues since that time and continuing to the present day.

47.  In 1989, thirty nine years after it finally opened its doors to its first Black Deaf Student, Gallaudet University had only 150 Black students on campus.

48.  Gallaudet's more recent history, during the past 10 years, is demonstrative of the unresolved and growing problem of systemic racism at all levels of Gallaudet University.

49.  On February 28, 2011, Gallaudet University appointed Dr. Angela McCaskill, the first Deaf Black woman to earn a Ph.D from Gallaudet University to be Gallaudet's first Chief Diversity Officer.

50.  By August 1, 2013 Gallaudet University demoted Dr. McCaskill, moving her to a faculty position and leaving the Chief Diversity Officer position vacant between Fall 2013 and July, 2017, one and a half years into President Cordano's first term as President, notwithstanding her assurance at the start of her tenure that she would make the filling of that position a priority.

51.  On December 2, 2015 then "President-Select" Roberta Cordano published a video message to the Gallaudet community wherein she spoke of a then recent Black Student Union Town Hall meeting wherein Black students told of experiences with racism, sexism, classism, audism, ableism, homophobia and belief based discrimination.  In that vlog no mention was made of Kappa Gamma or its student and/or alumni members being a cause of or responsible for "isms" and ailments. She stated as follows: "As we come together to work and listen to each other's stories, we will end racism and systemic discrimination."  That ideal and goal has never been fulfilled.

52.  On December 4, 2015, Heather Harker, then President of the University's Board of Trustees and now Chief of Staff to President Cordano, published a vlog wherein she stated that racism was one of Gallaudet University's biggest problems.  In doing so, she did not state or

suggest that Kappa Gamma and/or its student or alumni members were the cause or face of systemic racism at Gallaudet University.

53.  On December 17, 2015, Gallaudet's students of color presented a vlog called "Are We Done?" which was an open request to the University President and the Board of Trustees to develop a plan of action to end racism at Gallaudet University.

54.  On January 29, 2016 President Cordano and the students presented a second vlog wherein they detailed Gallaudet's commitment to addressing racism on campus.  In doing so, they did not state or suggest that Kappa Gamma and/or its student or alumni members were the cause or face of systemic racism at Gallaudet University.

55.  On May 11, 2016 President Cordano presented yet another vlog in which she stressed that the issues of racism and all other "isms" which had been prevalent since before her arrival at Gallaudet were very important to her and she stated "I am fully committed to working with you to build a more supportive climate for all members of the Gallaudet community."

56.  On November 17, 2016 President Cordano presented yet another vlog in which she shared Gallaudet's priorities with members of the campus community, identifying said priorities as bilingualism; campus climate, diversity, equity and inclusion; student success; institutional leadership and strategic planning; academic vitality and strategic positioning; and strengthening and diversifying revenue streams.  In discussing the priorities of campus climate, diversity, equity and inclusion she did not state or suggest that Kappa Gamma or its student and/or alumni members were causes of the problems for which those priorities were being established or a subject of those priorities.

57.  During the period from September 26, 2017 through December 28, 2018, President

Cordano found herself facing numerous objections in her attempts to appoint a Vice President of Student Affairs and Community Engagement when her first choice, a white male, was met with opposition from students and others with concerns about Diversity and Inclusion; none of those concerns were brought about by any conduct on the part of  Kappa Gamma or its alumni members.  Said opposition included a student led march joined in by faculty, staff, alumni and community members. This pressure caused President Cordano to put the position on hold.

58.  In announcing that she was putting the position on hold, President Cordano expressed her perception that the march was about creating a Gallaudet University where everyone belongs and feels safe.  No suggestion was made that this need to create a safe place was brought about by any acts of Kappa Gamma, Kappa Gamma International or its alumni members.

59.  Pressure on President Cordano increased when a Black Deaf female candidate for the aforesaid Vice President position, who had been one of the finalists for the position of President of Gallaudet University when President Cordano was chosen, was interviewed and screened out. This resulted in a letter of concern being sent to President Cordano by a group of students.  This letter and the concern reflected therein was not the result of any conduct on the part of Kappa Gamma or its alumni members.

60.  On May 10, 2019 President Cordano was faced once again with concerns about race, diversity, and inclusion when her choice for the University's 2019 Commencement Speaker met with opposition by minority students and others.  These concerns were not caused by any actions of Kappa Gamma or its student or alumni members.  Notwithstanding the expressed concerns, President Cordano continued with the invitation to her chosen speaker.

61.  On June 14, 2020, a vlog was presented by Sheryl Emery addressing Gallaudet

University's handling of Black Lives Matter, and asking the question "Do Black Deaf Lives Matter at Gallaudet and other Deaf Services Programs?"  The vlog made no mention of Kappa Gamma, nor its student or alumni members being a reason for which that question was posed.

62.  According to a Washington Post article dated October 20, 2020 a Black female Gallaudet Board member who resigned in May, 2020 just prior to the protests of violence against Black people erupted in the streets, stated  that university leadership "continually skirted around undertaking the uncomfortable conversations, as well as bold and decisive actions necessary to dismantle the pervasive structural and systemic racism that is so deeply entrenched in this 156-year-old institution."  No mention of Kappa Gamma was made in that article.

63.  In that same article it was also reported that current and former Board members of Gallaudet said that the issues of racism at Gallaudet are reflected in the school's leadership, where people of color are under-represented.

64.  In addition, in that same article, it was further reported that a Black student, a junior at Gallaudet, stated "There's not enough support for Black students, I'm from Mississippi. I came all the way to D.C. to take up classes. When I do take up classes, I feel discrimination."

65.  According to that same Washington Post article, President Cordano, who just four months earlier had destroyed the reputations of so many Kappa Gamma alumni, and in particular the plaintiffs herein, and caused them, and in some cases their family members also to sustain substantial personal, reputational, professional and financial losses with her false and defamatory claim that Kappa Gamma, and therefore its student and alumni members, had "become the face of systemic racism" at Gallaudet University, now admitted that "Our anti-racism commitment comes with full acknowledgment of where we have fallen short."  She then promised that "Our

focus on equity, belonging and anti-racism is now a collective commitment." That has yet to be proven true.

66. The foregoing facts establish that as of June 9, 2020 the problem of racism at Gallaudet University was the result of an already entrenched practice of systemic racism at all levels and that President Cordano had failed miserably in dealing with and bringing about even a partial resolution of the problem in the four and one-half years since she took office.

67 . The foregoing facts also establish that as of June 9, 2020, systemic racism had been so deeply entrenched at all levels of Gallaudet University, that there was no possibility that Kappa Gamma, its members and alumni could possibly be or have been the face of systemic racism at Gallaudet University.

68. Despite this complete failure on the part of President Cordano in undertaking and achieving any meaningful activity, efforts and progress in dealing with the pervasive systemic racism at Gallaudet, and despite having been made aware of the destruction and injury she caused to a number of Gallaudet alumni members of Kappa Gamma, including the plaintiffs herein, by scapegoating Kappa Gamma and its alumni members for her aforesaid failings, the Gallaudet Board of Trustees sanctioned and rewarded Cordano's aforesaid failings and destructive and harmful treatment of Gallaudet alumni by awarding her with a 5 year renewal of her contract as President. And as the Board did this, it demoted its Board President and Nomination Committee Chair for no reason other than that they had been members and alumni of Kappa Gamma.

69. While discovery will be needed to determine if the Gallaudet Board of Trustees had prior knowledge of, and/or given prior approval to, or itself directed Cordano to take the actions she did, having sanctioned President Cordano's wrongful, negligent and/or malicious defamation

of the plaintiffs herein, the Gallaudet University Board of Trustees has established itself as a joint-tortfeasor with Cordano for the wrongs upon which this action is predicated.

70.  Kappa Gamma Fraternity is Gallaudet's first and oldest fraternity.  It was founded by Dr. Percival Hall, who would later become the President of Gallaudet, and a group of male students.

71.  In its history and during the time plaintiffs herein were student members Kappa Gamma had traditions which included the use of a salute and the use of robes, traditions not unusual among fraternities nationwide.

72.  For a salute Kappa Gamma adopted the Bellamy Salute in 1901 and continued its use until, by its own volition, it ceased using such salute in 1992/93.

73.  The Bellamy salute was designated by Francis Bellamy, the author of the American Pledge of Allegiance and was utilized throughout the country, including by school children throughout the country in conjunction with the recitation of the Pledge of Allegiance commencing in 1892.

74.  During the 1920s and 1930s Italian Fascist and German Nazis adopted a salute popularly believed to have been used in ancient Rome.  That salute, while having some similarities in appearance to the Bellamy salute, was not the same salute as the Bellamy salute.

75.  The United States continued utilizing the Bellamy salute in conjunction with the Pledge of Allegiance throughout the 1920s and 1930s and early 1940s.

76.  It was not until December 22, 1942 that the United States Congress amended the Flag Code and replaced the Bellamy salute with the hand over heart salute as the salute to be used in conjunction with the Pledge of Allegiance.

77.  Patriotic groups such as the daughters of the American Revolution and the United States Flag Association opposed the change in the American use of the Bellamy salute on the grounds that it was inappropriate for Americans to have to change their traditional salute because foreigners had subsequently adopted a salute with similarities to the Bellamy salute.

78.  In amending the US Flag Code to replace the Bellamy salute with the hand over heart salute, Congress did not discuss or take into account the controversy over the use of the salute, nor did Congress declare the Bellamy salute should never again be used by any American.

79.  Further, Congress did not declare continued use of the Bellamy salute to be inappropriate or unpatriotic or a symbol of Nazism and did not ban the use of the salute in America.

80.  Under those circumstances, Kappa Gamma continued to use the Bellamy salute as its traditional salute throughout most of the twentieth century and it did so during that time without objection or criticism from the Gallaudet administration.

81.  At times the Bellamy salute was used in the presence of Gallaudet University Presidents who acknowledged and acquiesced in its use.  All but one now former President of Gallaudet University were members of Kappa Gamma either as Gallaudet students  or as invited members, and used the salute themselves.

82.  Having been designed by a patriotic American and adopted, not created, by Kappa Gamma long before Italian Fascist and German Nazis came into being, the Bellamy salute could not have been and never was a symbol of respect or support for Italian Fascist, German Nazis White Supremacists or any other nefarious organizations or purposes.

83.  Kappa Gamma, of its own volition, decided to discontinue the use of the Bellamy

15

salute in 1992/93.  If it was thereafter used at all, it was used in private only based on its tradition Kappa Gamma history.

84.   That decision to discontinue its use is wholly inconsistent with the organization being a racist organization, much less the face of racism.

85.   With respect to Kappa Gamma's use of robes, the idea of robes was first introduced to the Fraternity in 1904, upon the suggestion of Dr. Percival Hall, who later became President of Gallaudet. Over the years, there have been various modifications made to the robes with the addition of trims and patches.

86.   As with its adoption of the Bellamy salute, the use of the robes commenced long before Italian Fascist and German Nazis came into being.

87.   As such, Kappa Gamma's use of the robes could not have been and never was a symbol of respect or support for Fascists, Nazis, White Supremacists or any other nefarious organizations or purposes.

88.   Regalia such as robes, hoods, and unique to Gallaudet, the Mace, represented prestige and achievement - at both Gallaudet and other academic institutions.

89.   These robes were worn by Kappa Gamma members during "state occasions," including the annual fall visit to House One, to honor the University President as they welcomed the student body back to campus for another academic year.

90.   Emulating the University leaders, robes and similar regalia were also worn by members of other Greek organizations on the Gallaudet campus for their own events. The various regalia used throughout the institution by other individuals and organizations on campus were celebrated and proudly memorialized annually in the University yearbooks and student papers.

16

91.  The students, faculty, staff and administration at Gallaudet were all very much aware of the use of the Bellamy salute, the robes and other regalia; their use was no secret.

92.  Robes were worn by all brothers of Kappa Gamma and members of other Greek organizations at Gallaudet every year and without objection until 2014.

93.  The Student Body Government (SBG) issued a report to the University administration in 2014 advising that there was concern on campus regarding the use of robes by the various Greek organizations at Gallaudet.

94.  In 2014 when the Student Body Government informed the Gallaudet administration of  a number of concerns of which it had been made aware as aforesaid, no mention  of concerns about the Bellamy salute were made in the SBG report, its use having been discontinued by Kappa Gamma well prior to that time.

95.   This SBG report resulted in a written policy change announcement of July 15, 2015 by the then Dean of Student Affairs, A. Dwight Benedict. That written announcement was issued to the Greek Presidents' Council and was entitled "Greek Life at Gallaudet University."  It expressly applied to all Greek organization and was not directed solely at Kappa Gamma.

96.  Among the policies and restrictions set forth in that written announcement was a provision that stated as follows:

> **The use of robes and other similar regalia during marches and other public events on and off campus is permanently banned.**  This ban extends to **all Greek** Organization publications, promotions, and advertisement, including, but not limited to, member pictures, composites, websites, event banners, flyers, e-mail messages **and alumni functions.** (Emphasis supplied.)

97.  At the end of the third paragraph and beginning of the fourth paragraph of the July15,

2015 announcement, Dean Benedict stated:

> As institutions of higher education have evolved over
> time, such as Gallaudet University, the expectations and
> standards of conduct for Greek life have changed as well.
> **Conduct that was tolerated decades ago, is no longer
> acceptable**. (Emphasis supplied.)

98.  Nowhere in said July 15, 2015 announcement was any reference made of the use by Kappa Gamma of the Bellamy salute, which had already long been voluntarily discontinued two decades earlier without any ban or University directive.

99.  Despite Dean Benedict stating in his 2015 announcement with respect to the use of robes by Greek Organizations that "Conduct that was tolerated decades ago, is no longer acceptable" such statement was inaccurate.  It ignored the fact that it the use of such robes was not only "tolerated" but a common practice and fact of life at Gallaudet since the 1900s and until 2014/2015.

100.  In July 2015, when Gallaudet University, as part of its aforesaid new Greek Life policy, determined that the use of robes by Greek organizations would from that time forward no longer be tolerated in public spaces Kappa Gamma supported, accepted and respected that ban and has continued to do so to June 9, 2020 and beyond.

101.  Over its long history, the achievements of Kappa Gamma and its alumni members subsequent to their college days has greatly enhanced Gallaudet's reputation and prestige and benefitted the Gallaudet Community and the Deaf Community.

102.  Kappa Gamma's long history as part of the Gallaudet Community and the years of leadership, service, support and achievement by its student and alumni members has made Kappa Gamma and its student and alumni members prominent in the Gallaudet Community and the

18

wider Deaf Community.

103.   The prominence of Kappa Gamma's student and alumni members can be attributed in part to its stringent criteria for membership.  Such criteria is as follows:

- Scholarship - a minimum Grade Point Average
- Leadership - has the individual done anything notable during their time as a student at Gallaudet
- Has the individual held positions of work, leadership, innovation?
- Fellowship - is the individual highly regarded by his fellow students, by the faculty and staff?
- Character -  does he adhere to morals and ethics that are acceptable to the Deaf community?

104.   Kappa Gamma's members have been and are chosen for their potential to contribute to the Deaf community after graduation. Every year upon initiation of the new members, there is a banquet which the alumni are invited to attend. At this banquet, the notable achievements of the members of the Fraternity are shared, for all to see. Spectacular individual achievements are recognized. The message is:  You were admitted to this fraternity to improve the world, to improve the Deaf community, to make opportunities for others less fortunate than yourselves. What have you done in the past year?

105.   Kappa Gamma's prominence in the Gallaudet Community is a result of the many highly regarded achievements of its student and alumni members, including those who have become proven leaders in the Gallaudet Community, where two alumni members now sit on the Gallaudet Board of Trustees and one of them having been Board President.

106.   Years before President Cordano, a Deaf woman, assumed the presidency of Gallaudet University, the road was paved for her and other Deaf educators and administrators to attain such respected offices due in large part to student and alumni members of Kappa Gamma.

107.   That road was paved in 1988 by student protestors led by then Kappa Gamma

19

members, now Kappa Gamma alumni, who organized and led the "Deaf President Now" movement at Gallaudet University.  That successful protest brought an end to the despicable long time practice of audism by then Gallaudet officials and then Gallaudet Board members who, until then, would not appoint qualified Deaf educators and administrators to the Presidency of Gallaudet University.

108.  In what was perhaps the greatest modern day achievement of Kappa Gamma student and alumni members in the history of modern day Deaf education, the historic "Deaf President Now" movement enabled the many qualified Deaf individuals to take control of Deaf Education, not only at Gallaudet, but throughout the United States as well.

109.  The success of the Kappa Gamma student and alumni led DPN movement resulted in the appointment of Dr. I King Jordan as the first Deaf President of Gallaudet University. He and every subsequent Deaf male President of Gallaudet University has been a Deaf individual.

110.  Because the Deaf Community is a relatively small and intimate community sharing a common culture and language, word and the effects of the "Deaf President Now" movement and its success brought about a change in Deaf Education as  Deaf educators and administrators for the first time took control of Deaf Education, with Deaf individuals, many of whom are and/or were Kappa Gamma alumni, being appointed Superintendents and Board Members of Schools for the Deaf nationwide.

111.  The prominence of Kappa Gamma and its alumni extends beyond the Gallaudet Community and into the Deaf Community. It extends to those who value the concept of Deaf education and have since then served and still serve as Superintendents and/or Trustees of Schools for the Deaf.  It extends also to those who became entrepreneurs and have established

businesses to serve the Deaf community both nationally and internationally.  It extends as well to those who lead many non-profits that serve the deaf community.  They and others like the four Plaintiffs herein who have excelled in their post graduation careers have enhanced the prominence of Kappa Gamma, not only in the Gallaudet Community but the Deaf Community as well.

112.  In the aftermath of the tragic death of George Floyd on May 25, 2020 and in the midst of the resulting Black Lives Matter protests, the problem of systemic racism in America was brought to the forefront of the American psyche. Many governments and their agencies, private and public businesses, and organizations of all kinds including educational institutions and their leaders were quick to engage in self assessment, recognize the problem of systemic racism within, and then undertake to acknowledge and accept responsibility as the first step towards confronting and addressing this serious problem.

113.  This was not the case, however, with Gallaudet University, the face of the Deaf community, and its President, Roberta Cordano.  Instead, Roberta Cordano began her search for a scapegoat.

114.  Prior to the death of George Floyd, numerous concerns associated with systemic racism at Gallaudet had been repeatedly brought to the attention of the Gallaudet Board of Trustees, as well as the President's office, by the Organization for Equity for Deaf Staff of Color (OEDSOC) and others, but these efforts did not result in any substantive resolutions.

115.  Indeed, even before President Cordano took Office as President of Gallaudet University on January 1, 2016, systemic racism was and had long been a persistent, pervasive and entrenched problem at all levels of Gallaudet University, such that on December 2, 2015,

before she even took office, then "President-Select" Cordano published a vlog on Gallaudet's
web page expressing her awareness of the problem of systemic racism and assuring the Gallaudet
community that battling such problem would be a priority when she took office.

116.  As the facts herein will demonstrate, President Cordano failed miserably in living
up to that assurance.

117.  As Black Lives Matter protests over George Floyd's death and systemic racism
were taking place in early June, 2020, President Cordano participated in a Town Hall meeting
with Gallaudet's Student Body Government and the Black Student Union on or about June 5,
2020.

118.  At this June 5 meeting, President Cordano was confronted with the ongoing
problem of inequity within the hiring process at Gallaudet University, a lack of training for
officers of the Department of Public Safety, and a culture of racist and oppressive behavior at all
levels of the University that had and has severely damaged the lives of Black Deaf students,
faculty, and staff and the fact that this behavior and the results thereof had a ripple effect on
Black Deaf adults and children throughout the country and world-wide.

119.  President Cordano would shortly thereafter and on or about June 9, 2020 claim that
at such June 5, 2020 Town Hall meeting she " became aware of new information that led to
renewed demands for change with Kappa Gamma, a fraternity with a long history at Gallaudet."
She did not disclose what this "new information" was or how she "became aware of it.".

120.  Upon information and belief, if President Cordano did become aware on June 5,
2020 of "new information resulting in renewed demands for change with Kappa Gamma," such
information allegedly pertaining to Kappa Gamma was only one of many issues of systemic

22

racism brought up at that Town Hall Meeting of June 5. 2020 as identified in paragraph 118 of this Complaint.  Whether or not the claimed new information was actually obtained and exists has never been disclosed or documented.

121.  Having once again been confronted with the reality of this longstanding and unresolved problem of systemic racism at all levels of Gallaudet University at the June 5, 2020 Town Hall meeting, just as she had been so confronted many times since becoming President of Gallaudet University, President Cordano found herself compelled to create an appearance of taking immediate action.

122.  In what can only be described as a failure of leadership of the highest magnitude, President Cordano chose not to acknowledge and accept responsibility for the systemic racism that had long existed and still existed at Gallaudet and which had gone unresolved under her tenure as President which began more than four and one-half years earlier on January 1, 2016.

123.  Instead, consistent with her failure of leadership, President Cordano sought to divert attention from her failings and the failings of the University she had been leading for the past four and a half years.  She did this by scapegoating Gallaudet University's oldest and most prominent fraternity, Kappa Gamma, and therefore its student members and its alumni members, including the plaintiffs herein.

124.  On June 9, 2020, under pressure to create an appearance that she was taking prompt and meaningful action in the battle against systemic racism at all levels of Gallaudet University, President Cordano and Gallaudet University published a vlog on Gallaudet's You Tube page, posted at https://www.youtube.com/watch?v=hqdA3Zmtay0, and a separate written announcement purporting to be a transcript of that vlog wherein defendant Cordano inexplicably

announced that she was suspending Gallaudet's oldest on-campus fraternity, Kappa Gamma.

Both the vlog and the written announcement were addressed to students, faculty, staff, alumni

and community members.

125.  In the June 9, 2020 vlog wherein she inexplicably announced that she was

suspending Gallaudet's oldest on-campus fraternity, Kappa Gamma, President Cordano stated of

Kappa Gamma and therefore its current and alumni members as well as follows:

> "**During** the past few days, **starting** with the SBG/BSU Town
> Hall **meeting** last Friday, we received new information that led to
> **many people calling for attention to** Kappa Gamma, **one of
> Gallaudet's long established fraternities.  Kappa Gamma,
> pictures distributed on social media of their use of hooded
> robes and of the salute, they have become the face of systemic
> racism.**  This behavior is unacceptable."

(The wording in bold is used to reflect the difference between what President Cordano said in her

vlog and the written announcement which was also inserted beneath the vlog, purporting to be a

transcript of what was said in sign language in the vlog).[2]

126.  The purported transcript of the vlog message set forth at Paragraph 126 reads as

follows:

> Over the past few days, with the SBG/BSU Town Hall last Friday,
> we became aware of new information that led to renewed demands
> for change with Kappa Gamma, a fraternity with a long history at
> Gallaudet. They have become the face of systemic racism in our
> community, with photographs of the salute and use of robes being
> shared on social media. This behavior is unacceptable. Gallaudet
> has now taken action to suspend Kappa Gamma on campus. We

---

[2]  It is imperative to be aware of and note that there are significant variations between the
Cordano/Gallaudet vlogs and the Cordano/Gallaudet written announcements which also purport
to be a transcript of the signed statements made in the vlog.  These differences are significant in
that viewers of the vlogs receive a different message than readers of the written
announcement/transcripts.  In addition, facial expressions and bodily gestures are highly relevant
in accurately understanding vlogs of American Sign Language messages.  Thus, plaintiffs deem
those vlogs to be incorporated in and made part of this Complaint.

are in the process of reviewing other organizations and the status of
their histories and their efforts to determine if further steps will
need to be taken. As President, I am convening diverse leaders on
campus to develop a plan to review and understand the role of
fraternities and sororities at Gallaudet. I will make this plan public.

127.   In the vlog wherein the aforesaid statement was expressed in sign language,

the portion referring to the pictures on social media and the face of racism comment read as

follows:  **Kappa Gamma, pictures distributed on social media of their use of hooded robes**

**and of the salute, they have become the face of systemic racism**.  On the other hand, in the

purported transcript/announcement the reference to pictures on social media and the face on

racism comment reads as follows:  **Kappa Gamma, a fraternity with a long history at**

**Gallaudet. They have become the face of systemic racism in our community, with**

**photographs of the salute and use of robes being shared on social media.**

128.   The difference between the two versions of the Cordano message are particularly

significant.  In the vlog, the reference to Kappa Gamma immediately precedes the reference to

the pictures on social media which is then immediately followed by the word "They" followed by

the reference to the face of racism.  On the other hand, in the "transcript" version, the naming of

Kappa Gamma is in an entirely separate sentence which includes a reference to their being the

oldest fraternity.  Then a new sentence is begun with the word "They" which is followed with the

face of racism comment, which only then is followed by the reference to the pictures.

129.   The result of the foregoing differences, intended or not, is that in the vlog message

"they" immediately references the pictures, thereby directly pointing at those in the picture and

calling them the face of racism.  This is a direct implication that those in the picture are the face

of racism.  And two of the plaintiffs herein, Patrick Costello and Tim Mallach are in the

25

referenced photograph and are directly and immediately implicated as being the faces of racism.

130.  In addition, in the vlog Cordano exhibited facial gestures and bodily gestures in depicting her description of robes with hoods, purportedly the Kappa Gamma robes and her version of a Bellamy salute which she gives the appearance is a Nazi salute. Those bodily gestures and facial gestures conveyed and implied to the viewer, and particularly Deaf viewers, that the salute and robes were of a sinister and nefarious, if not Nazi and/or Ku Klux Klan appearance and use.

131.  In neither the vlog nor the written announcement did President Cordano or Gallaudet University disclose the underlying facts of the "new information" that they purportedly received the prior Friday which led to the publication of the vlog and written announcement and the false and defamatory statements contained therein that (1) Kappa Gamma and those members depicted in the picture referred to were "the face of systemic racism" (vlog) and "the face of systemic racism in the Gallaudet Community" (announcement/transcript) and (2) that Kappa Gamma and its members, including those in the picture referred to had engaged in "unacceptable behavior" associated with systemic racism, which unacceptable behavior and the time, place and manner of which are all undisclosed but serve as a basis for the defamatory statements made.

132.  The statement that Kappa Gamma was the "face of racism" was false and defamatory because Gallaudet's long term history of systemic racism unrelated to Kappa Gamma made it impossible for Kappa Gamma and its student and alumni members to be the "face of racism" or the "face of racism in the Gallaudet Community."

133.  In addition, such statement was and was intended to be and conveyed to be a statement of fact.  It could not be un-actionable opinion because the purported "facts" disclosed

in making the statement, that there were photographs of the salute and use of robes being shared on social media were untrue. In addition, Cordano would later say that the reference to photographs was not "old photographs" suggesting that there were new photographs to support her statements but those photographs were never disclosed and, upon information and belief, do not exist.

134. Additionally, when the Cordano statement was made, President Cordano and Gallaudet University knew that the only picture depicting the salute was a 31 year old picture[3] that had recently resurfaced as a result of some unknown person again posting it on the internet. Her message implied that the resurfacing of the photo was caused by Kappa Gamma and its active or alumni member(s) and such behavior was unacceptable. Thus the statement that expressed or implied that Kappa Gamma, by its current or alumni members, were engaged in "unacceptable behavior" was false and defamatory.

135. In addition, and upon information and belief, the June 9 statement was false and defamatory because there were in fact no new or recent photographs of current active or alumni members of Kappa Gamma wearing robes being shared on social media as of June 5, 2020. Indeed, neither Cordano nor Gallaudet has ever produced or disclosed any such photograph despite claiming and representing that it exists as they did in Cordano's June 9 vlog and announcement if that was the "new information" they were referring to.

136. President Cordano and Gallaudet University lobbed these false, outrageous and defamatory allegations contained in both the vlog and the written announcement at Kappa

---

[3] The photograph at issue has been dated by some as being taken in Fall, 1988, it was actually taken in Spring, 1989. Any references to a 1988 and/or 1989 photograph refer to the same Spring, 1989 photograph.

Gamma and therefore its current and former members despite the fact that neither Kappa Gamma nor its past or then current activities were the cause or face of the systemic racism at all levels of Gallaudet University as detailed in paragraph 118 of this complaint, which decades old systemic racism was the major, if not sole issue complained of at the June 5, 2020 Town Hall meeting.

137.  The June 9 statement was made for the sole and improper purpose of making Kappa Gamma and its current and alumni members the scapegoat for Gallaudet and Cordano's complete failure to address the longstanding systemic racism at Gallaudet.

138.  At best, the aforesaid defamatory statements made by Cordano and Gallaudet were the result of negligence in ascertaining and stating the true facts. At worst, the aforesaid defamatory statements were published by these defendants when they knew or should have known they were false or were published with reckless disregard for their falsity and/or reckless disregard for the truth.

139.  The evidence of the foregoing facts regarding the actual issues raised at the Town Hall meeting of June 5, 2020 is reflected in an open letter to the Board of Trustees of Gallaudet University, dated June 16, 2020, by the National Black Deaf Advocates (NBDA).

140.  Said letter accurately and eloquently characterized the offensive diversionary tactic of President Cordano saying:

> In response to this meeting, President Cordano inexplicably announced that she was suspending an on-campus fraternity, saying, "They have become the face of systemic racism in our community."  This was a deflection of the highest order.  It was a slap in the face to our Black Deaf students who bravely stepped up to address the injustices, oppression, and abuse that they have suffered. This failure to view systemic racism as an overarching priority for the University and to accept accountability demonstrates a lack of leadership, and moral conviction required

28

from her role. It was not only a leadership failure - it was a failure
of character. It was myopic, short-sighted, and displayed an
incredible lack of social awareness and empathy to Black Deaf
Community members, who are only demanding a safe and
inclusive space for everyone.

141. Said letter also reflected the fact that Cordano was the face of the Deaf Community
and as such the University and its President had and have the extraordinary influence and power
to shape public opinion in the Deaf Community:

As the face of the Deaf community world-wide, the Gallaudet
University President has the power to shape public opinion. Her
words carry the weight of her office, and the weight of the history
of Gallaudet University. The President has fostered a hostile and
unsafe environment on campus and in our communities.

142.  On or about June 15 or 16, 2020 defendants Cordano and Gallaudet published a
second vlog related to the ongoing controversy and her June 5 vlog message.  In this vlog, which
now seems to have disappeared from the internet and You Tube, Cordano apologized and said
she made a mistake.  But she did not apologize and acknowledge her mistake in declaring Kappa
Gamma and its alumni and student members to be the face of racism in the Gallaudet
community, Instead, she apologized for and said that she made a mistake in diverting attention
from the problems of systemic racism at Gallaudet in her June 9 vlog.

143.  On June 12, 2020 the Washington Post published the story of  Cordano's words and
actions online and in its printed newspaper, including and repeating the false and defamatory
attack by President Cordano against her University's oldest fraternity, that it was the "face of
racism" adding some additional defamatory statements of its own.

144.  Upon information and belief, the print and online articles first published by The

Post on June 12, 2020 were also false and defamatory in that, contrary to The Post's reporting, there were no Kappa Gamma student or alumni members "identified wearing prohibited ceremonial robes" as stated in the article.  The falsity was compounded when The Post updated its online story, apparently with information obtained, but not verified, from one or more of the three Gallaudet defendants shortly after initial online publication, stating that "The story was updated to clarify that new photos on social media led to the group's suspension" when upon information and belief, there were no such new photographs.

145.  Further, having stated in the original June 12 article that President Cordano had claimed that the suspension resulted when members of the fraternity "were identified wearing prohibited ceremonial robes," the Post article then dredged up and made reference to the "salute" photograph from 1989.

146.  The Post then purported to connect that photograph which included plaintiffs Patrick Costello and William Millios, with the alleged activities of then current members allegedly "wearing prohibited ceremonial robes" simply because that photograph reportedly "resurfaced around the time members were caught wearing the robes."

147.  In dredging up the old history of this decades old photograph (depicting former members/now alumni) which the Post actually knew had nothing to do with the suspension being reported on, (reportedly for wearing robes, which the individuals in the photograph were not wearing) the Post defamed the Kappa Gamma alumni members, and in particular the 30 then student Kappa Gamma members who are now alumni members including Plaintiffs Patrick Costello and William Millios.  Also defamed by reference to the photograph were others who were not in the picture but were incorrectly identified as being in the picture such as Plaintiff

Steven Florio. Likewise The Post defamed Plaintiff Tim Mallach and the other Kappa Gamma

alumni members who were not in the photograph but were defamed as members by The Post

having added a sensational element to the story which was likely to and did lead and induce its

readers to view Kappa Gamma and its alumni members with contempt.  That was the case

because given that the picture was reported as being from 1988 which left no doubt that those in

the picture were now alumni fraternity members as opposed to active student members of the

fraternity.

148.  Moreover the Post did not publish or disclose the photograph the article referred to

and did not disclose the facts supporting its statement that there were current members of Kappa

Gamma who were "caught wearing the robes."

149.  The Post's suggestion, reasonably obvious to the reader, that there was a connection

between the decades old photograph of alumni members of Kappa Gamma and the then current

suspension of Kappa Gamma allegedly due to student members being "identified wearing

prohibited ceremonial robes," was false, misleading and defamatory as there was and could be no

connection between the photograph and what it depicted and the purported wearing of robes by

current members since no one in the photograph was wearing a robe.

150.  Further aggravating the false reporting and, in a classic example of yellow

journalism, the Post adorned the article with this headline: GALLAUDET UNIVERSITY

SUSPENDS FRATERNITY AFTER ANTI-SEMITIC PHOTO RESURFACES.

151.  The Post falsely headlined the article with a description of the photograph as being

"anti-Semitic" and then suggested that there was a connection between the then current

suspension of the fraternity and the resurfacing of the 31 year old picture, when the suspension

had nothing to do with the picture or what it depicted, which was current alumni members, including two plaintiffs herein, Patrick Costello and William Millios, engaged in a non anti-Semitic Bellamy salute.

152.  That Bellamy salute could not be truthfully described as "anti- Semitic" in that it was first developed and utilized by the American public, including schoolchildren saluting the American Flag, in 1883 and was adopted by Kappa Gamma decades before Nazism came into being.

153.  Having emblazoned the article with the sensationalistic headline words "ANTI-SEMITIC PHOTO" the Post then buried in the article's much smaller print a statement that the salute depicted in the unpublished and undisclosed and falsely described photograph was an "apparent Nazi salute." It is clear from this that the Post itself was uncertain that the salute was in fact a Nazi salute.  And whether or not the salute depicted was a Nazi salute is able to be proven true or false, thereby preventing that statement from being non-actionable opinion.

154. Any reputable reporter and any reputable newspaper would have, in the exercise of proper journalistic diligence, undertaken to ascertain the exact nature of the "apparent" salute before publishing the outrageous, false and defamatory headline referring to it as an "anti-Semitic salute."

155.  At best, the Post's inaccurate and defamatory reporting was the result of negligence in, among other things, using a headline referring to the salute as anti-Semitic, when the Post knew that was questionable and later in smaller print described it as an "apparent Nazi salute." At best, it was the reporting of a story published notwithstanding that the Post knew or should have known it was false and published the story with reckless disregard for its falsity and/or

reckless disregard for the truth.

156.  Within hours, if not minutes of the publication of President Cordano's defamatory attack on Kappa Gamma, its student and alumni members, and the likewise defamatory Washington Post article, attacks on Kappa Gamma, its members and its alumni members, including each plaintiff herein, flooded the internet, social media, newspapers and television reports. Newspapers all over the country published and re-published the Washington Post article or reported the contents of that Washington Post article.  Television news stations likewise published and reported the false and defamatory allegations against Kappa Gamma.

157.  So too, the Cordano vlog with the text of the written announcement beneath it, spread and was viewed via the internet and You Tube and the Gallaudet website by the public, and in particular by members of the relatively small and intimate Gallaudet Community and the relatively small and intimate Deaf Community throughout the country, giving rise to attacks and threats on Kappa Gamma members, predominately Kappa Gamma alumni, and their families and friends.

158.  Across social media the Kappa Gamma alumni, including the plaintiffs herein, were vilified, with their names and pictures being posted and publicized with scorn and identifying them as members of Kappa Gamma.  Their employers and organizations with which  they were affiliated   were likewise identified, resulting in demand that those employers and those organizations terminate their employment and/or their affiliations with those organizations, many being Schools for the Deaf and non-profits whose missions were to serve the deaf community.

159.  On Facebook, a Deaf News video site known as "The Daily Moth" and hosted by a Kappa Gamma alumnus, Alex Abenchuchan, reported on the June 9, 2020 speech of President

Cordano as well as her subsequent video announcements and actions, and the wide ranging

reactions and effects thereof.  Due to his affiliation with Kappa Gamma, viewers questioned the

propriety of his involvement in the reporting on the controversy and Abenchuchan promptly

decided to recuse himself from any further reporting on it.

160.  From June 9, 2020 onward, and on and after June 12, 2020, posts and vlogs were

posted on Facebook by a multitude of members of the Deaf community naming individuals who

were Kappa Gamma alumni, posting "wanted" style pictures of them, accusing them and their

organizational affiliations of being racists and having engaged in Nazi, anti-Semitic and racist

practices, with deaf vloggers spreading their own critical and insulting vlogs.  These vlogs and

posts led to comments being added thereto, the great majority of which were adverse to the

Kappa Gamma alumni, and many dredged up long ago stories about them, mostly negative and of

questionable veracity.

161.  These posts then gave rise to numerous comments and tweets ridiculing and

expressing contempt for these indviduals, including the four plaintiffs herein and spreading false

rumors of wrongful or inappropriate behavior on their part, some as outrageous as claiming that

alumni members of Kappa Gamma had maintained a "rape room" at the fraternity's on-campus

home.

162.  These social media post included posts and comments identifying Tim Mallach and

Patrick Costello as being in the picture.

163.  Another member of the Deaf Community, a fellow government employee of

plaintiff Steven Florio, wrongfully reported to his superior that plaintiff Florio was in the picture.

164.  The aforesaid false and libelous publications by President Cordano, Gallaudet

University, and The Washington Post were shortly thereafter followed by many Kappa Gamma alumni and, in particular, each of the plaintiffs herein, being subjected to suspensions of their employment, "investigations" and placement on administrative leave by their employers and/or affiliated organizations.

165.  Not long thereafter, individuals associated with Kappa Gamma, including the plaintiffs herein, then lost their jobs and suffered financial losses to their businesses.  Each of the plaintiffs herein and others suffered permanent damage to their hard earned, longstanding good names and respected reputations within the Gallaudet Community and the Deaf Community.

166.  At least 25 Deaf individuals throughout the country reported as having been already identified as former student members of Kappa Gamma and/or current alumni members of Kappa Gamma and being subjected to harm caused by these defamatory publications by Gallaudet and the Washington Post.

167.  Originally 10 members of the Deaf Community across the country were believed to have been damaged enough to warrant participation in this lawsuit and were named in this lawsuit.

168. As word got out of their being named plaintiffs in this lawsuit, the various plaintiffs found themselves and their families again being subjected to scorn, contempt and ridicule leading six of them to voluntarily withdraw from this action within a week of its filing.

169.  On July 16, 2020 Cordano and Gallaudet published yet another Cordano vlog as well as a written announcement which also purported to be a transcript of the vlog.  This vlog was addressed solely to Gallaudet Alumni, although there is no evidence or assurance that all living alumni, as opposed to only those whose contact information Gallaudet had in its records,

were recipients.

170.  In this July 16 vlog, Cordano said, among other things, the following:

**What happened with the Suspension of Kappa Gamma?**

In 2015, Gallaudet issued a policy that prohibited the use of CEREMONIAL robes in public in response to concerns about the racist impact of the robes brought up by SBG and BSU AT THAT TIME. In early June 2020 RECENTLY, new evidence emerged about the Kappa Gamma student chapter's intention to bring back the use of robes in their meetings and ceremonies AND THEY DISTRIBUTED INFORMATION TO THE PUBLIC, triggering many members of THIS Gallaudet community. This prompted an immediate investigation AND PROVED EVIDENCE WAS FOUND THAT the Kappa Gamma chapter violated the 2015 policy and resulted in the immediate suspension of the chapter.  THIS case is NOW progressing through the Office of Student Conduct. **They were not suspended because of old photos.** (Emphasis in Bold supplied).

The announcement related to Kappa Gamma's suspension created an impression for many that Gallaudet was not focused on BROADER, more significant issues related to systemic racism, and seemed to put responsibility on THE student-run organization RATHER than on the BROADER Gallaudet administration and our WORKING COMMUNITY? Or WORK IN THE COMMUNITY?. I reiterate that Gallaudet recognizes there are larger, systemic issues related to inequities that have a greater impact on the well-being of OUR Black people and people of color HERE AT GALLAUDET UNIVERSITY. To be clear, the Board of Trustees, the Executive Team and I are committed to addressing systemic racism at every level IN GALLAUDET.

**Concerns about the impact of the phrase "the face of racism" in the announcement IN JUNE.**

Many alumni have ALREADY expressed concern about the impact of THAT sentence in the announcement IN JUNE AND HOW THAT STATEMENT IS BEING USED IN PUBLIC: WHAT WAS THAT EXACT QUOTE?  I WILL SPELL IT IN ENGLISH WITH SOME SIGNS.  Many alumni have expressed concern about the impact of this sentence in the announcement: "They

36

[MEANING Kappa Gamma] ALREADY have become the face of systemic racism in our community, with the photographs of the salute and the use of robes being shared in social media." I want to EXPLAIN MORE AND elaborate on what I intended to convey with that announcement.

There are many faces of racism -- racism shows up in our daily lives, often it is and feels invisible to those with privilege, most often white and hearing people; but people of color, and people of color who are deaf, hard of hearing or deafblind, they see it, they experience IMPACTS EVERY DAY. My intention with THAT QUOTE was to show how actions of people, in this case the robes and the salute, are often a "mirror" to the systemic racism that IS THERE. While Kappa Gamma used robes and a salute that is racist, it was not my intention to blame any one person or group OF PEOPLE for the systemic racism at Gallaudet as Kappa Gamma alone is not responsible for systemic racism BY ITSELF. IT'S NOT. The publicly SHARED PLAN to reintroduce the use of robes shone a spotlight on Kappa Gamma and they BECAME a face of the systemic racism that exists throughout the fabric of our racist COUNTRY.

I will make it clear, Kappa Gamma is not the sole culprit nor the ONE face of systemic racism alone at Gallaudet but THEY HAD ALREADY BECOME a face due to the re-emergence of the use of robes at the same time as our national Black Lives Matter response to the brutal death of George Floyd and pictures of the racist rituals SHOWED UP in social media SPOTLIGHTING THAT REASON. It is NOW up to Kappa Gamma to become anti-racist and join our broader community and Gallaudet in dismantling systemic racism. We all can emerge from this experience with a commitment towards anti-racism and restorative justice. WE CAN TOGETHER.

(The wording in bold is used to reflect the difference between what President Cordano said in her vlog and the written announcement which was also inserted beneath the vlog, purporting to be a transcript of what was said in sign language in the vlog).

171.  In the July 16, 2020 written announcement, also used as and purporting to be a transcript for the  July 16 vlog, Cordano said, among other things, the following:

**What happened with the Suspension of Kappa Gamma?**

In 2015, Gallaudet issued a policy that prohibited the use of robes in public in response to concerns about the racist impact of the robes brought up by SBG and BSU. In early June 2020, new evidence emerged about the Kappa Gamma student chapter's intention to bring back the use of robes in their meetings and ceremonies and this information became public, triggering many members of the Gallaudet community. This prompted an immediate investigation that concluded the Kappa Gamma chapter violated the 2015 policy and resulted in the immediate suspension of the chapter while their case is progressing through the Office of Student Conduct. **They were not suspended because of old photos.** (Emphasis in Bold supplied).

The announcement related to Kappa Gamma's suspension created an impression for many that Gallaudet was not focused on larger, more significant issues related to systemic racism, and seemed to put more responsibility on a student-run organization than on the Gallaudet administration and our work. I reiterate that Gallaudet recognizes there are larger, systemic issues related to inequities that have a greater impact on the well-being of Black people and people of color. To be clear, the Board of Trustees, the Executive Team and I are committed to addressing systemic racism at every level.

**Concerns about the impact of the phrase "the face of racism" in the announcement**

Many alumni have expressed concern about the impact of this sentence in the announcement: "They [Kappa Gamma] have become the face of systemic racism in our community, with the photographs of the salute and the use of robes being shared in social media." I want to further elaborate on what I intended to convey.

There are many faces of racism -- racism shows up in our daily lives, often it is and feels invisible to those with privilege, most often white and hearing people; but people of color, and people of color who are deaf, hard of hearing or deafblind, they see it, they experience it. My intention with this quoted section was to show how actions of people (in this case the robes and the salute) are

often a "mirror" to the systemic racism that exists. While Kappa Gamma used robes and a salute that is racist, it was not my intention to blame any one person or group for the systemic racism at Gallaudet as Kappa Gamma alone is not responsible for systemic racism. The publicly disclosed plans to reintroduce the use of robes shone a spotlight on Kappa Gamma and they had become a face of the systemic racism that exists throughout the fabric of our racist society.

I will make it clear, Kappa Gamma is not the sole culprit nor the face of systemic racism alone at Gallaudet but became a face due to the re-emergence of the use of their robes at the same time as our national Black Lives Matter response to the brutal death of George Floyd and pictures of the racist rituals being circulated in social media. It is up to Kappa Gamma to become anti-racist and join our broader community and Gallaudet in dismantling systemic racism. We all can emerge from this experience with a commitment towards anti-racism and restorative justice.

172.  President Cordano became president of Gallaudet University less than 6 months after the July 15, 2015 Greek Life policy was announced and at which time said policy still remained in effect, and it continued in effect to June 9, 2020 and beyond.

173.  On October 27, 2016 there appeared in a Gallaudet newspaper, "The Buff and Blue" an article entitled "The re-emergence of the Bellamy Salute" authored by Gabrielle Humlicek.  In said article Ms. Humlicek reported that **a photograph taken "25 years ago" was tweeted and re-tweeted**. She further reported that **the photo consisted of Kappa Gamma brothers**, with shaded circles blotting out their faces, **doing a Bellamy Salute**. . ." (Emphasis supplied).

174.  In said article Ms. Humlicek further reported as follows: **"From time to time, the photo of those Kappa Gamma brothers doing the Bellamy Salute re-emerges and circulates across the internet, like this recent incident."** (Emphasis supplied)

175.  Ms. Humlicek further reported that in response to said article, Kappa Gamma made

a Facebook post to address the circulated photo on September 26, 2016. She reported Kappa Gamma's response as being as follows: **"The gestures shown are denounced, not practiced, nor accepted in any form by any recent or current administration. These pictures go against our present-day standards of conduct for our members, pledges, and alumni," the Kappa Gamma fraternity replied, dispelling any doubts.** (Emphasis supplied.).

176.   The aforesaid University newspaper article was published while defendant Cordano was President.  Thus by June 9, 2020 defendant Cordano knew that the salute the Kappa Gamma members were using in the photograph she was referring to was a Bellamy salute; she also knew that the photograph was over 31 years old and that those depicted were necessarily Kappa Gamma alumni members; she also knew that the photograph had a tendency to re-emerge from time to time and that there was no suggestion or evidence that such re-emergence was caused by any act of any Kappa Gamma member, student or alumni; she also knew that as expressly stated in the article Kappa Gamma had denounced and no longer practiced or accepted use of the salute; and she knew that Kappa Gamma had dispelled any doubts about the foregoing and they had done so as reported in an October, 2016 publication.

177.   Based on the foregoing, five years later when Cordano and Gallaudet published the June 9 message, they well knew that the 31 year old picture had nothing to do whatsoever with the racism issue facing them in 2020 and that any reference to it on their part and any use of it to criticize Kappa Gamma and any of its members was wrongful, unjustified, and defamatory.

178.   It is therefore reasonable to conclude that the July 16 vlog and announcement claiming that the suspension of Kappa Gamma was not based on old photographs and the June 9 and July 16 vlogs and announcements claiming that there was undisclosed "new information"

received on June 5, 2020 and claiming that there was "new evidence" that established that Kappa Gamma had recently violated the 2015 policy were all false and defamatory statements.

179.  The July 16, 2020 vlog and written announcement by defendants Cordano and Gallaudet was clearly an admission that their vlog and announcement of June 9, 2020 was false in saying that Kappa Gamma and its active and alumni members were **the** face of racism in the Gallaudet community.  Indeed,  the statement "I will make it clear, Kappa Gamma is not **the sole** culprit nor **the** face of systemic racism **alone** at Gallaudet but became **a** face . . ." is unequivocal in establishing the falsity of that statement.

180.  The change in wording from "**the** face" to "**a** face" established that defendants were saying on June 9 that Kappa Gamma and its active and alumni members were the sole "face of racism in the Gallaudet Community."  If  **there** could be any doubt about that, it is wholly resolved by Cordano's July 16, 2020 admission that "Kappa Gamma is not **the sole** culprit nor **the** face of systemic racism **alone.**"

181.  Such admission confirms that on June 9, the defendant did say and intended to say and knew they were reasonably understood to be saying that Kappa Gamma and its student members and alumni were **"the** face of systemic racism **alone.**"

182.  Yet, if this admission was intended by Cordano and Gallaudet to avoid liability for having made the false and defamatory statement on June 9, it fails to achieve that, because even as they admit the falsity of their June 9 statement, they now persist in stating that Kappa Gamma **is a** face of racism in the Gallaudet community.  As such, they continue to defame Kappa Gamma and its student members and alumni members by falsely stating that they are a face of racism in the Gallaudet community.

183.  In terms of any mitigation intended by the July 16 vlog and announcement, it is of no help to plaintiff's herein as the damage to them had weeks ago already been done and made final.  In any event, there was no real mitigation because in the July 16 vlog and announcement the defendants continued to assert that Kappa Gamma was and is **a** face of racism.

184.  The July 16 vlog and announcement also establish that the June 9 statement was a statement "of and concerning" Kappa Gamma and its student and alumni members, including the plaintiffs herein.  This is so because the July 16 statement expressly acknowledges that it was alumni and alumni members and not current, active students who had been contacting defendant Cordano and expressing concern about the "face of racism" statement made on June 9.

185.  The foregoing expressed concerns establish that the June 9 defamatory statements and the subsequent Washington Post publications were viewed and understood as being statements of fact.

186.  By making another vlog admitting that her June 9 "face of systemic racism," statement was wrong and needed to be corrected, defendants Cordano and Gallaudet effectively acknowledged that such statement was capable of being true or false and corrected, thereby surrendering any claim they may have had that the June 9 statements were non-actionable opinion.

187.  This July 16 vlog and statement further establish that defendants constant and persistent reference to Kappa Gamma as"they" both in the June 9 and July 16 vlogs and announcements was in fact a reference to the Kappa Gamma alumni who were members at and around the time the decades old photograph was taken.

188.  Upon information and belief, the aforesaid 30/31 year old photo of Kappa Gamma

members using the Bellamy salute, in the public domain and not within the control of Kappa

Gamma student members or alumni members, re-emerged on social media once again in May or

June, 2020 and prior to June 9, 2020.

189.  Between June 9, 2020 and July 16, 2020 inclusive, Gallaudet University's President

Cordano made the following false statements which individually and in context with each other

were defamatory in that they asserted that Kappa Gamma and its then current and alumni

members were racist, that they were the face of racism in the Gallaudet Community, that the

Bellamy salute which they had once used and whose history establishes it was not racist was

racist, that the robes they used, as did other fraternities on campus and at colleges and

universities throughout the country, were racist, that Kappa Gamma had violated a 2015

University policy against the use of robes in public, that they did in fact resume use of the robes

in public, that they had an intention to resume the use of robes, and that they had a plan to resume

the use of robes and made such intentions and plans public causing distress on the Gallaudet

campus.  Said statements were as follows;

a) On June 9, 2020 (vlog and transcript)  **"Over the past few days, with the
SBG/BSU Town Hall last Friday, we became aware of new information that led to renewed
demands for change with Kappa Gamma"**

b)  On June 9 , 2020 (vlog):  **"Kappa Gamma, pictures distributed to media of
their use of robes with hoods and of their salute, they have become the face of systemic
racism.**

c)  On June 9, 2020 (transcript):  **"They have become the face of systemic
racism in our community, with photographs of the salute and use of robes being shared on**

social media.

d) June 12, 2020 WAPO article quote:  *"**Recent photos** posted on social media showed **the group in the outfits again**"*

e)  June 12, 2020 WAPO article quote: "***the return of the fraternity's** robes reignited demands for change within an organization that has previously been accused of anti-Semitism and racism."*

f) July 16, 2020 (vlog and transcript):  **"In early June 2020, new evidence emerged about the Kappa Gamma student chapter's** *intention to bring back the use of robes* **in their meetings and ceremonies and this information became public"** and "**This prompted an immediate investigation that concluded the Kappa Gamma chapter violated the 2015 policy."**

g)  July 16, 2020 (vlog and transcript): **"They were not suspended because of old photos**."

h) July 16, 2020 (vlog and transcript): **"Kappa Gamma alone is not responsible for systemic racism."**

I) July 16, 2020 (vlog and transcript): **"Kappa Gamma is not the sole culprit nor the face of systemic racism alone at Gallaudet but became a face"**

J)  July 16, 2020 (vlog and transcript): **Kappa Gamma used robes and a salute that is racist**.

k) July 16, 2020 (vlog and transcript):   **"The** *publicly disclosed plans to reintroduce the use of robes* **shone a spotlight on Kappa Gamma and they had become a face of the systemic racism that exists throughout the fabric of our racist society**."

l)  July 16, 2020 (vlog and transcript):  **I will make it clear, *Kappa Gamma is not the sole culprit nor the face of systemic racism alone at Gallaudet but became a face due to the re-emergence of the use of their robes* at the same time as our national Black Lives Matter response to the brutal death of George Floyd and pictures of the racist rituals being circulated in social media.**

m)  July 16, 2020 (vlog and transcript):  ***It is up to Kappa Gamma to become anti-racist* and join our broader community and Gallaudet in dismantling systemic racism.**

190.  The aforesaid defamatory and false statements contained in paragraph 189 above and identified as (a) through (m) were intended to be and were understood to be statements of fact and not opinion, particularly when viewed in light of the context and totality of the statements and the effects they had on the plaintiffs, their employers, their businesses, their families, their customers, their associates and friends and co-workers.

191.  The aforesaid statements (a) through (m) were not privileged, nor could they be because they were false and made with reckless disregard for the truth.

192.  Evidence of the falsity of President Cordano's defamatory statements regarding Kappa Gamma and misconduct on its part are reflected in her numerous evolving and conflicting statements from June 9, 2020 through July 16, 2020 as set hereinbefore set forth .

193.  As the aforesaid quoted statements demonstrate, an accusation that began with **"Members were identified wearing prohibited ceremonial robes that resemble Ku Klux Klan garb"** eventually shifted to an accusation that **"Recent photos posted on social media showed the group in the outfits again,"** which accusation then morphed into a lesser accusation of intent as opposed to an act that **"In early June 2020, new evidence emerged about the**

**Kappa Gamma student chapter's <u>intention to bring back</u> the use of robes in their meetings and ceremonies and this information became public"** which accusation then morphed into an even lesser accusation that there were ***"publicly disclosed plans to reintroduce the use of robes***.

194.  Even those of the above quoted statements of President Cordano which might at first appear to be exculpatory and non-defamatory of plaintiffs, are in fact defamatory.

195.  For example, when defendant Cordano claimed to be attempting to explain and clarify her statements about Kappa Gamma and its alumni members being the face of racism at Gallaudet University saying ***Kappa Gamma is not the sole culprit nor the face of systemic racism alone at Gallaudet but became a face*** [of racism], her use of the terminology 'is not the sole culprit or face of racism alone' simply amounted to yet another statement that Kappa Gamma and its alumni members are culprits and a face of systemic racism along with certain unidentified others.  President Cordano was therefore actually doubling down on her prior attacks on Kappa Gamma and its then current and alumni members.

196.  Similarly, President Cordano effectively branded Kappa Gamma and its alumni members racist or pro-racist when she said ***It is up to Kappa Gamma to become anti-racist.***

197.  The use of the word "They" when speaking of "the face of systemic racism"and when speaking of  "racist" behavior in Kappa Gamma's past clearly targeted the former student, now alumni, members of Kappa Gamma including the Plaintiffs herein in particular.

198.  The statements of defendant Cordano for which her employer, Gallaudet University and its board of trustees are liable, statements imputing to Plaintiffs support for Nazism, for the Ku Klux Klan, and for racism subjected each plaintiff herein to the hatred, contempt and ridicule of a considerable and respected class of their communities, the deaf community, the communities

46

in which they reside and the communities in which they worked and did business.

199.  The defendants Cordano, Gallaudet University and its Board of Trustees have subjected Plaintiffs to a double standard.  They are willing to overlook and/or forgive their institution's history of characterizing Deaf individuals as 'Deaf and Dumb' and 'Deaf Mutes' apparently because such terminology was acceptable at the time it was used, but refuse to accord the same perspective to Plaintiff's past use of the Bellamy salute and robes which were acceptable at the time they were used.

200.  President Cordano, Gallaudet University and its Board of Directors knew that the defamatory statements made by President Cordano while referring to Kappa Gamma as 'They' would cause those statements to be perceived as being directed against Kappa Gamma members and alumni, and they were indeed so perceived as is evidenced by the prompt adversity and harm to which such members, and plaintiffs herein in particular were subjected.

201.  Defendants Cordano, Gallaudet University and its Board of Trustees made and condoned the making of the defamatory statements knowing that they were false, with malice, and with a reckless disregard for the truth.

202.  On or about June 12, 2020 The Washington Post published in its print newspaper and its online publication articles pertaining to Gallaudet's suspension of Kappa Gamma.  In those articles the Washington Post made false, misleading and defamatory statements, express and implied about Kappa Gamma and its members and alumni members, and in particular the plaintiffs herein.

203.  The Post's articles also intended to and did portray Kappa Gamma members and alumni in a false light and did defame plaintiffs.

204.  The defamatory nature of The Post's June 12, 2020 article began with its sensationalized headline reading: "Gallaudet University suspends fraternity after anti-Semitic photo resurfaces." Without including the actual picture with the story, the Post then schemed to support its sensationalized headlined allegation of the fraternity having been suspended for "Anti-Semitic"activity, describing a 30 year old picture wherein then student members were depicted performing the Bellamy salute.

205.  In doing so, The Post knew full well that the suspension was not based on the 30 year old picture allegedly depicting anti-Semitic activity because in the article itself The Post reported that the suspension was reportedly due to "recent photos posted on social media" showing the group wearing robes again.

206.  As The Post well knew, the wearing of the robes, even if true, had no relation to "anti-semitic activity." Nevertheless, The Post, by its headline and its reference to an old picture having nothing to do with the suspension or alleged activity giving rise to the suspension, created the immediate impression that the fraternity and its members had engaged in anti-Semitic activity leading to the suspension.

207.  Having created the aforesaid false and defamatory impression, The Post subsequently added to its online publication of the story a "clarification" that the photo the suspension was reportedly based upon was a "new photo" as opposed to the 30 year old photo mentioned and described in the story and which had nothing to do with the suspension.  This clarification was "too little, too late" and meaningless since the story headlined with a false allegation of "anti-semitic activity" had already created the uproar that The Post had intended to create.

208.  The "clarification" that the photo the suspension was reportedly based upon was a

"new photo" as opposed to the 30 year old photo mentioned and described in the story was false because no new photo was disclosed, produced, identified, or published and upon information and belief no new photo exists. This clarification was yet another defamatory falsehood and the Post knew or should have known this.

209.  Within hours, if not minutes, of the publication of the story headlined with a false but sensational reference to anti-Semitic activity, The Post's story was spread all over the internet, was republished time and again by other news media including newspapers, internet news services, and television news reports.

210.  The Post's article was further false, misleading and defamatory in describing the robes that fraternity members were allegedly identified wearing as "ceremonial robes that resemble Ku Klux Klan garb."

211.  The Post's June 12th story however was based on a June 9th announcement by Gallaudet President Cordano which announcement made no statement or suggestion that the robes being referred to resembled "Ku Klux Klan" garb.

212.  The Post and its' reporter had never seen the Kappa Gamma robes nor a picture of them and therefore had no basis in fact to describe them as resembling Ku Klux Klan garb.

213.  No less sensational, false and defamatory was the statement in The Post's story that the Bellamy salute it referred to was an "apparent Nazi salute," when The Post knew or should have known in the exercise of proper journalistic practices that the salute was a Bellamy salute, which is not a "Nazi salute" nor an "apparent Nazi salute."

214.  The defamatory statements made in The Posts' article and in the Cordano/Gallaudet vlogs and announcements were not privileged, not could they be because they were false.

215.  The defamatory statements contained in The Post's article and in the Cordano/Gallaudet vlogs and announcements were intended to be and were understood by readers to be statements of fact and not statements of opinion.

216.  The defamatory statements contained in The Post's article and in the Cordano/Gallaudet vlogs and announcements were not non-actionable opinion because statements of opinion can be actionable if they imply a provably false fact and all the statements claimed herein to be defamatory implied false facts that the plaintiffs were each a face of racism in the community, that they were supporters of Nazis, Fascists, and White Supremacists.

217.  The defamatory statements contained in The Post's article and in the                \ Cordano/Gallaudet vlogs and announcements were not non-actionable opinion "because defendants did not reveal factual bases for their opinions and so did not invite readers to draw their own conclusions and/or because any purportedly factual bases which were disclosed were false.

218.  As to all defendants herein, it matters not that only Kappa Gamma was named and the Plaintiffs were not named in the defamatory statements because it was readily discernable to the reasonable readers and viewers who were intended expected recipients of these messages and statements that the plaintiffs herein were the individuals being referred to.  The subsequent immediate attacks upon them and sudden investigations of them confirmed this.  Likewise this was confirmed because their families, friends, neighbors, co-workers and the members of their Deaf Community promptly recognized that they were the individuals being referred to.

219.  Because the defamatory statements defamed Kappa Gamma, a prominent member of the Gallaudet Community and a prominent member of the Deaf Community and because Plaintiffs

50

herein were and are prominent members of the Gallaudet Community and the Deaf Community, the numerical size of the defamed Kappa Gamma's membership does not prevent Plaintiffs from proceeding herein upon the grounds that Kappa Gamma numerically is not a small group.

220.  Notwithstanding the numerical size of the Kappa Gamma membership, the Gallaudet Community, and the Deaf Community because a University is an intimate organization in which members are readily recognized and because the Kappa Gamma membership, the Gallaudet Community, and the Deaf Community are all intimate communities due to their shared Deaf Culture the numerical membership provision of group defamation does not bar this action.

## AS AND FOR A FIRST CAUSE OF ACTION
## ON BEHALF OF PLAINTIFF STEVEN FLORIO

### DEFAMATION.

221.  Plaintiff repeats and reiterates each and every allegation contained in the preceding paragraphs of this Complaint with the same force and effect as if more full set forth herein.

222.  Plaintiff Steven Florio is a graduate of Gallaudet University having attended starting in September and graduated in May, 1992.

223.  Plaintiff Florio was a student member of Kappa Gamma from April 1991 through May, 1992.

224.  Plaintiff Florio was a co-founder and the first director of the Kappa Gamma International chapter in New England in 2010.

225.  Plaintiff Florio's association with Kappa Gamma is such that he is well known and recognized as a student and alumnus member of Kappa Gamma and it is said of him "Steve Florio is Kappa Gamma."

226.  Plaintiff Florio was not in the 30 year old picture of Kappa Gamma members using the Bellamy Salute as he was not yet  a member of Kappa Gamma during that time.

227  Steven Florio is a prominent Gallaudet and Kappa Gamma alumnus and until the defamatory publications made by the defendants herein against Kappa Gamma were published in June, 2020, he enjoyed an excellent reputation in the deaf community, the Kappa Gamma Community, his home community, and among his friends and co-workers.

228.  Following his graduation from Gallaudet, Florio was employed as a Small Business Accountant from 1992 to 1993; he was thereafter employed by JP Morgan/Chase as an Accounting/Financial Specialist from 1993 to 2002.  Thereafter in 2002 he was appointed to be Executive Director of the Rhode Island Commission on the Deaf and Hard of Hearing from which employment continued until 2019.  In 2019 Florio was appointed by the Governor of Massachusetts to the position of Commissioner the Massachusetts Commission for the Deaf and Hard of Hearing.

229.  In addition to his impressive employment credentials Florio has obtained a MS Degree in leadership from North Eastern University and has attained specialized certificates from Villanova University and FEMA.

230.  Florio has an extensive history in working with and serving numerous organizations including Non-Profits and State Entities and Agencies.

231.  Florio's stellar reputation has earned him no less than 20 awards from 1998 to 2020.

232.  Shortly after he defamatory publications by defendants Corda no, Gallaudet and the Washington Post regarding Kappa Gamma on and after June 9, 2020 a Massachusetts state employee who saw such publications and knew of Florio's affiliation with Kappa Gamma made a

report to the Governor's Office regarding that affiliation and incorrectly reporting that Florio was

one of the individuals using the Bellamy Salute in the 30 year old picture.

233   As a result of the defamatory publications by the defendants, Florio was subjected to

numerous hours of interviews and investigations by two State agencies and was thereafter

terminated from his position as Commissioner of the Massachusetts Commission for the Deaf and

Hard of Hearing.

234.   Florio has since been unsuccessful in obtaining new employment as the news of his

affiliation with Kappa Gamma and the resulting rumors and allegations that he has participated in

Nazi and anti-Semitic activities as a Kappa Gamma member have seriously damaged his

reputation.  He was denied one position for which he was highly qualified due to this damage to

his reputation and his undeserved notoriety.  Despite multiple efforts to find employment he

remains unemployed and unemployable and is being compelled to depart his home state of

Massachusetts for Florida as another family member was able to secure employment there.

235.   Florio has sustained great economic loss and has developed emotional distress,

depression and sleeplessness as a result of the defendants' defamatory publications and his family

has suffered as well.

236.   The damage to Florio's reputation is such that it is unlikely he will find employment

in his field for he foreseeable future, and possibly not before he attains retirement age,

237.   The resulting loss of employment, loss of earnings, medical and emotional suffering

has caused and will continue to cause irreparable damage to Florio.

238.   Based on his age, experience, earnings history and abilities, and given the losses

other than earnings which he sustained Plaintiff Steven Florio has been damaged by the

defendants in the sum of Five Million Dollars.

**AS AND FOR A SECOND CAUSE OF ACTION**
**ON BEHALF OF PLAINTIFF PATRICK COSTELLO**

**DEFAMATION**

239.  Plaintiff repeats and reiterates each and every allegation contained in the preceding paragraphs of this Complaint with the same force and effect as if more full set forth herein.

240.  Plaintiff Patrick Costello is a graduate of Gallaudet University having entered in September, 1983 and graduated in May, 1989 with a BA Degree in Business.

241.  Plaintiff Costello was a student member of Kappa Gamma from February 1987 through May, 1989.  He was in the 31 year old picture that was used by the defendants to defame him.

242.  Plaintiff Costello has been a member of the Kappa Gamma alumni organization Kappa Gamma International from 1989 to date.

243.  Plaintiff Costello's association with Kappa Gamma is such that he is well known and recognized as a student and alumnus member of Kappa Gamma and it is said of him "Pat Costello is Kappa Gamma."

244  Plaintiff Costello continued with his post graduate education following receipt of his undergraduate degree by attending graduate school at Boston University where he obtained a Masters Degree in Deaf Education in 1997.  He then earned a ED.S Degree from Gallaudet University in 2002.

245.  Patrick Costello is a prominent Gallaudet and Kappa Gamma alumnus and until the defamatory publications made by the defendants herein against Kappa Gamma were published in

June, 2020, he enjoyed an excellent reputation in the deaf community, the Kappa Gamma Community, his home community, and among his friends and co-workers.

246.  Patrick Costello was employed by a deaf school, The Learning Center in Massachusetts for 23 years from 1996 to 2020, having held such positions as High School Teacher, Middle School Principal, Director of ASL Instruction and Director of the Deaf Cultural Center.

247.  As a result of the defamatory publications by the defendants, Costello was pressured to resign as word of the defamatory allegations published by the defendants Cordano, Gallaudet and The Post became common knowledge in the Deaf community and at the school where plaintiff was employed for 23 years.  The stellar reputation he had earned as an Educator and Administrator during his 23 years at The Learning Center was destroyed.

248.  Before his reputation was destroyed Plaintiff Costello was requested to work with other deaf schools as a consultant; was periodically requested by organizations to talk and give lectures at their events, did committee work with the MA Department of Education and had two articles in publication.

249.  Costello has since been unsuccessful in obtaining new employment as the news of his affiliation with Kappa Gamma and the resulting rumors and allegations that he has participated in Nazi and anti-Semitic activities as a Kappa Gamma member have seriously damaged his reputation.  Despite multiple efforts to obtain other employment he remains unemployed and unemployable to date.

250.  Costello  has sustained extreme financial loss and has developed emotional distress, shock, confusion, and sleeplessness as a result of the defendants' defamatory publications and his

family has suffered as well.

251.  The damage to Costello's reputation is such that it is unlikely he will find employment in his field for the foreseeable future, and possibly not before he attains retirement age,

252.  The resulting loss of employment, loss of earnings, medical and emotional suffering has caused and will continue to cause irreparable damage to Costello.

253.  Based on his age, experience, earnings history and abilities, and given the losses other than earnings which he sustained Plaintiff Patrick Costello has been damaged by the defendants in the sum of Five Million Dollars.

**AS AND FOR A THIRD CAUSE OF ACTION
ON BEHALF OF PLAINTIFF WILLIAM MILLIOS**

**DEFAMATION**

254.  Plaintiff repeats and reiterates each and every allegation contained in the preceding paragraphs of this Complaint with the same force and effect as if more full set forth herein.

255.  Plaintiff William Millios is a graduate of Gallaudet University having entered in January, 1984 and graduated in May, 1991 with a B.S. in Computer Science.

256.  Plaintiff Millios was a student member of Kappa Gamma from Spring, 1989 through May, 1991 and has remained an active alumnus member of Kappa Gamma International.  He also served as Fraternity Advisor to Kappa Gamma while employed at Gallaudet from 2003-2005.

257.  Plaintiff Millios' association with Kappa Gamma is such that he is well known and recognized as a student and alumnus member of Kappa Gamma and it is said of him "William Millios is Kappa Gamma."

258.  Plaintiff Millios continued with his post graduate education following receipt of his undergraduate degree by earning a M.A. Degree in Computer Science from George Washington University in 1994.  He has completed Ph.D course work in Computer Science at George Washington University from 1999 to 2005.

259.  William Millios is a prominent Gallaudet and Kappa Gamma alumnus and until the defamatory publications made by the defendants herein against Kappa Gamma were published in June, 2020, he enjoyed an excellent reputation in the deaf community, the Kappa Gamma Community, his home community, and among his friends and co-workers.

260.  William Millios was employed as a Systems Engineer and Software Developer at Bell Laboratories from 1991 to 1999.  From 1999 to 2006 he was an Assistant Professor of Mathematics and Computer Science at Gallaudet University. He subsequently served as Digital Media Director for USA Deaf Sports Federation from 2009-2013.  He is currently the owner of Bill Millios Photography from 2004 to the present.  He has worked for the Registry of Interpreters for the Deaf as a Communications Director from 2013-2017 and as Director of Communications and Outreach from 2017-2020.

261.  Due to his excellent communications skills and stellar reputation in the Deaf community Millios has served on the Boards of two schools for the Deaf and a Visual Arts and Education Center.

262.  As a result of the defamatory publications by the defendants, Millios lost his employment of 7 years with the Registry of Interpreters for the Deaf. Because the negative publicity generated by the defamatory publications of the defendants continues to persist, Millios has little hope of finding new gainful employment anytime in the foreseeable future, if ever.

263.  Plaintiff Millios has  has developed emotional distress and sleeplessness as a result of the defendants' defamatory publications and his family has suffered as well.  His two children are deaf and were traumatized when the Cordano announcement and Washington Post article were published and spread through the deaf community and the internet.

264.  The damage to Millios' reputation is such that he reasonably feels he will never obtain new employment. Despite multiple efforts to obtain other employment he remains unemployed and unemployable to date.

265.  The resulting loss of employment, loss of earnings, medical and emotional suffering has caused and will continue to cause irreparable damage to Millios.

266.  Based on his age, experience, earnings history and abilities, and given the losses other than earnings which he sustained Plaintiff William Millios has been damaged by the defendants in the sum of Three Million Dollars.

**AS AND FOR A FOURTH CAUSE OF ACTION**
**ON BEHALF OF PLAINTIFF TIMOTHY MALLACH**

**DEFAMATION**

267.  Plaintiff repeats and reiterates each and every allegation contained in the preceding paragraphs of this Complaint with the same force and effect as if more full set forth herein.

268.  Plaintiff Timothy Mallach attended Gallaudet University from August, 1986 through May, 1990.  He did not complete his education at Gallaudet.

269.  Plaintiff Mallach was a student member of Kappa Gamma from February 1990 through May 1990.

270.  Notwithstanding his short time as a student member of Kappa Gamma, Plaintiff

Mallach' association with Kappa Gamma is such that he is well known and recognized as a student and alumnus member of Kappa Gamma and it is said of him "Tim Mallach is Kappa Gamma."

271.  Plaintiff Mallach had been employed as a Resident Counselor at a school for the Deaf in Ontario, Canada for twenty years and worked as a Deaf Interpreter for 15 years.  His short time as a Gallaudet Student and Kappa Gamma member have now adversely affected his life and future.

272.  When the defamatory publications by the defendants became public and reached Canada, an individual who had been a substantial donor to his employer observed Tim Mallach's involvement and sent a threatening letter to his employer. In order to placate the donor the employer requested him to resign from his employment immediately.

273.   Plaintiff Mallach has been unable to find new employment due to the damage to his reputation.

274.  The damage to Mallach's reputation is such that he reasonably feels he will never obtain new employment.

275.  The resulting loss of employment, loss of earnings, and damage to his good name and reputation are such that Mallach will continue to suffer irreparable damage as a result of the defamation he was subjected to at the hands of the defendants.

276.  Based on his age, experience, earnings history and abilities, and given the losses than earnings which he sustained Plaintiff Timothy Mallach has been damaged by the defendants in the sum of Three Million Dollars.

**AS AND FOR A FIFTH CAUSE OF ACTION**

**ON BEHALF OF PLAINTIFF STEVEN FLORIO**

**DEFAMATION BY IMPLICATION**

277.  Plaintiff repeats and reiterates each and every allegation contained in the preceding paragraphs of this Complaint with the same force and effect as if more full set forth herein.

278.  Defendants herein jointly and severally published multiple false, misdealing, and defamatory statements about Plaintiff Florio as set forth in the preceding paragraphs.

279.  These false, misleading, and defamatory statements were published on the internet and in print and have been repeatedly published and republished in this district, domestically for the entire world to see and hear.

280.  These false, misleading and defamatory statements were published with malice as Defendants knew they were false and misleading and at a minimum acted with reckless disregard for the truth.

281.  These false, misleading, and defamatory statements created false and misleading implications that this Plaintiff is anti-Semitic and a supporter of Nazis, Fascists and White Supremacists and shares their beliefs.

282.  Plaintiff has been severely harmed and damaged by these false and misleading statements because they subject him to contempt, hatred, distrust, ridicule, and disgrace.

**AS AND FOR A SIXTH CAUSE OF ACTION**
**ON BEHALF OF PLAINTIFF PATRICK COSTELLO**
**DEFAMATION BY IMPLICATION**

283.  Plaintiff repeats and reiterates each and every allegation contained in the preceding paragraphs of this Complaint with the same force and effect as if more full set forth herein.

284.  Defendants herein jointly and severally published multiple false, misdealing, and defamatory statements about Plaintiff Costello as set forth in the preceding paragraphs.

285.  These false, misleading, and defamatory statements were published on the internet and in print and have been repeatedly published and republished in this district, domestically for th entire world to see and hear.

286.  These false, misleading and defamatory statements were published with malice as Defendants knew they were false and misleading and at a minimum acted with reckless disregard for the truth.

287.  These defamatory statements created false and misleading implications that this Plaintiff is anti-Semitic and a supporter of Nazis, Fascists and White Supremacists and shares their beliefs.

288.  Plaintiff has been severely harmed and damaged by these false and misleading statements because they subject him to contempt, hatred, distrust, ridicule, and disgrace.

## AS AND FOR A SEVENTH CAUSE OF ACTION
## ON BEHALF OF PLAINTIFF WILLIAM MILLIOS

### DEFAMATION BY IMPLICATION

289.  Plaintiff repeats and reiterates each and every allegation contained in the preceding paragraphs of this Complaint with the same force and effect as if more full set forth herein.

290.  Defendants herein jointly and severally published multiple false, misdealing, and defamatory statements about Plaintiff Millios as set forth in the preceding paragraphs.

291.  These false, misleading, and defamatory statements were published on the internet and in print and have been repeatedly published and republished in this district, domestically for

th entire world to see and hear.

292.  These false, misleading and defamatory statements were published with malice as Defendants knew they were false and misleading and at a minimum acted with reckless disregard for the truth.

293.  These defamatory statements created false and misleading implications that this Plaintiff is anti-Semitic and a supporter of Nazis, Fascists and White Supremacists and shares their beliefs.

294.  Plaintiff has been severely harmed and damaged by these false and misleading statements because they subject him to contempt, hatred, distrust, ridicule, and disgrace.

**AS AND FOR A EIGHTH CAUSE OF ACTION
ON BEHALF OF PLAINTIFF TIMOTHY MALLACH**

**DEFAMATION BY IMPLICATION**

295.  Plaintiff repeats and reiterates each and every allegation contained in the preceding paragraphs of this Complaint with the same force and effect as if more full set forth herein.

296.  Defendants herein jointly and severally published multiple false, misdealing, and defamatory statements about Plaintiff Mallach as set forth in the preceding paragraphs.

297.  These false, misleading, and defamatory statements were published on the internet and in print and have been repeatedly published and republished in this district, domestically for th entire world to see and hear.

298.  These false, misleading and defamatory statements were published with malice as Defendants knew they were false and misleading and at a minimum acted with reckless disregard for the truth.

299.  These defamatory statements created false and misleading implications that this Plaintiff is anti-Semitic and a supporter of Nazis, Fascists and White Supremacists and shares their beliefs.

300.  Plaintiff has been severely harmed and damaged by these false and misleading statements because they subject him to contempt, hatred, distrust, ridicule, and disgrace.

### AS AND FOR A NINTH CAUSE OF ACTION
### ON BEHALF OF PLAINTIFF STEVEN FLORIO

### FALSE LIGHT

301.  Plaintiff repeats and reiterates each and every allegation contained in the preceding paragraphs of this Complaint with the same force and effect as if more full set forth herein.

302.  Defendants herein jointly and severally knowingly made false statements, representations, or imputations, and misleading statements about Plaintiff Florio that he was and is anti-Semitic and a supporter of Nazis, Fascists and White Supremacists and shares their beliefs.

303.  These statements were all made in public and were forseeably published and disseminated through various media outlets to persons all across the world and were reasonably understood to be of and concerning plaintiff.

304.  These statements implying that Plaintiff was and is anti-Semitic and a supporter of Nazis, Fascists and White Supremacists and shares their beliefs placed plaintiff in a false light that would be offensive to a reasonable person.

305.  As a result, Plaintiff has suffered pecuniary damage as well as damage to reputation, impairment to standing in the communities, personal humiliation, pain suffering, emotional distress and physical ailments.

## AS AND FOR A TENTH CAUSE OF ACTION
## ON BEHALF OF PLAINTIFF PATRICK COSTELLO

### FALSE LIGHT

306.  Plaintiff repeats and reiterates each and every allegation contained in the preceding paragraphs of this Complaint with the same force and effect as if more full set forth herein.

307.  Defendants herein jointly and severally knowingly made false statements, representations, or imputations, and misleading statements about Plaintiff Costello that he was and is anti-Semitic and a supporter of Nazis, Fascists and White Supremacists and shares their beliefs.

308.  These statements were all made in public and were foreseeably published and disseminated through various media outlets to persons all across the world and were reasonably understood to be of and concerning plaintiff.

309.  These statements implying that Plaintiff was and is anti-Semitic and a supporter of Nazis, Fascists and White Supremacists and shares their beliefs placed plaintiff in a false light that would be offensive to a reasonable person.

310. As a result, Plaintiff has suffered pecuniary damage as well as damage to reputation, impairment to standing in the communities, personal humiliation, pain suffering, emotional distress and physical ailments.

## AS AND FOR A ELEVENTH CAUSE OF ACTION
## ON BEHALF OF PLAINTIFF WILLIAM MILLIOS

### FALSE LIGHT

311. Plaintiff repeats and reiterates each and every allegation contained in the preceding paragraphs of this Complaint with the same force and effect as if more full set forth herein.

312.  Defendants herein jointly and severally knowingly made false statements, representations, or imputations, and misleading statements about Plaintiff Millios that he was and is anti-Semitic and a supporter of Nazis, Fascists and White Supremacists and shares their beliefs.

313.  These statements were all made in public and were foreseeably published and disseminated through various media outlets to persons all across the world and were reasonably understood to be of and concerning plaintiff.

314.  These statements implying that Plaintiff was and is anti-Semitic and a supporter of Nazis, Fascists and White Supremacists and shares their beliefs placed plaintiff in a false light that would be offensive to a reasonable person.

315. As a result, Plaintiff has suffered pecuniary damage as well as damage to reputation, impairment to standing in the communities, personal humiliation, pain suffering, emotional distress and physical ailments.

AS AND FOR A TWELFTH CAUSE OF ACTION

ON BEHALF OF PLAINTIFF TIMOTHY MALLACH

FALSE LIGHT

316.  Plaintiff repeats and reiterates each and every allegation contained in the preceding paragraphs of this Complaint with the same force and effect as if more full set forth herein.

317.  Defendants herein jointly and severally knowingly made false statements, representations, or imputations, and misleading statements about Plaintiff Mallach that he was and is anti-Semitic and a supporter of Nazis, Fascists and White Supremacists and shares their beliefs.

318.  These statements were all made in public and were foreseeably published and disseminated through various media outlets to persons all across the world and were reasonably

understood to be of and concerning plaintiff.

319.  These statements implying that Plaintiff was and is anti-Semitic and a supporter of Nazis, Fascists and White Supremacists and shares their beliefs placed plaintiff in a false light that would be offensive to a reasonable person.

320. As a result, Plaintiff has suffered pecuniary damage as well as damage to reputation, impairment to standing in the communities, personal humiliation, pain suffering, emotional distress and physical ailments.

## JURY DEMAND

Plaintiffs demand trial by jury.

WHEREFORE Plaintiffs demand Judgment against the defendants jointly and severally in the following sums: Five Million Dollars on All Three Causes of Action in favor of Plaintiff Steven Florio, Five Million Dollars on All Three Causes of Action in favor of Plaintiff Patrick Costello, Three Million Dollars on All Three Causes of Action in favor of Plaintiff William Millios, and Three Million Dollars on All Three Causes of Action in favor of Plaintiff Timothy Mallach, all together with interest from June 9, 2020 and the costs, disbursements and attorneys fees incurred in the prosecution of this action.

Dated: Syosset, New York
     December 22, 2020                /s/ *Ralph G. Reiser*
                                      Ralph G. Reiser, Esq.
                                      Attorney for Plaintiffs
                                      3 Walnut Drive
                                      PO Box 171
                                      Syosset, NY 11791
                                      516-496-9745
                                      516-496-9754 (Fax)
                                      REISERLAW@AOL.COM