UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **STEVEN FLORIO**, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> **GALLAUDET UNIVERSITY**, *et al.*, <br><br> Defendants. | Case No. 21-cv-01565 (CRC) |

### MEMORANDUM OPINION

Two summers ago, Gallaudet University President Roberta Cordano suspended the school's chapter of the Kappa Gamma fraternity for violating a University policy banning the use of ceremonial hooded robes resembling those worn by some hate groups. Around the same time, a decades-old photograph resurfaced depicting a group of 34 chapter members performing something akin to a Nazi salute. Announcing the suspension—which coincided with the nationwide protests over the death of George Floyd—President Cordano remarked that Kappa Gamma had "become the face of systemic racism in our community, with photographs of the salute and use of robes being shared on social media." Cordano did not display any photos or mention any fraternity member by name. The Washington Post later reported on the suspension, quoting Cordano's comments. It, too, did not publish any photograph or name any individual Kappa Gamma member.

In this suit, four alumni members of Gallaudet's Kappa Gamma chapter have sued the University, its Board of Trustees, President Cordano, and the Washington Post for defamation, focusing on Cordano's statement that the fraternity was "the face of systemic racism" on campus and her and the Post's reference to the salute photograph. The defendants move to dismiss.

Because none of challenged statements concern the individual plaintiffs, and others are also either non-actionable statements of opinion or concededly true, the Court will grant the motion and dismiss the case.

## I. Background

Chartered in 1864, Gallaudet University has a storied history as the oldest college in the United States for students who are deaf and hard of hearing. Am. Compl. ¶¶ 5, 22, ECF No. 23. The four plaintiffs in this case are Gallaudet alumni Steven Florio, Patrick Costello, William Millios, and Timothy Mallach. All graduated between 1989 and 1992 and were members of Kappa Gamma, the University's oldest fraternity. Id. ¶¶ 70, 222–23, 240–41, 255–56, 269.

The plaintiffs stress that the fraternity has "stringent criteria for membership," including a minimum GPA and leadership requirements, and is highly regarded in the Deaf community. See Am. Compl. ¶¶ 103–05. Yet it has also come under controversy. Not unusual for fraternities, says the complaint, Kappa Gamma has certain traditions that include a salute and the donning of robes. Id. ¶ 71. The plaintiffs acknowledge that the fraternity's former salute, known as the "Bellamy salute," "ha[s] some similarities in appearance" to that used by "Italian Fascist[s] and German Nazis." Id. ¶ 74. While the Bellamy salute was used in America during the Pledge of Allegiance beginning in 1892, id. ¶ 73, the federal government enacted a law during World War II that "replaced [it] with the hand over heart" gesture used during the Pledge today. Id. ¶ 76. Supposedly because the Bellamy salute was not explicitly declared a symbol of Nazism, Kappa Gamma continued to perform the salute until the early 1990s. Id. ¶¶ 78–80, 83.

Enter the photograph from the late 1980s, depicting 34 Kappa Gamma members

performing the Bellamy salute.[1]  Am. Compl. ¶¶ 146–47, 151, 241; Pls. Opp'n-Gallaudet Mot. Dismiss Am. Compl. Ex. B (salute photograph), ECF No. 33-2.  Plaintiffs Costello and Millios appear in the photo.  Am. Compl. ¶¶ 146–47, 151, 241.  Florio and Mallach, who were not in the fraternity at the time, do not.  See id. ¶¶ 223, 226, 269; Pls. Opp'n-Gallaudet Mot. Dismiss Am. Compl. at 3, ECF No. 33 (Corrected Version).  The photograph first emerged on social media in 2016.  Am. Compl. ¶¶ 173–76.  When it surfaced, Kappa Gamma responded that "[t]he gestures shown are denounced, not practiced, nor accepted in any form by any recent or current administration.  These pictures go against our present-day standards of conduct for our members, pledges, and alumni."  Id. ¶ 175 (emphasis in complaint omitted).

Notwithstanding the fraternity's official comments, the photograph reappeared on social media four years later.  Am. Compl. ¶ 188.  The timing coincided with the death of George Floyd in May 2020 and the resulting nationwide protests for racial justice.  Id. ¶ 112.  As the amended complaint acknowledges, those events brought "the problem of systemic racism . . . to the forefront of the American psyche."  Id.  Also around the same time, information emerged regarding Kappa Gamma's apparent intent to bring back the ceremonial hooded robes that had been banned in 2015.  See id. ¶ 170.  That ban stemmed from concerns expressed by Gallaudet's student body government that the robes resembled "those used by hate groups."  Gallaudet Ex. 2 (2015 Robes Ban Announcement), ECF No. 25-2; see Am. Compl. ¶¶ 95–99.  The "new evidence" regarding Kappa Gamma's reintroduction of the robes prompted an investigation,

---

[1] The Washington Post's article dated the photograph from 1988, see Wash. Post Ex. F (online article), ECF No. 26-7; id. Ex. G (print article), ECF No. 26-8; however, the amended complaint alleges it was taken in 1989.  Am. Compl. ¶ 145.  Assuming plaintiff Millios is in the photo, 1989 would make more sense because he was not a Kappa Gamma member until that year.  Id. ¶ 256; Pls. Opp'n-Gallaudet Mot. Dismiss Am. Compl. at 3, ECF No. 33 (Corrected Version) (clarifying that Millios, and not Mallach, is in the photograph at issue).

which concluded that the fraternity violated the ban and resulted in the chapter's suspension from campus. See Am. Compl. ¶ 170.[2] All these events led to Gallaudet President Roberta Cordano's June 9, 2020 address on the suspension, which she delivered using American Sign Language (ASL) on Gallaudet's YouTube channel. Id. ¶ 124.

The plaintiffs mainly take offense with the following portion of President Cordano's remarks. Per the transcript of her ASL address, she said that she:

> became aware of new information that led to renewed demands for change with Kappa Gamma, a fraternity with a long history at Gallaudet. They have become the face of systemic racism in our community, with photographs of the salute and use of robes being shared on social media. This behavior is unacceptable. Gallaudet has now taken action to suspend Kappa Gamma on campus. We are in the process of reviewing other organizations and the status of their histories and their efforts to determine if further steps will need to be taken. As President, I am convening diverse leaders on campus to develop a plan to review and understand the role of fraternities and sororities at Gallaudet.

Am. Compl. ¶ 126. The plaintiffs allege, however, that there is a key difference in the actual ASL version of the address. They say Cordano signed, in relevant part, "Kappa Gamma, pictures being distributed on social media of their use of hooded robes and of the salute, they have become the face of systemic racism." Id. ¶ 125 & n.2; id. ¶ 127–29. The alleged implication is that the fraternity members in the salute photograph, including plaintiffs Costello and Millios, are the "faces of racism." Id. ¶ 129. President Cordano, the complaint continues, also did "her version of a Bellamy salute" that gave "the appearance [of] a Nazi salute." Id. ¶ 130. The complaint does not allege that either she or the University published the salute

---

[2] The Post article reported that President Cordano and University officials said that Kappa Gamma "members were identified wearing the prohibited ceremonial robes," apparently from other "recent photos posted on social media"; the article later adds that "members were caught wearing the robes." See Wash. Post Exs. F & G. But the complaint does not provide this detail. It instead asserts on "information and belief" that "there were in fact no new or recent photographs of current active or alumni members of Kappa Gamma wearing robes being shared on social media as of June 5, 2020." Am. Compl. ¶ 135; id. ¶¶ 120, 178.

photograph, or that she named the plaintiffs, or any particular Kappa Gamma member or alumni, in her address.

On June 12, 2020, the Washington Post published an article with the headline, "Gallaudet University suspends fraternity after anti-Semitic photo resurfaces." Wash. Post Ex. F, ECF No. 26-7 (online article); Am. Compl. ¶¶ 150, 240. The article recounts the controversy over the robes, before turning to the salute photograph. "That photo," the Post reported, "shows former members, including a current member of the school's board of trustees, performing an apparent Nazi salute. Th[is] older photo resurfaced around the same time members were caught wearing the robes. School officials denounced the salute but said it was not a factor in the suspension." Wash. Post Ex. F; Am. Compl. ¶¶ 144–46, 153. The article also quoted President Cordano's ASL address, including her statement that Kappa Gamma had become the "face of systemic racism" on campus. Wash. Post Ex. F; Am. Compl. ¶ 143. No version of the article includes any picture of or link to the salute photograph, nor did the article mention the plaintiffs.

A year later, a group of ten plaintiffs filed this lawsuit, asserting only defamation claims against Gallaudet University, its Board of Trustees, President Cordano, and the Post. See Compl., ECF No. 1. Six of the original group of plaintiffs have since voluntarily dismissed their claims, ECF Nos. 5 & 6, leaving Florio, Costello, Millios, and Mallach. The remaining plaintiffs allege that, because of President Cordano's statements and the Post's subsequent reporting, they were fired from their jobs and have suffered other monetary, emotional, and reputational harms—particularly in the Deaf community. See generally Am. Compl. ¶¶ 221–320. After the defendants filed initial motions to dismiss, the plaintiffs (with the defendants' consent) filed an amended complaint. See Am. Compl., ECF No. 23. The amended complaint adds claims for defamation, defamation by implication, and false light. The defendants' fresh motions to dismiss

5

that complaint are ripe for decision.

## II. Legal Standards

The defendants have moved to dismiss the amended complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). "To survive a motion to dismiss [under 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. A court "must treat the complaint's factual allegations as true and must grant plaintiff the benefit of all inferences that can be derived from the facts alleged." Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (cleaned up).

As to the Post's motion, it is worth noting that in a defamation case, even "at this stage, the article . . . speaks for itself." Croce v. N.Y. Times Co., 930 F.3d 787, 792 (6th Cir. 2019). And the article, President Cordano's statements, the accompanying transcript, and the salute photograph "are referred to in the complaint and are integral to [the plaintiffs'] claim[s]." Kaempe v. Myers, 367 F.3d 958, 965 (D.C. Cir. 2004). The Court may therefore consider these materials, which the parties also attach as exhibits to their motion papers. See id.

Because the Court is sitting in diversity, it applies the law of the forum, the District of Columbia. See Steorts v. Am. Airlines, Inc., 647 F.2d 194, 196–97 (D.C. Cir. 1981). It therefore must defer "to the published opinions of the D.C. Court of Appeals," though "of course, district courts also remain bound by the decisions of the D.C. Circuit." Deripaska v. Associated Press, Civ. A. No. 17-00913 (ESH), 2017 WL 8896059, at *1 (D.D.C. Oct. 17, 2017) (citations omitted).

### III. Analysis

The plaintiffs bring three claims—defamation, defamation by implication, and false light—but the analysis here is materially the same for each.

A defamation claim under D.C. law requires allegations:

> (1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm.

Close It! Title Servs., Inc. v. Nadel, 248 A.3d 132, 139 (D.C. 2021).  Because "[d]efamation by implication" is "an area of law 'fraught with subtle complexities,'" plaintiffs must make an "especially rigorous showing," Guilford Transp. Indus., Inc. v. Wilner, 760 A.2d 580, 596 (D.C. 2000) (citation omitted), in addition to the elements of defamation, that "the defendant *intends* or *endorses* the defamatory inference." Armstrong v. Thompson, 80 A.3d 177, 183–84 (D.C. 2013) (quoting White v. Fraternal Order of Police, 909 F.2d 512, 520 (D.C. Cir. 1990)).  And where, as here, "the plaintiff rests both his defamation and false light claims on the same allegations . . . the claims will be analyzed in the same manner." Close It!, 248 A.3d at 140 (omission in original) (quoting Blodgett v. Univ. Club, 930 A.2d 210, 222–23 (D.C. 2007)).

The Court will begin with the primary impediment to the plaintiffs' claims—the first, "concerning the plaintiffs" element.  It will then explain additional grounds warranting dismissal with respect to certain challenged statements.

#### A. None of the Challenged Statements Are "Concerning" the Plaintiffs

"Defamation is personal; allegations of defamation by an organization and its members are not interchangeable." Jankovic v. Int'l Crisis Grp., 494 F.3d 1080, 1089 (D.C. Cir. 2007) (cleaned up).  "[S]tatements which refer to an organization do not implicate its members." Id.

7

(citation omitted). "This principle" may not be "absolute," but it is largely dispositive in this case. See id.

Starting with plaintiffs Florio and Mallach, neither is named in any of the challenged statements, nor do they appear in the salute photograph referenced in some of the statements. The statements mention only Kappa Gamma as a whole. This implicates "the 'group defamation' doctrine." See Alexis v. District of Columbia, 77 F. Supp. 2d 35, 40 (D.D.C. 1999). Across various jurisdictions, including the District, courts have "narrowly construed" a "small-group exception" to generally require "no more than 20 or 30 members [ ] before they will hold that defamation of the group should be deemed to have particular application to a group member who is not named in the defamatory remarks." Id. at 41. These "rules of thumb have been followed in this Circuit" and easily dispose of Florio's and Mallach's claims. See id.

The plaintiffs concede that the fraternity "numerically is not a small group." See Am. Compl. ¶¶ 219–20. This makes sense—given its long history, Kappa Gamma surely has hundreds (if not thousands) of living alumni. Plainly, then, none of the challenged statements are "of and concerning" Florio or Mallach individually. See Close It!, 248 A.3d at 139–140. Their sole connection to the statements is that they were in Kappa Gamma; that does not "reasonably give rise to the conclusion that" the statements about the larger group make "*particular reference*" to them as former student members. See Alexis, 77 F. Supp. 2d at 40 (quoting Restatement (Second) of Torts § 564A (1977)) (emphasis added in Alexis). Florio's and Mallach's claims thus fail the threshold element of defamation. This problem cannot be fixed, so the Court will dismiss their claims with prejudice.

The plaintiffs themselves recognize that D.C. case law "support[s]" this application of the group-defamation doctrine. See Pls. Opp'n-Gallaudet at 14. In Fowler v. Curtis Publishing Co.,

8

182 F.2d 377 (D.C. Cir. 1950), for instance, the D.C. Circuit held that individual plaintiffs could not sue for defamatory comments directed at a group of 59 "taxicab drivers as a group." Id. at 378. The group in Service Parking Corp. v. Washington Times Co., 92 F.2d 502 (D.C. Cir. 1937) was even smaller—"ten or twelve" parking lot owners in downtown D.C. Id. at 503. Affirming a directed verdict for the defendant newspaper, the Circuit reasoned that "no language referr[ed] 'to some ascertained or ascertainable person[,]' [n]or is the downtown class [of parking lot owners] so small . . . as to cause defamation" of the individual owner plaintiff. Id. at 506; see also Steorts, 647 F.2d at 196 ("Prior to 1971, the federal courts in the District of Columbia were authoritative expositors of local . . . law").[3]

Unlike Florio and Mallach, Costello and Millios were among the 34 Kappa Gamma members in the salute photograph. See Pls. Opp'n-Gallaudet Ex. B (salute photograph). That figure comes much closer to a sufficiently small group to trigger the small-group exception to the group-defamation doctrine. Alexis, on which the defendants heavily rely, noted that the cases "do *not* establish a 'bright line'" rule, though "unnamed group members *generally* are not permitted to sue for group defamation if the group has more than 25 members." 77 F. Supp. 2d at 41 (emphasis added). To be sure, Service Parking involved a much smaller group, 92 F.2d at 503, 506 (ten or twelve), and the D.C. Circuit affirmed a directed verdict even though "someone reading the newspaper article there readily could have found out the identities of the few parking-lot owners the article disparaged." See Alexis, 77 F. Supp. 2d at 43. But it is not clear

---

[3] The plaintiffs' reliance on factors considered by courts outside this jurisdiction in applying the group-defamation doctrine is misplaced. See Pls. Opp'n-Gallaudet at 14–16 (citing New York and Oklahoma cases instructing courts to consider, for example, "the prominence of the group and its individual members"). This Court obviously is bound by D.C. law. But even if factors like "the prominence" of any individual plaintiff were relevant, the complaint's allegations that each individual plaintiff "*is* Kappa Gamma" are wholly speculative and conclusory. See Am. Compl. ¶¶ 225, 243, 257, 270 (emphasis added); id. ¶ 21.

how that case would have come out if there was "language referring 'to some ascertained or ascertainable person,'" Service Parking, 92 F.2d at 506 (citation omitted), or "evidence that the statement about the group had some particular application to the unnamed individual." Alexis, 77 F. Supp. 2d at 40.

This Court is hesitant to rest its ruling as to Costello and Millios on the proposition that, as a matter of law, 34 members is *always* too big of a group for unnamed individuals to sue for defamation in D.C. While the thrust of Service Parking suggests that 34 members may well be too large—if twelve members are too many, *a fortiori* 34 would be—the defendants have cited no local precedent that concretely establishes an absolute, per se numerical line beyond which unnamed group members are foreclosed from suing for defamation. And this Court has not located any such bright-line rule. Putting the size of the group aside, the underlying question remains whether the plaintiffs have alleged that the challenged statements "concerned" them— "that is, that a 'reasonable listener'" or reader "could think that [the defendants were] referring to [the plaintiffs] even though" President Cordano and the Post's article "never named [them]." See Browning v. Clinton, 292 F.3d 235, 247 (D.C. Cir. 2002). They have not.

No "reasonable listener" or reader "could conclude that the statement[s] referred to each member" in the salute photograph "or 'solely or especially' to" any individual in the photo, including Costello or Millios. See Browning, 292 F.3d at 248 (affirming grant of motion to dismiss as to defamation and false light claims). Reading the challenged "statements in context," Close It!, 248 A.3d at 139–40, President Cordano's address and the Post's article were about the suspension of *Kappa Gamma* generally, which in turn was based on "*new* information" and the controversy regarding the *recent* reappearance of the banned robes apparently worn by *current* student members. Am. Compl. ¶ 189(a), (d), (e), (f), (k), (*l*); id. ¶¶ 125–26. Although the

10

decades-old salute photograph is mentioned, that reference appears right alongside other references to "Kappa Gamma" as a group, the use of the robes—which involves additional (apparently current) student members, thus adding to the overall size of the group—and the word "they."  See id. ¶¶ 125–26; cf. N.Y. Times Co. v. Sullivan, 376 U.S. 254, 288–89 (1964) (rejecting argument that the word "They" could be reasonably read to refer to the individual plaintiff).  Moreover, these statements are followed by mentions of reviews of "other organizations" and "fraternities and sororities at Gallaudet" generally.  Am. Compl. ¶ 126.

In sum, the challenged statements are about Gallaudet's Kappa Gamma chapter as a whole, not about any one member.  The crux of the plaintiffs' complaint is that because the whole of Kappa Gamma was disparaged, even though no member current or former was mentioned, they themselves have a personal claim sounding in defamation.  But again, "no reasonable person would be able to infer that [the defendants were] accusing [Costello and Millios] of" being the face of systemic racism in the Gallaudet community.  See Browning, 292 F.3d at 247–48.  Indeed, no reasonable person could conclude that *any* of the challenged statements—in President Cordano's comments or in the Post's article—are about any of the plaintiffs as opposed to the broader fraternity chapter to which they belong.  Thus, Costello's and Millios's claims also fail the first element of defamation.

A final note on the purported "significant variations" between President Cordano's actual use of sign language and the transcript of her ASL address.  See Am. Compl. ¶ 125 n.2; id. ¶ 128.  To refresh, the plaintiffs allege that what Cordano actually signed was different than the transcript of her remarks; the suggestion is that she directly signed that the fraternity members in the photograph are the "faces of racism."  Id. ¶ 125 & n.2; id. ¶¶ 127–29.  While the Court accepts that "facial expressions and bodily gestures are highly relevant" for understanding ASL,

11

id. ¶ 125 n.2, and the plaintiffs' formulation of Cordano's message is slightly different than the transcript, the analysis under the group-defamation doctrine does not yield a different result. This version of the message still references both the hooded robes and the salute, thus increasing the size of the group, and the full context of the statements, noted above, is the same. It cannot be interpreted as specifically referring to a particular individual. But even if it could, for the reasons the Court will explain next, the plaintiffs still fail to state a claim.

    B.  <u>Other Grounds Warranting Dismissal</u>

Two other grounds warrant dismissal of the plaintiffs' claims. First, President Cordano's "face of systemic racism" remark constitutes non-actionable opinion. Second, as the plaintiffs concede, the Bellamy salute bears similarities to the salute adopted by the Nazis, so the salute-related statements are substantially true.

To begin, the main statement at issue is President Cordano's remark that Kappa Gamma has "become the face of systemic racism in our community, with photographs of the salute and use of robes being shared on social media." Am. Compl. ¶ 126. The Post article repeats this quote, accurately attributing it to President Cordano. See Wash. Post Exs. F & G.

"Whether [the defendants] made statements of 'fact' or of 'opinion' is a question of law for the court." <u>Sigal Constr. Corp. v. Stanbury</u>, 586 A.2d 1204, 1210 (D.C. 1991). In making that determination, the D.C. Court of Appeals has directed courts to:

> (1) "examine the allegedly defamatory words in the context of the entire document in which they appear"; (2) determine whether the statements "could be said to imply undisclosed defamatory facts"; (3) "consider whether the allegedly defamatory words are susceptible to proof of their truth or falsity"; and (4) "consider the context in which the document containing the allegedly defamatory reference is published."

<u>Id.</u> (quoting <u>Myers v. Plan Takoma, Inc.</u>, 472 A.2d 44, 47 (D.C. 1983) (per curiam)). Under the Supreme Court's decision in <u>Milkovich v. Lorain Journal Co.</u>, 497 U.S. 1 (1990), "statements of

opinion can be actionable if they imply a provably false fact, or rely upon stated facts that are provably false." Guilford, 760 A.2d at 597 (citation omitted). But "if it is plain that a speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, . . . the statement is not actionable." Id. (citation omitted).

President Cordano's "face of systemic racism" statement is an opinion; it is her "subjective view" or "interpretation" of the fallout from the reappearance of the salute photo on social media and the controversy over the robes. The phrase "face of" connotes an inherently subjective assessment and is the sort of "imaginative expression" and "rhetorical hyperbole" that typifies non-actionable opinion. See Milkovich, 497 U.S. at 20; Farah v. Esquire Mag., 736 F.3d 528, 539 (D.C. Cir. 2013) ("comments" that used "strong rhetoric and salty language" were non-actionable).

Yes, there are facts undergirding this opinion—that the salute photo was circulated and depicts Kappa Gamma members—but they are undisputed. "[W]hen," as here, a speaker "gives a statement of opinion that is based upon *true* facts that are revealed to readers or which are already known to readers, such opinions generally are not actionable." Farah, 736 F.3d at 539 (quoting Moldea v. N.Y. Times Co. ("Moldea I"), 15 F.3d 1137, 1144–45 (D.C. Cir. 1994)). That is because "the reader understands" such opinions as the speaker's "interpretation of the facts presented," so "the reader is free to draw his or her own conclusions." Id. So too here.[4]

---

[4] The closest potential implication of "undisclosed defamatory facts" that would render this statement actionable, Sigal Constr., 586 A.2d at 1211, is President Cordano's reference to "*new information* that led to renewed demands for change with Kappa Gamma." Am. Compl. ¶¶ 125–26 (emphasis added). But again, the "new information" relates to "renewed demands for change with *Kappa Gamma*" as a whole, not any individual plaintiff. Id. (emphasis added). Also, the "new information" seemingly includes the salute photograph's recent circulation—which, as mentioned, is a true fact—and/or the use of the robes. The use of the robes is a recent controversy concerning current Kappa Gamma members—again, unrelated to the individual

Numerous other courts have found similar commentary on racism or bigotry to be non-actionable opinion. See, e.g., McCaskill v. Gallaudet Univ., 36 F. Supp. 3d 145, 158–60 (D.D.C. 2014) ("[N]o decision has found statements claiming that a person is anti-gay or homophobic to be actionable defamation.") (collecting cases); Brimelow v. N.Y. Times Co., No. 20 Civ. 222 (KPF), 2020 WL 7405261, at *9 (S.D.N.Y. Dec. 16, 2020) (holding that the "characterization of some individuals . . . as 'white nationalists' is . . . non-actionable opinion commentary"); Smith v. Sch. Dist. of Phila., 112 F. Supp. 2d 417, 429 (E.D. Pa. 2000) (statements that plaintiff was "racist and anti-Semitic" were "non-fact based rhetoric"); Skidmore v. Gilbert, No. 20-cv-06415, 2022 WL 464177, at *9 (N.D. Cal. Feb. 15, 2022) (collecting cases from "multiple courts" holding "that a term like 'racist' . . . is not actionable under defamation-type claims."), appeal docketed, No. 22-15394 (9th Cir. Mar. 16, 2022); Ward v. Zelikovsky, 643 A.2d 972, 980 (N.J. 1994) ("Most courts that have considered whether allegations of racism, ethnic hatred or bigotry are defamatory have concluded for a variety of reasons that they are not."). If statements that someone is a racist are susceptible to multiple meanings and different interpretations such that they are non-actionable opinion, then the phrase "face of systemic racism," as used by President Cordano and quoted by the Post, fits even more squarely into that category.

Next, the Court will address two other challenged statements that appear in the Post article that both do not concern the plaintiffs and are not actionable on additional grounds. The first is the article's opening line: "Gallaudet University's oldest fraternity has been suspended from campus after members were identified wearing prohibited ceremonial robes that resemble Ku Klux Klan garb, officials said"; the second is the description of the salute photograph as

---

plaintiffs. And the "new information" statement is not in the Post article, so it is irrelevant to the Post's motion.

showing former fraternity members "performing an apparent Nazi salute." See Wash. Post Exs. F & G. Words like "resemble" and "apparent," while accurately reporting statements made by University officials and attributing those statements to them, id., "qualify as language of 'apparency,'" which militates in favor of treating these statements as opinion. See Ollman v. Evans, 750 F.2d 970, 985–86 n.31 (D.C. Cir. 1984) (en banc); Bauman v. Butowsky, 377 F. Supp. 3d 1, 11 (D.D.C. 2019) (same for "cautionary language").

Moreover, the complaint concedes that the "apparent Nazi salute" statement is substantially true, which defeats any claim of defamation. See Armstrong, 80 A.3d at 183–84 ("[S]ubstantial truth" is "a defense to defamation."). Specifically, the plaintiffs acknowledge that the salute adopted by Fascists and Nazis in the 1920s and 1930s "ha[s] some similarities in appearance to the Bellamy salute" performed by Kappa Gamma. Am. Compl. ¶ 74; id. ¶ 130 (alleging that President Cordano's "version of [the] Bellamy salute" gave "the appearance [of] a Nazi salute."). There is no material difference between that conceded description and The Post calling the salute an "apparent Nazi salute." The statements do not say that the salute was an actual Nazi salute. The plaintiffs' admission thus provides another ground for dismissal.[5]

\* \* \*

The plaintiffs' claims rest on President Cordano's address on the suspension of Kappa Gamma and the Post article. Assessing those statements, the Court concludes that they do not

---

[5] Similar logic may well apply to the plaintiffs' allegations on the robes, but the Court does not reach that issue at the motion to dismiss stage. The amended complaint acknowledges that "Kappa Gamma supported, accepted and respected" the ban on robes, Am. Compl. ¶ 100, which was based on the robes' similarity "to those used by hate groups," Gallaudet Ex. 2, such that their use was viewed as "no longer acceptable." See Am. Compl. ¶¶ 97–100. But, unlike with the salute, the plaintiffs do not make as clear of a concession on the robes' similarity to those worn by hate groups. Accordingly, the Court cannot say at this stage whether statements about the robes are substantially true. The core problem on the statements concerning the robes is, again, that they do not concern the plaintiffs individually.

concern the plaintiffs, and certain other statements that are the focus of the plaintiffs' challenge suffer from additional legal defects that cannot be corrected. "Therefore, dismissal with prejudice is appropriate." See Abbas v. Foreign Policy Grp., LLC, 783 F.3d 1328, 1340 (D.C. Cir. 2015) (affirming dismissal with prejudice of a complaint that "relie[d] exclusively on two questions in one article" that the court held were not "false and defamatory statements under D.C. law.").

### IV. Conclusion

For these reasons, the Court will grant the motions to dismiss and dismiss this case with prejudice. A separate Order accompanies this opinion.

CHRISTOPHER R. COOPER
United States District Judge

Date: July 15, 2022